## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL, INC.; and ANIMAL WELFARE INSTITUTE, | Case No. 26-cv-02998 |
| *Plaintiffs*, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; | |
| EUGENIO PIÑEIRO SOLER, in his official capacity as the ASSISTANT ADMINISTRATOR for NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES; | |
| HOWARD LUTNICK, in his official capacity as the SECRETARY OF COMMERCE; | |
| SCOTT BESSENT, in his official capacity as the SECRETARY OF THE TREASURY; | |
| and | |
| MARKWAYNE MULLIN, in his official capacity as the SECRETARY OF HOMELAND SECURITY, | |
| *Defendants.* | |

## INTRODUCTION

1.      Bycatch occurs when marine mammals become entangled or hooked in fishing gear. Bycatch is the most significant threat to marine mammals worldwide, killing an estimated 650,000 whales, dolphins, porpoises, and other marine mammals each year, though that estimate

is likely low. In addition to causing suffering to individual animals, bycatch has caused severe declines and even extinction of marine mammal populations.

2. Congress enacted the Marine Mammal Protection Act of 1972 (MMPA) to combat the threat of bycatch from commercial fisheries and to protect marine mammals from human activities. The MMPA is designed not only to reduce deadly marine mammal bycatch within U.S. fisheries toward zero but also to put economic pressure on foreign fisheries that export their products to the United States to do the same as a prerequisite to accessing the U.S. seafood market. The MMPA's foreign fisheries framework is intended to address a global problem using the tools available to the United States, driving greater protection for dolphins, porpoises, seals, sea lions, whales, and other marine mammal species worldwide, while safeguarding domestic commercial fishers from unfair competition.

3. To achieve that goal, the MMPA requires the federal government to ban seafood imports from foreign fisheries that harm or kill marine mammals in excess of what would be allowed in the United States. If a foreign nation does not provide "reasonable proof" that its export fisheries meet U.S. standards for protecting marine mammals from harm in the course of commercial fishing operations, then Federal Defendants "shall" ban imports from those fisheries. 16 U.S.C. § 1371(a)(2) (collectively, the Import Provisions). This case challenges Federal Defendants' authorization of imports from a number of foreign fisheries that do not meet U.S. standards under the Import Provisions.

4. On September 2, 2025, the National Marine Fisheries Service (NMFS) published determinations on whether approximately 2,500 fisheries across 135 nations meet standards comparable to U.S. fisheries. NMFS determined that approximately 2,286 of those fisheries meet the standard and, thus, may continue exporting seafood to the United States.

5.      However, a number of NMFS's findings are arbitrary and capricious and contrary to law. As a result, NMFS is unlawfully authorizing—and Federal Defendants have failed to ban—imports from fisheries that catch and kill marine mammals in excess of U.S. standards.

6.      NMFS's findings for fisheries in Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu (collectively, the Comparability Findings) are based on incorrect assumptions, flawed and inadequate evidence, and other logical and factual errors. Moreover, NMFS failed to correctly evaluate the fisheries against all statutorily and regulatorily required standards that are a legal prerequisite for finding comparability.

7.      For example, Vanuatu's tuna fishery operates in high-seas waters alongside U.S. vessels, but it fails to use the same special hooks required for U.S. fishers to reduce bycatch of false killer whales. Argentina's fisheries are catching the vulnerable franciscana dolphin at rates exceeding what would be permitted under U.S. standards, causing the population to decline. Bycatch rates of gray seals and harbor porpoises in Norway's fisheries are similarly exceeding what would be permitted under applicable U.S. standards and causing population declines.

8.      For some fisheries, it is impossible to even determine that bycatch rates are within applicable U.S. limits because the nations do not effectively monitor their fisheries to obtain reliable bycatch estimates. In Ecuador, India, and Tunisia, some fisheries have no monitoring at all. Many nations also fail to conduct stock assessments for marine mammal populations, which are critical to estimate marine mammal population abundance levels and determine whether bycatch levels are remaining below applicable thresholds. The MMPA does not allow such a hear-no-evil, see-no-evil approach.

9.      Ultimately, NMFS failed to insist on, and these nations did not provide, reasonable proof of the effects their fisheries have on marine mammals. NMFS therefore did not

3

and could not rationally conclude that these nations' fisheries do not kill or seriously injure marine mammals in excess of U.S. standards. The agency's determinations violate the MMPA and Administrative Procedure Act (APA).

10.     Federal Defendants are obligated to ban imports from these fisheries absent valid comparability findings. They have unlawfully failed to do so.

11.     Accordingly, Plaintiffs ask the Court to: declare that the Comparability Findings for Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu are arbitrary and capricious and contrary to law, in violation of the MMPA and APA; declare that Federal Defendants have unlawfully failed to ban imports from certain fisheries in those nations; vacate and remand the Comparability Findings with respect to those fisheries; and order Federal Defendants to promptly implement a ban on imports from those fisheries.

## JURISDICTION AND VENUE

12.     This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C) and (D) because Plaintiffs challenge actions by the United States government arising out of a law providing for embargoes "on the importation of merchandise for reasons other than the protection of the public health or safety" and the "administration and enforcement" of such embargoes. These final agency actions are reviewable under the APA. 5 U.S.C. § 704.

13.     Congress has waived sovereign immunity over this action under 28 U.S.C. § 1581(i)(1)(C) and (D).

14.     This Court may grant the relief requested pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a 501(c)(3) nonprofit corporation with over 93,000 active members from within the United States and

4

abroad. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats. Through its Oceans and International programs, the Center has worked for years to protect marine mammals around the world's oceans that are threatened by unsustainable or harmful fishing practices, including through advocacy, litigation, and participation as appointed members of six MMPA-mandated Take Reduction Teams. The Center has been actively involved in implementation of the MMPA Import Provisions for nearly two decades. The Center filed an APA rulemaking petition in 2008, requesting that NMFS implement the MMPA Import Provisions and subsequently filed litigation to: 1) compel NMFS to issue implementing regulations for the MMPA Import Provisions, 2) compel a ban on imports from Mexican fisheries that bycatch critically endangered vaquita, and 3) compel NMFS to implement the Import Provisions for all fisheries that export to the United States.

16.    Center members regularly use coastal areas and marine waters to view and study marine wildlife, including in Argentina, Ecuador, Norway, Tunisia, and Taiwan, as well as in other nations throughout the world where bycatch impacts marine mammals. Center members derive recreational, conservation, aesthetic, and other benefits from seeing marine mammals in the wild.

17.    For example, one Center member, Mr. Brett Hartl, is an avid wildlife watcher who regularly travels to nations around the globe to view wildlife, particularly marine mammals. In summer of 2026, Mr. Hartl has booked a trip to Europe in which he will visit both Italy and Norway. While in Italy, he will visit the Mediterranean coast and will take a ferry to Corsica and will be looking for and attempting to photograph marine mammals, including several populations that face entanglement risk in Tunisian fisheries. In Norway, he will be traveling along the coast

to Tromsø, Vardø, Svalbard, and south of Oslo and will be looking for marine mammals including harbor porpoises and gray seals. Mr. Hartl also has concrete plans to visit Buenos Aires and the Rio de la Plata area in Argentina in 2027. He visited the same region in 2023 and unsuccessfully attempted to view an imperiled franciscana dolphin. He plans to hire a guide boat on his next trip to increase his chances of viewing the species, as well as other marine mammals.

18.     Another Center member, Ms. Scout Coberg, travels to Argentina to visit family every other year and has concrete plans to return to Buenos Aires in December 2026 for a two-week trip. Ms. Coberg will visit the coast as she usually does on these trips and will attempt to view marine mammals, including the imperiled franciscana dolphin, which is gravely threatened by bycatch in Argentinian fisheries.

19.     Ms. Anna Sophia is another Center member and diver who deeply enjoys visiting and viewing marine animals, including marine mammals. Ms. Sophia has booked a trip in summer of 2027 during the eclipse to visit Tunisia. She will visit an island off the coast of Tunisia and plans to dive, swim, snorkel, and look for whales and dolphins, including common bottlenose dolphins, that may become entangled in Tunisian fisheries.

20.     Dr. Alex Hearn, another Center member, teaches zoology at a university in Ecuador and has been named a National Geographic Explorer for his marine research. He regularly visits coastal Ecuador to conduct research, teach field classes, and for pleasure. He visits the mainland coast of Ecuador, including near Manta and the Gulf of Guayaquil, typically three to four times a year and often leads an annual field trip to Puerto Lopez. He looks for and often sees dolphins and whales on these trips. Additionally, for 12 to 16 weeks each year, Dr. Hearn visits the Galapagos Islands for research and to teach a course, regularly observing marine

mammals, including bottlenose dolphins, pilot whales, Bryde's whales, and other species at risk of entanglement in Ecuador's fisheries.

21. Jean Su is another member of the Center; she has lived in Taiwan in the past and now visits regularly—at least once a year. During her next visit in August 2026, she plans to visit the west coast of Taiwan in hopes of spotting endangered Taiwanese humpback dolphins, finless porpoises, bottlenose dolphins, short-finned pilot whales, and Indo-Pacific bottlenosed dolphins. She also plans to go on a whale watching excursion on the east coast of Taiwan to look for cetaceans such as Bryde's whales, sperm whales, false killer whales, Risso's dolphins, spinner dolphins, striped dolphins, pantropical spotted dolphins, Fraser's dolphins, melon-headed whales, and beaked whales.

22. The ability of the Center's members to pursue these interests hinges on the well-being of franciscana dolphins, gray seals, harbor porpoise, bottlenose dolphins, and other marine mammals and on the health of the marine ecosystems on which the species depend. Bycatch by Argentina, Ecuador, Norway, Tunisia, Taiwan, and Vanuatu in gillnet, longline, and trawl fisheries harms the marine wildlife species that Center members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild.

23. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. (NRDC) is a not-for-profit, tax-exempt membership organization with hundreds of thousands of members and online activists nationwide. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has worked for more than 30 years to implement and enforce the MMPA and to protect marine mammals in the United States and around the world. NRDC advocates, litigates, participates in Take Reduction Teams authorized by the MMPA to reduce bycatch for at risk stocks, and helps develop policy to reduce

marine mammal mortality and serious injury from commercial fisheries. NRDC has been actively involved in implementation of the MMPA Import Provisions for more than a decade. NRDC has filed litigation to 1) compel NMFS to issue implementing regulations for the MMPA Import Provisions, 2) compel a ban on imports from Mexican fisheries that cause bycatch of critically endangered vaquita, and 3) compel NMFS to implement the Import Provisions for all fisheries that export to the United States. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by bycatch in fisheries covered by the challenged Comparability Findings.

24.    NRDC members live near and regularly travel to locations including the Indian Ocean, Northeast Atlantic, the convergence of the South China Sea and the East China Sea, and the Pacific Ocean where they delight in looking for and seeing marine mammals. They plan to continue visiting these regions and hope to observe marine mammals in the future. NRDC members derive recreational, conservation, aesthetic, and other benefits from seeing marine mammals in the wild.

25.    For example, one NRDC member, Nicola Hodgins, is a marine biologist and dolphin researcher, who studies and enjoys seeing marine mammals in the United Kingdom. She lives on the coast of a Scottish island where she sees wildlife, including marine mammals, on a daily basis, which she values for the impact it has on her mental health, physical health, and quality of life. Ms. Hodgins goes to Tiumpan Head on the Isle of Lewis in Scotland every day to look for marine mammals and also crews for a whale watching company operating out of Stornoway harbor, where it is possible to see any of the United Kingdom's marine mammal species that inhabit the Northeast Atlantic.

26.    Another NRDC member, Rebecca Allen, also lives in the United Kingdom and regularly sees marine mammals, including common dolphins and harbor porpoises off the coast of the Cornwall area of England. Ms. Allen works for the Cornwall Wildlife Trust and sees living and dead marine life, including marine mammals, while overseeing the Trust's Marine Stranding Network and when training community members to monitor abundance and distribution of marine megafauna, including marine mammals, around the Cornish coast for the Trust's Seaquest Southwest project. She has had many memorable experiences observing marine mammals, which she considers amazing and priceless, and will continue her work into the foreseeable future.

27.    Another NRDC member, Roshan Balasubramanian, lives in Chennai, India, and is an avid diver. He has diving certifications from the Professional Association of Diving Instructors and Technical Diving International and has spent more than 500 hours underwater while diving. He has dived at most of the sites between Chennai and Puducherry, covering an approximately 95-mile stretch of India's East Coast. In addition to diving, Mr. Balasubramanian surfs, bodyboards, free dives, or swims in the sea almost every weekend. When doing these activities, he loves seeing marine mammals in their natural environment and believes that it significantly contributes to his happiness and quality of life. Mr. Balasubramanian has concrete plans to continue his local, weekly ocean activities and to make multiple dives in 2026 and beyond, having just completed a diving trip to the Andaman and Nicobar Islands in March. When he does these activities, he intends to look for the marine mammal species that make Indian waters their home.

28.    Ms. Chiawen Kuo, another NRDC member, is a wildlife conservation practitioner in Taiwan, where she works for the Wild at Heart Legal Defense Association. She finds comfort

when going into nature and, as part of her work, she regularly sees dolphins every two to three months, including Taiwanese humpback dolphins, common bottlenose dolphins, and Indo-Pacific bottlenose dolphins. On a yearly basis she visits the east coast of Taiwan for a whale watching excursion where she sees a variety of cetaceans, including spinner dolphins, Fraser's dolphins, and Risso's dolphins. Ms. Kuo is always happy to see dolphins but also is saddened by the difficulties they face.

29.    Another NRDC member, Mr. Doug Perrine, is a photojournalist living in Hawai'i who has spent his career photographing and writing about nature, with a particular specialty in marine wildlife. Mr. Perrine is regularly on the water both around Hawai'i and in other parts of the globe, photographing and learning about marine species. He has seen false killer whales around two dozen times and intends to continue regularly looking for and photographing false killer whales in the future, as he has in the past.

30.    The ability of NRDC's members to pursue these interests hinges on the well-being of the above-listed and other marine mammals, and on the health of the marine ecosystems on which the species depend. Bycatch by gillnet, longline, trawl, pot and trap, purse seine, and other fisheries in India, Taiwan, the United Kingdom, Vanuatu, and on the high seas harms the marine wildlife species that NRDC members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild.

31.    Plaintiff ANIMAL WELFARE INSTITUTE (AWI) is a nonprofit organization with more than 160,000 members and supporters. Since its founding in 1951, AWI's mission has been to alleviate human-inflicted animal suffering and exploitation by vigorously defending animals' interests through advocacy, research, education and engagement with key stakeholders. AWI engages policymakers, scientists, industry professionals, non-governmental organizations,

and the public in fulfilling its mission. AWI advocates for the protection and welfare of marine wildlife, including marine mammals, in the United States and throughout the world. AWI promotes increased protections of marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI regularly prepares and issues fact sheets, peer-reviewed and policy papers, and news alerts to educate its members and online activists about marine wildlife and the threats they face; monitors legislation and research activities that may affect the well-being of marine mammals; and briefs members of Congress and their staff about agency actions, legislation, international developments, and other activities that bear on these issues. AWI has worked for many years, through a variety of advocacy efforts (including the 2024 litigation to compel NMFS to comply with the Import Provisions), to protect marine mammals from bycatch. AWI has been a member of the International Whaling Commission Bycatch Mitigation Initiative Standing Working Group (IWC BMI SWG) since its inception in 2016. The IWC BMI SWG aims to help prevent bycatch by developing, assessing and promoting effective bycatch prevention and mitigation measures worldwide.

32.    AWI members strongly desire increased protections for imperiled marine wildlife to increase the likelihood of species recovery. AWI members purchase and consume or seek to purchase and consume fish that has been caught with minimal impacts to marine mammals. And AWI members live in or regularly travel to the coasts of countries such as Norway and Taiwan, where they delight in the continued existence of marine mammals, advocate for imperiled species of marine mammals, and have specific plans to return in hopes of observing marine mammals in their natural habitat. AWI members derive recreational, conservation, aesthetic, and other benefits from seeing marine mammals in the wild.

33.     For example, one AWI member, Marius Røising, lives in Oslo, Norway and recreates out on the water in the Oslofjord, kayaking there regularly, and going out on a motorized boat with friends at least once a summer. Whether he is in a kayak or in a larger boat, he always looks for and enjoys seeing various marine mammals. In the past he has seen harbor seals and harbor porpoises. He plans to go out on the water to engage in these activities again this summer, and will continue to look for a variety of marine mammals.

34.     Another AWI member, Maria Lien, lives in Norway and enjoys spending time on the water observing marine mammals in their natural environment. Trips along the Norwegian coast, in areas such as the Vega Islands and Andenes in the north, Runde on the west coast, Tromøy in the south, and the Oslofjord have allowed her to observe several species of marine mammals in the wild, such as harbor seals, sperm whales, and beluga. She goes out on the water at least once a summer, and looks for marine mammals like whales, seals, dolphins, and porpoises, every time. She will be going out on the water again this summer and hopes to see more sperm whales as well as killer whales, humpback whales, harbor porpoises, and other marine mammals. Knowing that marine mammal bycatch in Norwegian fisheries is a problem makes her sad and disappointed.

35.     Another AWI member, Robin Winkler, is the founder of the nonprofit public interest environmental and social justice organization Wild at Heart Legal Defense Association, Taiwan. Over the last 48 years, he has frequently visited Taiwan's coastal areas, has been out to sea to view marine mammals dozens of times, and plans to continue to engage in such activities long into the future. He is an advocate for Taiwan's wildlife, including the endangered Taiwanese humpback dolphin. At least two to three times a year, he goes out on the water to observe marine wildlife, often looking for members of populations like the Taiwanese humpback

12

dolphin, finless porpoises, and Indo-Pacific bottlenose dolphins, among others. These excursions include those organized by Wild at Heart, which organizes field visits in association with other public interest groups and the Taiwan Coast Guard.

36.    The ability of AWI's members to pursue these interests hinges on the well-being of harbor seals, harbor porpoises, Indo-Pacific bottlenose dolphins, Taiwanese humpback dolphins, finless porpoises, sperm whales, and other marine mammals and on the health of the marine ecosystems on which the species depend. Bycatch in gillnet/set net, purse seine, stow net, bottom trawl/demersal, longline/demersal fisheries, and demersal pot and trap fisheries in Norway and Taiwan harms the marine wildlife species that AWI members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild.

37.    Federal Defendants' failure to comply with the MMPA and APA has caused and is causing Plaintiffs' members substantive and procedural harms connected to their conservation, recreational, spiritual, scientific, and aesthetic interests. All fisheries challenged in this litigation interact with marine mammal populations that Plaintiffs' and their members have an interest in viewing, studying, and enjoying. Those fisheries export seafood to the United States. Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu all applied to continue exporting seafood to the United States by submitting an application under the MMPA Imports Rule. Relying on NMFS's Comparability Findings for these fisheries, the United States continues to import seafood from these fisheries even though the relevant exporting nations have not demonstrated they have implemented regulatory programs for these fisheries that are comparable to U.S. standards. The United States is a significant market for these fisheries. Congressional findings, NMFS's findings and actions to implement import bans, nations' responses to past import bans, and evidence specific to these fisheries and nations demonstrate

13

that a properly imposed import ban under the MMPA is likely to induce exporting nations to take actions that reduce marine mammal bycatch risk to maintain access to U.S. markets.

38.     For example, Grenada, New Caledonia, and Ireland have fisheries that were denied comparability findings in September 2025. Each nation has since implemented corrective measures, reapplied for comparability findings, and been granted comparability findings. 91 Fed. Reg. 12510 (Mar. 16, 2026).

a.  Since its September 2025 comparability finding denial, Grenada passed new regulations prohibiting the intentional killing of marine mammals, implementing a monitoring program, and requiring reporting of marine mammal bycatch.

b.  New Caledonia was denied a comparability finding because it "did not prohibit the intentional killing or serious injury of marine mammals in the course of commercial fishing operations." Just over a month after that denial, New Caledonia adopted new legislation to address this issue.

c.  Ireland was denied a comparability finding for certain fisheries because it allowed for the intentional killing of seals. As noted in its March 2026 comparability finding, following the denial, the Irish government prepared a Ministerial attestation that it will no longer issue permits to allow the lethal removal of seals in any of its fisheries "because such authorizations would be incompatible with the import requirements under the U.S.," and noted "its commitment to ensuring that its fisheries management framework remains fully compatible with international obligations and requirements applicable to the export of fisheries products to the United States."

39.     In preparation for the implementation of the MMPA Import Provisions, in 2021, the United Kingdom began to include a condition with fishing vessel licenses requiring vessels to

report interactions that may have caused or contributed to marine mammal injury or death within 48 hours of the end of a fishing trip. The government of the United Kingdom included this additional license requirement in order "[t]o continue to export fisheries products to the United States." *Guidance, Marine Mammal Reporting Requirements*, GOV.UK (Jan. 30, 2025), https://www.gov.uk/guidance/marine-mammal-reporting-requirements.

40.    The interests of Plaintiffs, their members, and supporters have been, are being, and will be adversely affected by Federal Defendants' violations of federal law, as described herein. These harms can only be remedied if the Court orders Federal Defendants to comply with the MMPA and APA. Plaintiffs have no other adequate remedy at law.

41.    Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce with responsibility for administering and implementing the Secretary of Commerce's duties under the MMPA Import Provisions. The MMPA and its implementing regulations charge the Secretary of Commerce with determining whether fish from an exporting nation have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of marine mammals in excess of U.S. standards. The Secretary has delegated that responsibility to NMFS.

42.    Defendant EUGENIO PIÑEIRO SOLER is sued in his official capacity as the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries. The Assistant Administrator is responsible for implementing and fulfilling NMFS's duties under the MMPA.

43.    Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce. The Secretary of Commerce is responsible for implementing and fulfilling the Department of Commerce's duties under the MMPA and for overseeing NMFS.

44.     Defendant SCOTT BESSENT is sued in his official capacity as the Secretary of the Treasury. The Secretary of the Treasury is responsible for implementing and fulfilling the Department of the Treasury's duties under the MMPA.

45.     Defendant MARKWAYNE MULLIN is sued in his official capacity as the Secretary of Homeland Security. Pursuant to the Homeland Security Act, the Department of Homeland Security is responsible for certain functions of the Secretary of the Treasury relating to the United States Customs Service, which may include implementing import bans under the MMPA. 6 U.S.C. §§ 203(1), 212(a)(1).

## STATUTORY BACKGROUND

I.      MARINE MAMMAL PROTECTION ACT

46.     Congress enacted the MMPA in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Congress sought to ensure that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

47.     Through the MMPA, Congress intended to protect marine mammal populations both within the United States and abroad, recognizing that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and . . . they should be protected and encouraged to develop to the greatest extent feasible." *Id.* § 1361(6).

48.     To this end, Congress included a provision designed to protect marine mammal populations outside of U.S. waters through leveraging the United States' position as a major

16

seafood importer. Specifically, the MMPA requires the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). In determining whether exporting fisheries meet this standard, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

    A.    <u>United States Standards</u>

49.    "United States standards" within the meaning of 16 U.S.C. § 1371(a)(2) include, but are not limited to, the provisions of the MMPA that are applicable to managing mortality and serious injury to marine mammals from commercial fisheries. *See Sea Shepherd N.Z. v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) (identifying "statutory markers of 'United States standards'" under the MMPA). The MMPA addresses incidental catch of marine mammals in commercial fisheries by imposing a robust fisheries management regime that requires, among other things, a mandate to reduce bycatch causing mortality and serious injury to insignificant levels approaching zero, bycatch limits, take reduction plans, bycatch monitoring programs, and stock assessments.

**Zero Mortality Rate Goal**

50.    First, the MMPA requires that commercial fisheries reduce incidental mortality and serious injury of marine mammals to "insignificant levels approaching a zero mortality and serious injury rate" within a specified period of time. 16 U.S.C. § 1387(b), (f)(2); *accord id.* § 1371(a)(2). NMFS defines "insignificant levels approaching a zero mortality and serious injury rate" as 10% of the Potential Biological Removal level—which is detailed below—for a given

17

marine mammal stock. 50 C.F.R. § 229.2. NMFS defines "serious injury" as "any injury that will likely result in mortality." *Id.*

51.     To effectuate the zero-mortality rate mandate, the MMPA requires NMFS to analyze, for each commercial fishery interacting with a marine mammal stock, "whether [the incidental mortality and serious injury] level is insignificant and is approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1386(a)(4); 1387(b), (f).

### Potential Biological Removal Level

52.     Second, the MMPA requires that incidental mortality and serious injury of marine mammals incidentally taken in commercial fisheries be below the Potential Biological Removal (PBR) level. *Id.* § 1387(f)(2). The MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20).

53.     NMFS must estimate the PBR for each marine mammal stock. *Id.* § 1386(a)(6). PBR is the mathematical product of three values: "[t]he minimum population estimate of the stock," "[o]ne-half the maximum theoretical or estimated net productivity rate of the stock at a small population size," and a "recovery factor of between 0.1 and 1.0." *Id.* § 1362(20).

54.     The "minimum population estimate" is an estimate of the number of animals in a marine mammal stock that is "based on the best available scientific information on abundance" and "provides reasonable assurance that the stock size is equal to or greater than the estimate." *Id.* § 1362(27). The "net productivity rate" is "the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality." *Id.* § 1362(26). The recovery factor is set at a value that will ensure the recovery of populations to their optimum sustainable populations. To ensure human-caused harms are addressed with the requisite level of urgency, the default value for endangered species is the lowest value, 0.1. NMFS, *Guidelines for*

*Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act* 9, NMFS

Proc. 02-204-01 (Feb. 7, 2023), https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-

GAMMS-IV-Revisions-clean-1-kdr.pdf.

55. If human-caused incidental mortality and serious injury exceed the calculated

PBR for any stock, NMFS must enact measures to reduce mortality and serious injury in

fisheries in a take reduction plan, as described below. 16 U.S.C. § 1387(f)(5).

**Negligible Impact Standard**

56. Third, the MMPA only allows commercial fisheries to incidentally take marine

mammals listed as threatened or endangered under the Endangered Species Act (ESA) if certain

requirements are met, including that "the Secretary, after notice and opportunity for public

comment, determines that the incidental mortality and serious injury from commercial fisheries

will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(E)(i).

57. Pursuant to NMFS Procedural Directive 02-204-02, NMFS uses a quantitative

approach to determine if a fishery has a negligible impact. NMFS, *Criteria for Determining

Negligible Impact under MMPA Section 101(a)(5)(E)*, NMFS Proc. 02-204-02 (June 17, 2020),

https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf. First, NMFS calculates a

threshold for negligible impact for total human-caused mortality and serious injury. *Id.* at 4. For

endangered species, this threshold uses the same calculation values as PBR, so the threshold is

equivalent to PBR. *Id.* at 4, 12. If the total human-caused mortality and serious injury for a stock

exceeds this threshold, then NMFS will calculate a second, lower threshold to evaluate whether

the effect of an individual commercial fishery is negligible. *Id.* at 4. For endangered species, this

smaller threshold equals 13% of PBR. *Id.* at 5, 14. If mortality and serious injury in a fishery

exceeds that threshold, then it has more than a negligible impact. *Id.* at 9.

58.    If the incidental mortality or serious injury from commercial fisheries "has resulted or is likely to result in an impact that is more than negligible on the endangered or threatened species or stock," NMFS is required to use its emergency authority "to protect such species or stock." 16 U.S.C. § 1371(a)(5)(E)(iii).

### Take Reduction Plans

59.    The MMPA requires NMFS to effectuate the zero-mortality rate and PBR limit by developing and implementing a "take reduction plan" for any marine mammal "strategic stock" that interacts with commercial fisheries. *Id.* § 1387(f). A strategic stock includes any species listed, or likely to be listed, as threatened or endangered under the ESA, as well as any other marine mammal stock suffering human-caused mortality exceeding PBR. *Id.* § 1362(19).

60.    A take reduction plan must be designed to achieve two standards. The "immediate goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries below PBR within six months of implementation. *Id.* § 1387(f)(2). The "long-term goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries "to insignificant levels approaching a zero mortality and serious injury rate" within five years. *Id.*

61.    If the "incidental mortality and serious injury from commercial fisheries exceeds" the established PBR, the plan "shall include measures the Secretary expects will reduce . . . such mortality and serious injury to a level below" the PBR within six months. *Id.* § 1387(f)(5).

### Bycatch Monitoring

62.    The MMPA requires NMFS to establish "a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations." *Id.* § 1387(d)(1). One purpose of the monitoring program is to determine whether and when bycatch limits are exceeded.

63.     The program must be sufficient to "obtain statistically reliable estimates of incidental mortality and serious injury." *Id.* § 1387(d)(1)(A); *see also id.* § 1387(d)(3)(A) (requiring program implementation to be guided by a "requirement to obtain statistically reliable information").

**Stock Assessments**

64.     The MMPA requires NMFS to prepare a stock assessment for each marine mammal stock under the agency's jurisdiction. *Id.* § 1386(a).

65.     A stock assessment must contain several elements. It must: 1) describe the stock's range; 2) provide a minimum population estimate, current and maximum productivity rates, and the current population trend, with supporting information; 3) estimate the annual human-caused mortality and serious injury of the stock; 4) describe commercial fisheries that interact with the stock, including a) the number of vessels in the fishery, b) the estimated annual level of incidental mortality and serious injury by each fishery, c) seasonal or geographic differences in such incidental mortality or serious injury, and d) "the rate, based on the appropriate standard unit of fishing effort, of such incidental mortality and serious injury, and an analysis stating whether such level is insignificant and is approaching a zero mortality and serious injury rate"; 5) categorize the stock's status (as either a "strategic stock" or a stock with a "level of human-caused mortality and serious injury that is not likely to cause the stock to be reduced below its optimum sustainable population"); and 6) estimate PBR, as described above. *Id.*

66.     Stock assessments must be based on the "best scientific information available." *Id.*

A.      Marine Mammal Protection Act Regulations

67.     NMFS has promulgated regulations (the Import Regulations) establishing a process for identifying whether each export fishery complies with the Import Provisions. 81 Fed.

21

Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h)).

68.    Under the regulation, incidental mortality or incidental serious injury of marine mammals in a fishery is in excess of U.S. standards unless NMFS has issued "a valid comparability finding" that is "in effect" for the fishery. 50 C.F.R. § 216.24(h)(1)(i), (h)(2); *see also id.* § 216.24(h)(1)(ii) (making it unlawful to import fish from any fishery that does not have a valid comparability finding in effect).

69.    A harvesting nation must apply for a comparability finding before NMFS may issue one. *Id.* § 216.24(h)(6)(ii). The application must include reasonable proof of the effects of the relevant fisheries on marine mammals and documentary evidence demonstrating that the conditions for a comparability finding have been met. *Id.* § 216.24(h)(6)(i); *see also* 16 U.S.C. § 1371(a)(2)(A) (requiring "reasonable proof").

70.    The Import Regulations require NMFS to make specified findings and consider mandatory factors before it may issue a comparability finding. 50 C.F.R. § 216.24(h)(6)(iii), (h)(7). In doing so, NMFS "shall consider documentary evidence provided by the harvesting nation *and* relevant information readily available from other sources." *Id.* § 216.24(h)(6)(ii) (emphasis added).

71.    First, NMFS must find that the harvesting nation "[p]rohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations" and "[d]emonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal." *Id.* § 216.24(h)(6)(iii)(A).

72.    Second, NMFS must find that the harvesting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory

program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B).

73.     To qualify as "comparable in effectiveness" to the U.S. regulatory program, the harvesting nation's regulatory program for fisheries operating in its own Exclusive Economic Zone must "provide[] for, or effectively achieve[] comparable results as," among other things: 1) "[m]arine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery"; 2) a calculation of "bycatch limits" (defined as the PBR or a "comparable scientific metric," *id.* § 216.3) for marine mammal stocks that are incidentally killed or seriously injured by the fishery; 3) "[a] requirement to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit"; 4) "[i]mplementation of monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury in the export fishery, . . . including an indication of the statistical reliability of those estimates"; and 5) a comparison of the incidental mortality and serious injury levels in the fishery with the bycatch limit and a showing that the fishery does not exceed the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C).

74.     The regulations establish specific requirements "for a harvesting nation's export fishery operating on the high seas under the jurisdiction of the harvesting nation or another state." *Id*. § 216.24(h)(6)(iii)(E). Under this provision, NMFS must first determine that the fishery implements "marine mammal data collection and conservation and management measures applicable to that fishery required under any applicable intergovernmental agreement or regional fisheries management organization to which the United States is a party." *Id.* § 216.24(h)(6)(iii)(E)(*1*). NMFS also must determine, "[w]ith respect to any transboundary stock

interacting with the export fishery," that the nation implements "measures to reduce the incidental mortality and serious injury of that stock that the United States requires its domestic fisheries to take with respect that transboundary stock." *Id.* § 216.24(h)(6)(iii)(E)(*2*)(*i*). NMFS defines a transboundary stock as "occurring in the: (1) Exclusive economic zones or territorial sea of the United States and one or more other coastal States; or (2) Exclusive economic zone or territorial sea of the United States and on the high seas." *Id.* § 216.3. For "any other marine mammal stocks interacting with the export fishery while operating on the high seas," NMFS must determine that the nation implements "measures to reduce incidental mortality and serious injury that the United States requires its domestic fisheries to take with respect to that marine mammal stock when they are operating on the high seas." *Id.* § 216.24(h)(6)(iii)(E)(*2*)(*ii*).

75.    For all export fisheries, NMFS is also required to consider: 1) "U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries"; 2) the extent to which the harvesting nation has successfully implemented measures to reduce incidental mortality and serious injury of marine mammals to levels below the bycatch limit; 3) whether measures for the export fishery "have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit"; 4) "[o]ther relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in th[e] export fishery, whether the level of incidental mortality and serious injury . . . exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, . . . the population level impacts of the incidental mortality or serious injury of marine mammals," and the conservation status of the marine mammal stocks. *Id.* § 216.24(h)(7).

76.     If NMFS issues a comparability finding, it is valid for four years from its publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv). Absent a *valid* comparability finding, the Secretaries of the Treasury and Homeland Security shall prohibit the importation of fish and fish products until such time that NMFS issues a valid comparability finding for the fishery. *Id.* § 216.24(h)(1)(i), (h)(9).

## II.     ADMINISTRATIVE PROCEDURE ACT

77.     The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

78.     The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

79.     The APA also provides that the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

## I.     BYCATCH IN FISHERIES IS ONE OF THE LARGEST THREATS TO MARINE MAMMALS ACROSS THE GLOBE.

80.     Bycatch is the predominant threat to marine mammals globally, responsible for the death of over 650,000 marine mammals each year.

81.     Certain types of commercial fishing gear pose greater risks of death to marine mammals, including gillnets, longlines, trawls, traps and pots, and purse seines.

82.     Gillnets are particularly perilous for marine mammals. Gillnets are walls of netting designed to hang vertically in the water column and allow only the head of a fish to pass through. When the fish attempts to back out of the net, it becomes entangled and the fish is caught. However, gillnets are non-selective, and because they can hang in the water column for

hours—or even days—at a time, they incidentally capture a vast array of non-target marine life including marine mammals. Because marine mammals need to surface to breathe, they often drown after becoming entangled in gillnets.

83.     Longline gear can also be dangerous for marine mammals. Longline gear employs a mainline, which floats horizontally in the water column, and numerous branchlines with baited hooks that hang vertically from the mainline. The mainline can be dozens of miles long with hundreds to thousands of baited hooks that may be left in the water for hours. Longlines are often used to target highly migratory large fish species like tuna and swordfish, but they attract many other species as well, including marine mammals, that then get caught in the gear.

84.     Trawl fishing is yet another indiscriminate fishing gear that poses serious risk to marine mammals. Trawl fishing involves fishing nets that are towed behind boats, either through the water column or across the seafloor, capturing nearly everything in their path. Trawl nets can vary in size but some are as wide as a football field. Trawl gear can entangle and drown marine mammals when these animals are foraging or migrating near the nets. The towlines, the lines that connect the net to the boat, can also capture or entangle marine mammals.

85.     Trap and pot fishing gear involves submerged wood, metal, or plastic devices that allow animals like lobster or crab to enter but not escape. The submerged pots and traps are typically connected with fishing line to a buoy at the surface of the water (vertical lines). Sometimes, fishing line also connects multiple pots and traps together (groundlines). Both vertical lines and groundlines can entangle marine mammals, causing them to drown or suffer lacerations and other injuries.

86.     Purse seining involves large curtain-like nets that are used to encircle schooling fish. The fishing boat, or skiff, encircles the fish with the net. A weighted line runs through the

26

bottom of the net. Once the fish are encircled, the weighted bottom line is pulled tight, like a draw string on a purse, capturing the entire school of fish and any other animals, including marine mammals, within the net.

87.     The United States is the world's largest importer of seafood by value. The United States sources substantial amounts of seafood from foreign fisheries around the world.

88.      The United States currently imports fish and fish products from many nations that allow the use of gillnets, longlines, trawls, pots and traps, and purse seines that bycatch marine mammals that inhabit the waters in which those fisheries operate.

A.     <u>Argentina</u>

89.     Argentina exports fish and fish products to the United States from fisheries that use gillnets, trawls, and other gear.

90.     Multiple marine mammal populations inhabit the waters in which these Argentinian fisheries operate and may be at risk from fishing operations, including populations of the Burmeister's porpoise, the Lahille's bottlenose dolphin, the dusky dolphin, the common dolphin, the bottlenose dolphin, the franciscana dolphin, the South American fur seal, and the South American sea lion.

91.     Bycatch is a significant threat to the franciscana dolphin (*Pontoporia blainvillei*), a small dolphin that inhabits shallow coastal waters. The franciscana dolphin is one of the most threatened cetaceans in the southwestern Atlantic due to unsustainable bycatch levels. The International Union for Conservation of Nature (IUCN) assessed the species as "Vulnerable" because the species is expected to suffer a 30% population decline over the next 30 years. The species' primary threat is fisheries bycatch.

92.     The franciscana dolphin is bycaught in both gillnet and trawl fisheries. The species has been caught in gillnets for decades, leading to significant population declines, and

gillnets remain the greatest danger to the species. Trawl fisheries also catch franciscana dolphins in substantial numbers, adding to the risk gillnet bycatch already poses to stocks.

B.     Ecuador

93.     Ecuador exports fish and fish products to the United States from fisheries that use gillnets, longlines, and other gear.

94.     Multiple marine mammal populations inhabit the waters in which these Ecuadorian fisheries operate and may be at risk from fishing operations, including populations of the bottlenose dolphin, the common dolphin, the Eastern spinner dolphin, the pantropical spotted dolphin, the Risso's dolphin, the striped dolphin, the short-finned pilot whale, the false killer whale, the Bryde's whale, the humpback whale, the Galapagos fur seal, and the Galapagos sea lion.

95.     Bycatch is a particular concern for a resident population of bottlenose dolphins (*Tursiops truncatus*) in the Gulf of Guayaquil, which has decreased 50% over the past 30 years. This resident population is genetically distinct from other coastal populations of bottlenose dolphins and is at risk of extirpation, in part due to fisheries bycatch.

C.     India

96.     India exports fish and fish products to the United States from fisheries that use gillnets, longlines, trawls, pots and traps, purse seines, and other gear.

97.     Multiple marine mammal populations inhabit the waters in which these fisheries operate and may be at risk from fishing operations, including populations of the blue whale, the Bryde's whale, the dugong, the dwarf spinner dolphin, the false killer whale, the Ganges river dolphin, the humpback whale, the Indian Ocean humpback dolphin, the Indo-Pacific bottlenose dolphin, the Indo-Pacific finless porpoise, the Indo-Pacific humpback dolphin, the Irrawaddy

28

dolphin, the pantropical spotted dolphin, the Risso's dolphin, the short-finned pilot whale, the sperm whale, the spinner dolphin, and the striped dolphin.

98.    Bycatch is a threat for many of these marine mammals in India. India's tuna gillnet fishery has been found to kill 9,000 to 10,000 cetaceans per year. Of particular concern is the Indian Ocean humpback dolphin (*Sousa plumbea*), which IUCN assesses as "Endangered," noting that the "primary threat to the Indian Ocean Humpback Dolphin throughout most, or all, of its range, is incidental mortality in fisheries ('bycatch'), including in gillnets." IUCN assesses the Ganges river dolphin (*Platanista gangetica*) as "Endangered" and states, "Dolphins are particularly vulnerable to mortality from bycatch in the dry season from November to May because, during this period, their preferred habitat near channel confluences and divergences overlaps with fishing grounds which become crowded with nets that bycatch dolphins and reduce space available for accessing prey." Another species occurring in India and assessed by IUCN as "Endangered" is the Irrawaddy dolphin (*Orcaella brevirostris*); IUCN noted that the "most severe threat to most subpopulations is incidental mortality from entanglement in fishing gear, particularly gillnets" and that the dolphins "are caught accidentally in fishing nets in all areas where they have been studied."

99.    Similarly, IUCN assesses the Indo-Pacific humpback dolphin (*Sousa chinensis*), the Indo-Pacific finless porpoise (*Neophocaena phocaenoides*), and dugong (*Dugong dugon*) as "Vulnerable." About the Indo-Pacific humpback dolphin, IUCN states that "[r]ange-wide, incidental mortality in fishing gear (especially in gillnets and trawls) is probably the greatest threat to this species." As to threats to Indo-Pacific finless porpoise, IUCN states that finless porpoises "are extremely susceptible to entanglement in gillnets, and large numbers have been, and continue to be, killed in many parts of their range" and they "are caught in nets in Iranian,

Indian, Pakistani and Malaysian coastal waters." As to the dugong, while IUCN assessed them as "Vulnerable" throughout their range, the assessment notes that researchers undertook a regional assessment and concluded that the Indian sub-continent and Andaman and Nicobar Islands population was likely "Endangered," that incidental capture in fishing gear is a major threat, and that "it is often very difficult to convince the fishers or the fisheries managers to take the capture of dugongs seriously" and that "[w]hen dugong population sizes are low, their capture in fisheries is a rare event, which becomes rarer as the dugong population declines."

D.    Norway

100.    Norway exports fish and fish products to the United States from fisheries that use gillnets/set nets.

101.    Multiple marine mammal populations inhabit the waters in which these fisheries operate, including populations of the common bottlenose dolphin, the minke whale, the humpback whale, the harbor porpoise, the beluga whale, the killer whale, the gray seal, the harbor seal, the sperm whale, and the blue whale.

102.    Bycatch is a particular threat to the harbor porpoise (*Phocoena phocoena*, Norwegian coastal waters stock) and the gray seal (*Halichoerus grypus*, Norwegian coast stock), which Norway considers "Vulnerable" on its national red list. A report submitted to the North Atlantic Marine Mammal Commission Coastal Seals Working Group in 2023 found "a high level of grey seal by-catch" with "by-catch [being] a key factor contributing to the apparent population decreases." Bycatch of gray seal pups was particularly "significant," with all tagged pups found by-caught in monkfish and cod gillnets. In addition, IUCN assesses the sperm whale (*Physeter macrocephalus*) as "Vulnerable," citing bycatch as one of the most serious threats to the species; the species is also listed as "Endangered" under the ESA.

30

103.    The conservation status of several other of these species is also concerning. For example, Norway considers the beluga whale (*Delphinapterus leucas*) "Endangered" on its national red list and IUCN assesses the species as "Vulnerable." Likewise, IUCN assesses the blue whale (*Balaenoptera musculus*) as "Endangered" and the species is listed as "Endangered" under the ESA. Norway also considers the harbor seal, Svalbard (*Phoca vitulina*) as "Near Threatened" on its national red list.

104.    Both humpback whales (*Megaptera novaeangliae)* and killer whales (*Orcinus orca*) have been regularly observed in association with large aggregations of herring in northern Norway and data from fishing logbooks in the Norwegian purse seine fishery for herring and capulin indicate the fishery incidentally catches both species. IUCN assesses the killer whale as "Data Deficient," which means there is inadequate information to assess the species' risk of extinction.

E.    Tunisia

105.    Tunisia exports fish and fish products to the United States from fisheries that use gillnets, longlines, trawls, pots and traps, purse seines, trammel nets, and other gear.

106.    Multiple marine mammal populations inhabit the waters in which these Tunisian fisheries operate and may be at risk from fishing operations, including populations of the common bottlenose dolphin, the common dolphin, the fin whale, the long-finned pilot whale, the Risso's dolphin, the sperm whale, and the striped dolphin.

107.    Bycatch is a threat for many of these marine mammals. Of particular concern is the Mediterranean population of common bottlenose dolphin (*Tursiops truncatus*), which is made up of distinct populations across the Black Sea and the Mediterranean Sea. While IUCN assessed the Mediterranean population as "Least Concern," it noted that "it is imperative to keep [sic.] monitor and mitigate the cumulative effects of anthropogenic pressures on the reproductive

31

success and/or the survival rate at the local level." The Tunisia Dolphin Project estimated the abundance for the northern Tunisia population as 137. In addition, bycatch is a threat for the following marine mammals that co-occur with Tunisian fisheries: the inner Mediterranean subpopulation of common dolphin (*Delphinus delphis*), assessed by IUCN as "Endangered"; the inner Mediterranean subpopulation of long-finned pilot whale (*Globicephala melas*), assessed by IUCN as "Endangered"; the Mediterranean subpopulation of Risso's dolphin (*Grampus griseus*), assessed by IUCN as "Endangered", the Mediterranean subpopulation of sperm whale (*Physeter macrocephalus*), assessed by IUCN as "Endangered"; and the Mediterranean subpopulation of striped dolphin (*Stenella coeruleoalba*), assessed by IUCN as "Endangered."

F.    United Kingdom

108.    The United Kingdom exports fish and fish products to the United States from fisheries that use gillnets, pots and traps, and other gear.

109.    Multiple marine mammal populations inhabit the waters in which these UK fisheries operate and may be at risk from fishing operations, including populations of the Atlantic white-sided dolphin, the beaked whale, the bottlenose dolphin, the common dolphin, the common minke whale, the fin whale, the gray seal, the harbor porpoise, the harbor seal, the humpback whale, the killer whale, the long-finned pilot whale, the Risso's dolphin, the sperm whale, the striped dolphin, and the white-beaked dolphin.

110.    Bycatch is a threat for many of these marine mammals, particularly the harbor porpoise (*Phocoena phocoena*), the common dolphin (*Delphinus delphis*), the minke whale (*Balaenoptera acutorostrata*), and the humpback whale (*Megaptera novaeangliae*). The primary threat to these species is fisheries bycatch.

111.    The Convention for the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention), to which the United Kingdom is a Contracting Party, produced

32

an assessment indicating that bycatch of the harbor porpoise and the common dolphin "is a significant pressure" with bycatch exceeding sustainable thresholds.

112.    In 2020, the International Whaling Commission published a report stating that "[e]ntanglements occurring in Scottish waters could potentially impact small populations of humpback whales in the [Northeastern] Atlantic" and that the "estimated fatal entanglement rate of minke whales . . . suggest[s] a risk of localised depletion."

G.    Vanuatu

113.    Vanuatu exports fish and fish products to the United States from fisheries that use longlines.

114.    Vanuatu's longline fisheries operate on the high seas, including off Hawai'i where U.S. longline fisheries also operate. Vanuatu's longline fisheries are known to incidentally kill or seriously injure false killer whales (*Pseudorca crassidens*) from the Hawai'i pelagic stock. IUCN assesses the false killer whale as "Near Threatened," citing bycatch as a likely threat to the species.

H.    Taiwan

115.    Taiwan exports fish and fish products to the United States from fisheries that use gillnets, longlines, and other gear.

116.    Over thirty marine mammal species/populations have been known to inhabit the waters surrounding Taiwan, including populations of the Bryde's whale, the Omura's whale (also known as the dwarf fin whale), the sperm whale, the false killer whale, the Risso's dolphin, the spinner dolphin, the striped dolphin, the pantropical spotted dolphin, the Fraser's dolphin, the melon-headed whale, several species of beaked whales, the Taiwanese humpback dolphins (also known, particularly locally, as the Taiwanese white dolphin), the Rough-toothed dolphin, the

common bottlenosed dolphin, the short-finned pilot whale, and the Indo-Pacific bottlenosed dolphin.

117.    Bycatch is a threat for many of these marine mammals, including the Taiwanese humpback dolphin (*Sousa chinensis taiwanensis*), which IUCN assesses as "Critically Endangered" and is listed as "Endangered" under the ESA. The Taiwanese humpback dolphin inhabits the shallow coastal waters of the Eastern Taiwan strait, along the coast of western Taiwan. The population's most direct and immediate threat is fisheries bycatch. With approximately 60 individuals estimated to remain (less than 50 mature individuals), the population is declining at an alarming rate; at the time of its ESA listing, the population was estimated at less than 100.

118.    Similarly, bycatch off Taiwan poses a threat to the Indo-Pacific finless porpoise (*Neophocaena phocaenoides*), which IUCN assesses as "Vulnerable." The Indo-Pacific finless porpoise inhabits shallow, coastal waters from the Taiwan Strait north into the Yellow Sea and southern Japan. IUCN states that the porpoise is "extremely susceptible to entanglement in gillnets" and that in the Taiwan Strait, "a considerable number . . . are taken in trammel nets, trawl nets, stow nets, and other gear."

119.    The Indo-Pacific bottlenosed dolphin (*Tursiops aduncus*) is likewise threatened by bycatch. IUCN assesses the species as "Near Threatened," stating that "[b]ycatch is the dominant threat" to the species throughout its range. Finally, the sperm whale is assessed by IUCN as "Vulnerable" and listed under the ESA as "Endangered," and the false killer whale is assessed by IUCN as "Near Threatened," with IUCN finding bycatch as a likely threat to both species.

120.    Taiwan's fisheries also fish on the high seas and within the exclusive economic zones (EEZs) of several nations, where they catch and seriously injure other marine mammals. Taiwan's longline fisheries operate on the high seas in some of the same areas as U.S. longline fisheries, including waters where the Hawai'i pelagic stock of false killer whale is found. Taiwan's pelagic longline fisheries operating in these waters pose a risk of mortality and serious injury to these false killer whales.

II.    FOR DECADES, FEDERAL DEFENDANTS FAILED TO IMPLEMENT THE MMPA IMPORT PROVISIONS.

121.    For over 50 years, Federal Defendants largely failed to implement the MMPA's Import Provisions. Decades passed while foreign fisheries continued to engage in harmful fishing practices and sell the fish they caught to the U.S. market, in violation of the MMPA.

122.    Following a 2008 petition, NMFS undertook a rulemaking process to implement the Import Provisions and create a process for determining whether foreign fisheries exporting fish and fish products to the United States meet U.S. standards. NMFS issued a final rule enacting the Import Regulations in 2016, agreeing with commenters who "supported efforts to level the playing field for U.S. fisheries, noting that American fishermen comply with the requirements of the MMPA in conducting their fishing activities, and those efforts come at an increased cost, so it is only fair to U.S. fisheries that a level playing field exists such that importing fisheries abide by similar standards when introducing fish into the U.S. market." 81 Fed. Reg. at 54408. Rather than implementing the rule immediately, NMFS granted a "one-time only" five-year extension to come into compliance, delaying the effective date of import bans to January 1, 2022. NMFS then issued three more extensions, delaying the effective date to January 1, 2026.

123.    On August 8, 2024, Plaintiffs filed suit in this Court to compel Defendants to ban the importation of fish and fish products that do not meet U.S. standards for protection of marine mammals under the Import Provisions and Import Regulations. Compl., *Nat. Res. Def. Council, Inc. v. Lutnick*, 774 F. Supp. 3d 1348 (Ct. Int'l Trade Aug. 8, 2024). Plaintiffs and Defendants subsequently entered into a stipulated settlement, under which Defendants would, by September 1, 2025, issue final comparability findings for all export nations and, by January 1, 2026, "prohibit the importation of fish and fish products into the United States from all harvesting nations or fisheries for which NMFS has denied a comparability finding." *Id.* at 1355. ("Lutnick settlement").

III.    NMFS ISSUES COMPARABILITY FINDINGS AUTHORIZING IMPORTS FROM OVER 2,250 FISHERIES UNDER THE MMPA.

124.    Pursuant to the *Lutnick* settlement, NMFS published comparability finding determinations for roughly 2,500 fisheries across 135 nations on September 2, 2025, in the Federal Register. 90 Fed. Reg. 42395, 42396 (Sep. 2, 2025).[1] NMFS granted comparability findings to approximately 2,286 of these fisheries, concluding that the fisheries do not kill or seriously injure marine mammals in excess of U.S. standards and therefore should be allowed to export seafood to the United States. Import bans for nearly all of the remaining fisheries went into effect on January 1, 2026. 90 Fed. Reg. at 42396.

125.    The Comparability Findings purport to determine that the regulatory programs for marine mammal bycatch in some or all fisheries from Argentina, Ecuador, India, Norway,

---

[1] Defendant Eugenio Piñeiro Soler signed a Decision Memorandum for the Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings on July 9, 2025, in which he "concur[red] with the comparability finding determinations for all nations as described [in the Memorandum], in the attached tables, and the individual country reports." As used herein, "Comparability Finding[s]" refers to the Decision Memorandum, Federal Register Notice, and the applicable country reports.

Taiwan, Tunisia, the United Kingdom, and Vanuatu are comparable in effectiveness to the U.S. program. However, these Comparability Findings are contrary to the MMPA's Import Provisions and its implementing regulations in several ways and are based on arbitrary and inaccurate analyses.

A.      Argentina

126.    NMFS issued a comparability finding (the Argentina CF) determining that "all of Argentina's exempt and export fisheries are comparable in effectiveness" to the U.S. program. Among the fisheries granted comparability are Fishery ID 48 and Fishery ID 45. Fishery ID 48 is a gillnet fishery targeting sharks, weakfish, croaker, and red porgy, among other fish species. Fishery ID 45 is a trawl fishery similarly targeting sharks, weakfish, red porgy, croaker, and other fish.

127.    The Argentina CF fails to demonstrate that bycatch in Argentina's export fisheries does not exceed U.S. standards or that Argentina maintains a regulatory program that is comparable in effectiveness to U.S. standards.

128.    The Argentina CF explicitly states that bycatch of the franciscana dolphin in Fishery ID 48 is exceeding the bycatch limit. The Argentina CF states that Fishery ID 48 kills an average of 450 franciscana dolphins per year, whereas the bycatch limit for the stock is only 166.95.  Fishery ID 48 alone is taking nearly *triple* the bycatch limit, without even considering all the other fisheries that catch and kill the species.

129.    The Argentina CF states that Fishery ID 48 "is not currently being exported to the United States" with no further explanation. However, NMFS's 2020 List of Foreign Fisheries lists the fishery as exporting to the United States. U.S. seafood import records show imports of fish targeted by Fishery ID 48 including croaker, red porgy, and weakfish from Argentina in 2025. Moreover, even if NMFS is correct that Fishery ID 48 is not *currently* exporting fish to the

United States, because NMFS issued a comparability finding for this fishery, the Import Regulations allow the fishery to export fish to the United States at any time over the Argentina CF's four-year period. There is no information in the Argentina CF indicating that Fishery ID 48 will not export fish to the United States at any point during that entire period.

130.    For Fishery ID 45, the Argentina CF states that the fishery "does not currently have monitoring in place" and that Argentina only plans to develop an observer program within the next five years. Without any monitoring in place, Argentina does not maintain a regulatory program for Fishery ID 45 that is comparable in effectiveness to U.S. standards.

131.    The Argentina CF does not demonstrate that Fishery IDs 45 or 48 or other Argentinian export fisheries meet U.S. standards for monitoring. The Argentina CF states that Argentina has an observer program for all fisheries except Fishery ID 45. However, the Argentina CF does not explain how much monitoring occurs or how the monitoring is comparable in effectiveness to U.S. standards. Nor did NMFS evaluate whether Argentina can obtain statistically reliable estimates of bycatch. Without statistically reliable estimates of bycatch, Argentina's regulatory program for its export fisheries is not comparable to U.S. standards.

132.    The Argentina CF does not demonstrate that Argentina conducts or otherwise has stock assessments for all marine mammals caught in its export fisheries. Argentina lacks a regulatory program requiring stock assessments that is comparable in effectiveness to those required under U.S. standards.

133.    The Argentina CF asserts that "bycatch was reported in other fisheries, but did not approach the bycatch limit and were not endangered species or otherwise considered 16 U.S.C. § 1387(f)(3) stocks." The Argentina CF does not provide any bycatch estimates for any fishery

other than Fishery ID 48. The Argentina CF also does not provide cumulative franciscana dolphin bycatch estimates for Fishery ID 48, Fishery ID 45, and any other export fishery causing franciscana dolphin bycatch. Without bycatch estimates based on reasonable proof, NMFS failed to show that marine mammal bycatch in Argentina's export fisheries does not exceed bycatch limits.

134.    The Argentina CF asserts that "Argentina's efforts and mitigation strategy is comparable to a U.S. [Take Reduction Plan]." NMFS's explanation for this assertion is not reasonable. NMFS did not assess whether or establish that this mitigation strategy contains measures sufficient to reduce marine mammal bycatch below the relevant bycatch limit.

135.    The Argentina CF contains no assessment or indication of whether Argentina's export fisheries meet a negligible impact standard for mortality or serious injury for species that would qualify for listing under the ESA, including the franciscana dolphin. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). Argentina's fisheries do not achieve a comparable standard.

136.    The Argentina CF contains no assessment or indication of whether Argentina's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). Argentina's regulatory program does not have or achieve a comparable standard.

137.    Other than citing past consultations with Argentina, the Argentina CF contains no assessment of the comparability factors under 50 C.F.R. § 216.24(h)(7). It instead claims each factor is "Not applicable."

B.    Ecuador

138.    NMFS issued a comparability finding (the Ecuador CF) determining that ten export fisheries from Ecuador are comparable in effectiveness to the U.S. program. The approved fisheries include two bottom gillnet fisheries (Fishery ID 1182 targeting tilefish,

grouper, flounder, and other fish, and Fishery ID 1183 targeting shrimp and other crustaceans) and two longline fisheries (Fishery ID 1171 targeting pelagic/tuna-like fish, and Fishery ID 1180 targeting tilefish, croaker, and whitefish), among other fisheries. NMFS denied a comparability finding for one fishery—Ecuador's pelagic tuna/swordfish gillnet fishery (Fishery ID 1179)—because it lacks bycatch reporting or monitoring.

139.    The Ecuador CF fails to demonstrate that bycatch in Ecuador's export fisheries does not exceed U.S. standards or that Ecuador maintains a regulatory program that is comparable in effectiveness to U.S. standards.

140.    There is no current monitoring of bycatch in the tilefish longline fishery (Fishery ID 1180). Bycatch in the tilefish/grouper gillnet fishery (Fishery ID 1182) is monitored via dockside inspections only; Fishery IDs 1171 and 1183 report between 1% and 25% observer coverage. NMFS did not explain why those levels of monitoring are comparable in effectiveness to U.S. standards. Nor did NMFS evaluate whether Ecuador's monitoring programs produce statistically reliable estimates of bycatch. Without statistically reliable estimates of bycatch, Ecuador's regulatory program for its export fisheries is not comparable to U.S. standards.

141.    The Ecuador CF also provides no information on whether Ecuador conducts or otherwise has stock assessments for any of the marine mammals caught in its export fisheries. Ecuador lacks a regulatory program requiring stock assessments that are comparable in effectiveness to those required under U.S. standards.

142.    The Ecuador CF states "Ecuador has not provided marine mammal bycatch data" aside from one study. And the Ecuador CF states, "it has not yet been possible to quantify marine mammal bycatch with precision." Bycatch has been documented in Ecuadorian gillnet fisheries and longline fisheries. NMFS failed to show that marine mammal bycatch in Ecuador's export

fisheries does not exceed bycatch limits comparable to U.S. standards or that Ecuador manages bycatch to achieve comparable results as under U.S. standards.

143. The Ecuador CF contains no assessment or indication of whether Ecuador's export fisheries meet a negligible impact standard for mortality or serious injury for populations that would qualify for listing under the ESA, including the resident population of bottlenose dolphins in the Gulf of Guayaquil, which is at risk of extirpation. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). Ecuador's fisheries do not achieve a comparable standard.

144. The Ecuador CF contains no assessment or indication of whether Ecuador's fisheries have a comparable standard to the MMPA's requirement to reduce incidental mortality and serious harm from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). And Ecuador's fisheries do not have nor achieve such a comparable standard.

145. The Ecuador CF contains no assessment of most of the comparability factors under 50 C.F.R. § 216.24(h)(7). It instead claims six factors are "Not applicable."

C.     India

146. NMFS issued a comparability finding determining that "all of India's exempt and export fisheries are comparable in effectiveness" to the U.S. program. Among the fisheries granted comparability, Fishery ID 1505 is a pelagic purse seine fishery targeting various anchovy fish, sardine fish, Indian mackerel, and other fish; Fishery ID 1507 is a stationary bag net and dol net fishery targeting various prawn species, shrimp species, anchovy fish, and other fish; Fishery ID 1509 is a trawl fishery targeting various prawn species, shrimp species, squid species, and other fish; Fishery ID 1511 is a pelagic gillnet and entangling net fishery targeting banana prawn, blue swimming crab, various croaker fish, mullet fish, anchovy fish, and other fish; Fishery ID 1512 is a pelagic longline fishery targeting various shark species, barracuda fish, mackerel fish,

marlin fish, and other fish; Fishery ID 1513 is a midwater gillnet and entangling net fishery targeting common dolphinfish, swordfish, various grouper fish, tuna fish, snapper fish, and other fish; Fishery ID 1515 is a pelagic hook and line fishery targeting Indo-Pacific king mackerel, various croaker fish, grouper fish, hairtail fish, snapper fish, and other fish; Fishery ID 1516 is a pelagic purse seine fishery targeting black pomfret, great barracuda, Indian mackerel, Indian threadfish, various tuna fish, sardine fish, scad fish, and other fish; Fishery ID 7084 is a pot and trap fishery targeting blue swimming crab, crucifix crab, three-spot swimming crab, and Scylla crab species; and Fishery ID 7085 is a lobster trap fishery targeting mud spiny lobster, ornate spiny lobster, painted spiny lobster, and scalloped spine lobster.

147. The India CF fails to demonstrate that bycatch in India's export fisheries does not exceed U.S. standards or that India maintains a regulatory program that is comparable in effectiveness to U.S. standards.

148. The India CF states that "India has a program to monitor for incidental injuries and mortalities of marine mammals." The India CF also states, "In 2021, India developed policies and procedures for marine mammal strandings and India states it has 5-10% coverage of its stranding survey." In addition, the India CF states, "All export fisheries also have dockside inspection reporting (50-75% coverage) and fishermen interviews (25-50% coverage)." The CF also states that India "interviewed 6,258 fishermen on the east and west coasts of India to ascertain marine mammal bycatch by gear type." Finally, the India CF states, "As India's export fisheries include gears with a high-risk of interaction with marine mammals, the effectiveness of the bycatch regulatory program, including data collection and mitigation, will become increasingly important." India does not employ observers on the large majority of its fishing vessels. NMFS does not explain how India's monitoring program is comparable in effectiveness

to U.S. standards. Nor did NMFS evaluate whether India can obtain statistically reliable estimates of bycatch. India lacks monitoring procedures that are comparable in effectiveness to those required under U.S. standards.

149. The India CF states, "India generated marine mammal abundance estimates, bycatch limits, and bycatch numbers." According to the CF, "India states that the bycatch limit for the India stock [of the Indian Ocean humpback dolphin] has not been exceeded (bycatch limit: 33.04; total estimated mortality: 29)." The India CF does not provide information on an "Indian stock" of the Indian Ocean humpback dolphin and does not indicate if the "stock" overlaps with non-Indian fisheries.

150. According to the India CF, India stated that the "bycatch limits for its other marine mammal species had not been exceeded." But the India CF does not provide any bycatch estimates for any marine mammal other than the "India stock" of the Indian Ocean humpback dolphin. Nor does the India CF provide cumulative bycatch estimates for any export fishery causing bycatch. And while the India CF says that India indicated "that the Ganges river dolphin and Irrawaddy dolphin do not co-occur with India's fisheries," the India CF does not say anything further about bycatch or bycatch limits for these two endangered species that are specifically threatened by bycatch. NMFS failed to show that marine mammal bycatch in India's export fisheries does not exceed bycatch limits comparable to U.S. standards or that India manages bycatch to achieve comparable results as under U.S. standards.

151. The India CF contains no assessment or indication of whether Indian fisheries have a comparable standard to the MMPA's requirement to reduce incidental mortality and serious harm from commercial fishing "to insignificant levels approaching a zero mortality and

serious injury rate." 16 U.S.C. § 1371(a)(2). And India's fisheries do not have nor achieve such a comparable standard.

152.    The India CF contains no assessment or indication of whether India's export fisheries meet a negligible impact standard for mortality or serious injury for species that are listed under the ESA (i.e., blue whale, fin whale, humpback whale, sei whale, and sperm whale) or would qualify for listing under the ESA, including the Indian Ocean humpback dolphin, the Irrawaddy dolphin, and the Ganges river dolphin. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). India's fisheries do not achieve a comparable standard.

153.    The India CF provides no information on whether India maintains a regulatory program to conduct stock assessments for any of the marine mammals caught in its export fisheries. India lacks stock assessments that are comparable in effectiveness to those required under U.S. standards.

154.    Other than citing past consultations with India and noting India's participation in two regional fisheries management organizations, the India CF contains no assessment of the comparability factors under 50 C.F.R. § 216.24(h)(7). It instead claims each factor is "Not applicable."

D.    Norway

155.    NMFS issued a comparability finding (the Norway CF) determining that "all of Norway's exempt and export fisheries are comparable in effectiveness" to the U.S. program. Among the fisheries granted comparability, Fishery ID 2018 is a set gillnet/set net fishery that targets haddock, Greenland halibut, lumpfish, and saithe/pollock; Fishery ID 2019 is a set gillnet/set net fishery that targets monkfish; and Fishery ID 10291 is a set gillnet/set net fishery that targets Atlantic cod.

156. The Norway CF fails to demonstrate that bycatch in Norway's export fisheries does not exceed U.S. standards or that Norway maintains a regulatory program that is comparable in effectiveness to U.S. standards.

157. The Norway CF indicates that bycatch of harbor porpoises is exceeding the bycatch limit. It indicates that the PBR is 2546.18, and that the total annual average mortality in Fishery IDs 2018, 2019, and 10219 is estimated to be 2594.60.

158. The Norway CF states Norway "is mitigating harbor porpoise bycatch in one of the fisheries (Fishery ID 10219) through the use of acoustic deterrents that meet NMFS's Guidelines for Non-Lethally Deterring Marine Mammals." However, the Norway CF indicates that such mitigation may be optional during some periods. NMFS did not assess whether or establish that these measures are sufficient to reduce harbor porpoise bycatch below the bycatch limit.

159. The Norway CF also indicates that bycatch of gray seals is exceeding the bycatch limit. It indicates that the PBR is 105.12, and the total average annual mortality in Fishery IDs 2019 and 10219 is estimated to be 314.

160. As noted above, logbook data indicates humpback whales and killer whales are incidentally caught in Norway's purse seine fisheries for herring and capelin. The Norway CF does not evaluate whether or establish that this bycatch does not exceed U.S. standards.

161. The Norway CF states that "all of Norway's fisheries are monitored either through self-reporting via vessel logbooks or are monitored for scientific purposes of estimating catch and bycatch (coastal reference fleet) or have an on-board observer program." However, Norway's fisheries are only required to report landed catch and are not required to report marine mammal bycatch that is not landed. NMFS did not address that issue, explain how much

monitoring occurs, or explain how Norway's monitoring is comparable in effectiveness to U.S. standards. Nor did NMFS evaluate whether Norway's monitoring programs produce statistically reliable estimates of bycatch. Without statistically reliable estimates of bycatch, NMFS cannot rationally conclude that Norway's export fisheries are comparable to U.S. standards, nor can NMFS conclude that bycatch is not in excess of U.S. standards.

162.    The Norway CF provides no information on whether Norway conducts or otherwise has stock assessments for any of the marine mammals caught in its export fisheries. Norway lacks a regulatory program requiring stock assessments that are comparable in effectiveness to those required under U.S. standards.

163.    The Norway CF contains no assessment or indication of whether Norway's export fisheries meet a negligible impact standard for mortality or serious injury for species that are listed under the ESA or would qualify for listing under the ESA, including sperm whales and blue whales. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). Norway's fisheries do not achieve a comparable standard.

164.    The Norway CF contains no assessment or indication of whether Norway's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). Norway's regulatory program does not have or achieve a comparable standard.

165.    Other than citing past consultations with Norway, the Norway CF contains no assessment of the comparability factors under 50 C.F.R. § 216.24(h)(7). It instead claims each factor is "Not applicable."

E.    Tunisia

166.    NMFS issued a comparability finding (the Tunisia CF) determining that "all of Tunisia's exempt and export fisheries are comparable in effectiveness" to the U.S. program.

Among the fisheries granted comparability: Fishery ID 2459 is a purse seine fishery targeting herrings/sardines; Fishery ID 2461 is a purse seine fishery targeting mackerels; Fishery ID 2462 is a trammel net fishery targeting marine shrimps; Fishery ID 2463 is a single boat bottom otter trawl fishery targeting marine shrimps; Fishery ID 2458 is a pot and trap fishery targeting octopuses; Fishery ID 2457 is a trammel net fishery targeting lobsters; Fishery ID 2454 is a drifting longline fishery targeting swordfish; Fishery ID 12754 is a barriers, fences, weirs, etc., and fyke net fishery targeting European eel; Fishery ID 12737 is a pot and trap fishery targeting Portunus swimcrabs; and Fishery ID 12752 is a combined gillnet-trammel net, single boat bottom trawl, trammel net, and trolling line fishery targeting common cuttlefish.

167. The Tunisia CF fails to demonstrate that bycatch in Tunisia's export fisheries does not exceed U.S. standards or that Tunisia maintains a regulatory program that is comparable in effectiveness to U.S. standards.

168. The Tunisia CF states that "Tunisia does not require vessel operators to report all incidental injuries and mortalities of marine mammals." The Tunisia CF also states that "Tunisia has monitoring programs for some export fisheries," indicating in a table that Fishery IDs 2459, 2461, 2462, 2463, and 12752 have an observer program. Tunisia does not have a monitoring program for Fishery IDs 2454, 2457, 2458, 12737, and 12754, many of which use gear that poses a documented bycatch threat to marine mammals. Finally, the Tunisia CF states that "Tunisia acknowledged that additional monitoring is needed to set a bycatch limit and determine if that limit has been exceeded." NMFS did not explain how Tunisia's monitoring program is comparable in effectiveness to U.S. standards. Nor did NMFS evaluate whether Tunisia can obtain statistically reliable estimates of bycatch. Without statistically reliable estimates of

bycatch, Tunisia's regulatory program for its export fisheries is not comparable to U.S. standards.

169.    The Tunisia CF states that in 2018, Tunisia participated in a 20-country survey effort across the Mediterranean and Black Seas sponsored by the Agreement on the Conservation of Cetaceans of the Black Sea, Mediterranean Sea and contiguous Atlantic, which "improved the region's understanding of its marine mammal populations." Otherwise, the Tunisia CF provides no information on whether Tunisia conducts or otherwise has stock assessments for any of the marine mammals interacting with its export fisheries. Tunisia lacks a regulatory program requiring stock assessments that are comparable in effectiveness to those required under U.S. standards.

170.    As described above, several stocks of marine mammals are likely caught in Tunisia's export fisheries. The Tunisia CF states, "For all marine mammal species, Tunisia used the lookup table to determine bycatch limits. Although Tunisia indicated in its application that the bycatch limit is not exceeded for any species, without monitoring programs in every export fishery, it is unclear how this could be known." The Tunisia CF does not provide any bycatch estimates for any fishery other than Fishery IDs 2459, 2461, 2462, and 2463, which Tunisia indicated had no "documented interactions with common bottlenose dolphins." NMFS failed to show—and without sufficient bycatch data, could not show—that marine mammal bycatch in Tunisia export fisheries does not exceed bycatch limits comparable to U.S. standards.

171.    The Tunisia CF contains no assessment or indication of whether Tunisia's export fisheries meet a negligible impact standard for mortality or serious injury for species that are listed under the ESA (i.e., fin whale and sperm whale) or would qualify for listing under the

ESA. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). Tunisia's fisheries do not achieve a comparable standard.

172.    The Tunisia CF contains no assessment or indication of whether Tunisia's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). Tunisia's regulatory program does not have or achieve a comparable standard.

173.    Other than citing past consultations with Tunisia, the Tunisia CF contains no assessment of the comparability factors under 50 C.F.R. § 216.24(h)(7). It instead claims each factor is "Not applicable."

F.    United Kingdom

174.    NMFS issued a comparability finding (the United Kingdom CF) determining that "all of the United Kingdom's exempt and export fisheries are comparable in effectiveness" to the U.S. program. Among the fisheries granted comparability, Fishery ID 2679 is a gillnet fishery targeting Atlantic cod, spinous spider crab, and turbot, among other fish species. Fishery ID 2653 is a pot and trap fishery targeting edible crab, Norway lobster, and other fish.

175.    The United Kingdom CF fails to demonstrate that bycatch in the United Kingdom's export fisheries does not exceed U.S. standards or that the United Kingdom maintains a regulatory program that is comparable in effectiveness to U.S. standards.

176.    The United Kingdom CF states that the United Kingdom provided bycatch estimates for large whale species. The United Kingdom CF provides no additional details on the bycatch limit or the bycatch rate for marine mammal species. The United Kingdom CF does not provide bycatch estimates for Fishery ID 2679, a gillnet fishery operating in harbor porpoise and common dolphin habitat. The United Kingdom CF does not provide bycatch estimates for Fishery ID 2653, a pot and trap fishery operating in humpback whale and minke whale habitat.

The United Kingdom CF does not provide cumulative bycatch estimates for Fishery ID 2679, Fishery ID 2653, and any other export fishery causing harbor porpoise, common dolphin, humpback whale, and minke whale bycatch. Without bycatch estimates based on reasonable proof, NMFS failed to show that marine mammal bycatch in the United Kingdom's export fisheries does not exceed bycatch limits.

177. The United Kingdom CF states that Fishery IDs 2679 and 2653 "have documented bycatch" and that this "bycatch is below the bycatch limit." It also states that Fishery ID 2679 is "contributing to 25% of the bycatch limit for harbor porpoise." The United Kingdom CF states that the United Kingdom provided bycatch estimates for large whale species. The United Kingdom CF provides no evidence to support these statements, nor does it demonstrate that the referenced bycatch limit is comparable to U.S. bycatch limits. Moreover, the United Kingdom CF's conclusion that bycatch is below the bycatch limit contradicts available scientific literature that shows bycatch is likely exceeding limits. As discussed above, an OSPAR Convention report found that bycatch of harbor porpoises and common dolphins is exceeding sustainable thresholds in certain areas of the Northeast Atlantic, including in the Celtic seas, an area which overlaps with the area for Fishery ID 2679. This evidence indicates Fishery ID 2679 is exceeding the applicable bycatch limit for the harbor porpoise and the common dolphin. Likewise, a report from the International Whaling Commission found that that bycatch from the Scottish static pot creel fishery was taking more than three times the PBR for minke whales. This evidence indicates Fishery ID 2653 is exceeding the applicable bycatch limit for the minke whale.

178. The United Kingdom is implementing some mitigation in Fishery ID 2679, including the use of pingers. The United Kingdom CF states "[t]he information provided by the

50

United Kingdom to NMFS regarding harbor [sic] bycatch reduction measures did not allow

NMFS to quantify a specific bycatch reduction percentage" and that NMFS was unable to verify

the United Kingdom's estimates of bycatch reduction from these measures. NMFS failed to

assess whether or establish that these mitigations measures are sufficient to reduce marine

mammal bycatch below the relevant bycatch limit.

179.    The pot and trap fishery in the northeast Atlantic (Fishery ID 2653) catches minke

whales, humpback whales, gray seals, and harbor seals. There are no regulatory requirements to

mitigate that bycatch. The United Kingdom CF notes "it is unclear whether additional mitigation

measures are needed to reduce bycatch of minke and humpback whales" in this fishery. NMFS

failed to show that bycatch of minke whales, humpback whales, gray seals or harbor seals in the

pot and trap fishery does not exceed bycatch limits comparable to U.S. standards or that the

United Kingdom manages marine mammal bycatch in that fishery to achieve comparable results

as under U.S. standards.

180.    The United Kingdom CF reports the United Kingdom has "self-reporting" of

bycatch in all fisheries, with observer coverage ranging from <1% to 50%. NMFS did not

explain why the limited amount of bycatch monitoring in the United Kingdom's fisheries is

comparable in effectiveness to U.S. standards. Nor did NMFS evaluate whether the United

Kingdom can obtain statistically reliable estimates of bycatch. Without statistically reliable

estimates of bycatch, the United Kingdom's regulatory program for its export fisheries is not

comparable to U.S. standards.

181.    The United Kingdom CF provides no information on whether the United

Kingdom conducts or otherwise has stock assessments for any of the marine mammals caught in

its export fisheries. The United Kingdom lacks a regulatory program requiring stock assessments that are comparable in effectiveness to those required under U.S. standards.

182.    The United Kingdom CF contains no assessment or indication of whether the United Kingdom's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). The United Kingdom's regulatory program does not have or achieve a comparable standard.

G.      Vanuatu

183.    NMFS issued a comparability finding (the Vanuatu CF) determining "that all of Vanuatu's exempt and export fisheries are comparable in effectiveness to the U.S. regulatory program." Among the fisheries granted comparability, Fishery IDs 2796, 2850, 2851, and 2852 are each pelagic longline fisheries that fish on the high seas and target albacore tuna, bigeye tuna, and marlin, among other fish species.

184.    The Vanuatu CF fails to demonstrate that bycatch in Vanuatu's export fisheries does not exceed U.S. standards or that Vanuatu satisfies the Import Regulations' requirements for fisheries operating on the high seas, either for transboundary or other stocks. *See* 50 C.F.R. § 216.24(h)(6)(iii)(E).

185.    Vanuatu's pelagic longline fisheries fish in areas where false killer whales are present. The Vanuatu CF states that the false killer whale stock that Vanuatu listed as being in the same waters as its fisheries "could be the Hawai'i Pelagic Population." NMFS has elsewhere determined that Vanuatu's longline fisheries operate within the range of the Hawai'i pelagic stock of false killer whales. NMFS's Stock Assessment Report for the "FALSE KILLER WHALE (*Pseudorca crassidens*): Hawaiian Islands Stock Complex" recognizes that the Hawai'i pelagic stock of false killer whales occurs in both the U.S. EEZ and on the high seas. This Stock

Assessment Report expressly refers to the Hawai'i pelagic stock as a "transboundary stock" of false killer whales. Nevertheless, the Vanuatu CF states that "Vanuatu and the United States do not share any transboundary stocks."

186.    The Vanuatu CF notes that "Vanuatu's pelagic longline fisheries are similar to the U.S. pelagic longline fishery covered by the False Killer Whale Take Reduction Plan (FKWTRP)." The FKWTRP requires measures to reduce bycatch both within the U.S. EEZ and on the high seas. The FKWTRP establishes a 282,796 square kilometer, year-round closure to all longline fishing around the main Hawaiian Islands. 50 C.F.R. § 229.37(d); 77 Fed. Reg. 71260, 71262 (Nov. 29, 2012). It also establishes a "trigger"-based closure of a portion of the U.S. EEZ to deep-set longline fishing if a particular number of false killer whales (calculated annually from defined factors) are observed killed or seriously injured in the U.S. EEZ. 50 C.F.R. § 229.37(e). This additional closure totals 386,122 square kilometers. 77 Fed. Reg. at 71266. The FKWTRP also imposes mandatory gear restrictions that apply to deep-set longline fishing both within the U.S. EEZ and on the high seas. 50 C.F.R. § 229.37(c). Specifically, the FKWTRP requires the use of circle hooks in the deep-set longline fishery, with a maximum wire diameter of 4.5 millimeters. *Id.* § 229.37(c)(1). It also requires the deep-set longline fishery to use branch lines and leaders that are 2.0 millimeters or larger in diameter and requires that any other materials used in branch lines or leaders have a breaking strength of 400 pounds or greater. *Id.* § 229.37(c)(2). Finally, the FKWTRP requires captains to be certified annually regarding proper marine mammal handling and release practices. *Id.* § 229.37(f).

187.    A study by NMFS scientists determined that the vast majority of foreign longline fisheries that target tuna on the high seas (such as Vanuatu's Fishery IDs 2796, 2850, 2851 and 2852 at issue here) "would be classified as deep setting, with characteristics more similar to the

Hawai'i-based [deep-set longline] fishery." However, the Vanuatu CF does not evaluate whether Vanuatu's pelagic longline fisheries implement the measures the United States requires of the Hawai'i-based deep-set and shallow-set pelagic longline fisheries. Vanuatu does not implement the gear modifications in its pelagic longline fisheries that the United States requires of the Hawai'i-based pelagic longline fisheries under the FKWTRP. Vanuatu does not implement any static or dynamic closures in its pelagic longline fisheries to protect false killer whales. NMFS has elsewhere determined that foreign longline fisheries may be more likely to kill false killer whales than the Hawai'i longline fishery given the bycatch mitigation measures in place for the Hawai'i-based fleet.

188.    Vanuatu and the United States are both members of the Inter-American Tropical Tuna Commission (IATTC) and the Western and Central Pacific Fisheries Commission (WCPFC), which are regional fisheries management organizations (RFMOs) responsible for the conservation and management of tuna and tuna-like species in the eastern Pacific Ocean and in the western and central Pacific Ocean, respectively.

189.    The Vanuatu CF states that Vanuatu reported that none of its export fisheries have had interactions with marine mammals, but that NMFS discovered an IATTC report from 2022 for Vanuatu showing it had five marine mammal takes in 2019. Vanuatu has previously reported bycatch of false killer whales in its pelagic longline fisheries to WCPFC. NMFS has developed estimates of false killer whale bycatch in longline fisheries based on the number of hooks used. These estimates show that Vanuatu's longline fisheries incidentally take false killer whales, including false killer whales from the Hawai'i pelagic stock. NMFS did not provide evidence or explanation to support Vanuatu's reported bycatch estimate. Without bycatch estimates based on

reasonable proof, NMFS failed to show that marine mammal bycatch in Vanuatu's export fisheries does not exceed bycatch limits.

190.    The Vanuatu CF states that "Vanuatu is in compliance with the circle hooks requirements as part of its requirements under IATTC and WCPFC" and that Vanuatu's other reported mitigation measures are just "education efforts, not mitigation." The RFMOs implemented the measure regarding the use of circle hooks to protect sea turtles. The RFMO circle hook measure applies to shallow-set longlines only, not deep-set longlines. The measure is for the use of "large" circle hooks and is not mandatory under the RFMO requirements. Instead of circle hooks, a fisherman can choose to use fin-fish bait, which false killer whales eat and will still be attracted to.

191.    The Vanuatu CF contains no assessment or indication of whether Vanuatu's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2); § 1387(f)(2). Vanuatu's regulatory program does not have or achieve a comparable standard.

H.    Taiwan

192.    NMFS issued a comparability finding (the Taiwan CF) determining that nineteen of Taiwan's exempt and export fisheries "are comparable in effectiveness to the U.S. regulatory program."

193.    The Taiwan CF fails to demonstrate that bycatch in Taiwan's export fisheries does not exceed U.S. standards or that Taiwan maintains a regulatory program that is comparable in effectiveness to U.S. standards. The Taiwan CF also fails to demonstrate that Taiwan satisfies the Import Regulations' requirements for fisheries operating on the high seas, either for transboundary or other stocks. *See* 50 C.F.R. § 216.24(h)(6)(iii)(E).

194.    Among the fisheries granted comparability are Fishery ID 809, a pelagic longline fishery that targets dolphinfishes, marlins, and other fish, on the high seas and within the EEZs of several nations and territories in Southeast Asia and Oceania; Fishery ID 885, a pelagic longline fishery that targets dolphinfishes, marlins, etc., on the high seas; Fishery ID 889, a pelagic longline fishery that targets dolphinfishes, marlins, sailfishes, true tunas, etc., on the high seas and within the EEZs of certain countries in the Atlantic Ocean; and Fishery ID 886, a pelagic longline fishery that targets marlin, sailfish, true tunas, etc., on the high seas and within the EEZs throughout the Indian Ocean.

195.    Taiwan's pelagic longline fisheries operate in high seas areas where false killer whales are present. NMFS has elsewhere determined that some of Taiwan's longline fisheries operate within the range of the Hawai'i pelagic stock of false killer whales and cause serious injury and mortality of these marine mammals. The Hawai'i pelagic stock of false killer whales is a transboundary stock. Nevertheless, the Taiwan CF states that "Taiwan and the United States do not share any transboundary species."

196.    The CF fails to demonstrate that Taiwan satisfies the Import Rule's requirements for fisheries operating on the high seas, either for transboundary or other stocks. *See* C.F.R. § 216.24(h)(6)(iii)(E). The Taiwan CF states that Taiwan requires its fishing vessels to follow the conservation measures of the RFMOs to which it is a party. The CF relies on the fact that the WCPFC and IATTC require the use of circle hooks. The circle hook requirement under these RFMOs is for the use of "large" circle hooks, applies to shallow-set longlines only, and is not mandatory as fishers can choose instead to use fin-fish bait which still attracts false killer whales.

197.    For Taiwan's non-high-seas fisheries, Fishery ID 891 is an anchored/set gillnet/set net surface fishery that targets blue mackerel, bullet tuna, common dolphinfish, etc.

within Taiwan's EEZ; Fishery ID 892 is a surface stow net fishery targeting Buccaneer anchovy and Japanese anchovy along the Northwest coast of Taiwan; Fishery ID 893 is a bottom trawl/demersal fishery targeting cephalopods, demersal fishes, and marine crabs within Taiwan's territorial sea, including the eastern Taiwan Strait; Fishery ID 10431 is a longline/demersal fishery targeting blue-spotted stingray, Greater amberjack, etc. within Taiwan's EEZ/surrounding waters; and Fishery ID 11108 is a demersal pot and trap fishery targeting Charybdis crabs, Maculated ivory whelk, etc., in the waters surrounding Taiwan.

198.    The Taiwan CF reports varying levels of monitoring in Taiwan's fisheries. It states, "[f]or the fisheries in its national waters, Taiwan uses a combination of dockside inspection reports, a landing declaration scheme, and observer programs." For these fisheries, The Taiwan CF states that it uses self-reporting and observer programs to monitor these fisheries "at unknown, but probably low levels." For example, the Taiwan CF states that the observer program for Fishery ID 11108 has less than one percent coverage. The Taiwan CF notes that the observer programs for Fishery IDs 893 and 10431 have unknown coverage. Fishery ID 891 has only self-reporting for monitoring. The Taiwan CF states, "it is not known whether the existing monitoring programs in the coastal domestic fisheries are sufficient to estimate marine mammal bycatch with any level of statistical confidence as it is self-reporting and what appears to be a low level of observer coverage." NMFS did not explain why the limited amount of bycatch monitoring in Taiwan's fisheries is comparable in effectiveness to U.S. standards. Nor did NMFS establish that Taiwan's monitoring programs can obtain statistically reliable estimates of bycatch. Without statistically reliable estimates of bycatch, Taiwan's regulatory program for its export fisheries is not comparable to U.S. standards.

199.    The Taiwan CF provides no information on whether Taiwan conducts or otherwise has stock assessments for any of the marine mammals caught in its export fisheries. Taiwan lacks a regulatory program requiring stock assessments that are comparable in effectiveness to those required under U.S. standards.

200.    The Taiwan CF does not provide any bycatch estimates for fisheries based on reasonable proof, either individually or cumulatively. Taiwan reported that fin whales, sei whales, and "a number of unknown baleen whale, whale, dolphin, toothed whale, etc." may be incidentally caught in its fisheries. NMFS determined that blue whales, humpback whales (Western North Pacific stock), sperm whales, narrow-ridged (Indo-Pacific) finless porpoises, and Taiwanese humpback dolphins may also be caught in Taiwan's fisheries. For its coastal and domestic fisheries, Taiwan indicated that "there are marine mammals present in the same area, but no interactions are occurring." The Taiwan CF acknowledges Taiwan "did not provide any documentary evidence to support its conclusion." Nonetheless, NMFS concluded Fishery IDs 892, 893 and 11108 either do not interact with marine mammals or do not exceed existing bycatch limits. NMFS failed to show—and without bycatch data based on reasonable proof, could not show—that marine mammal bycatch in these fisheries or any of Taiwan's other export fisheries does not exceed bycatch limits comparable to U.S. standards.

201.    NMFS denied a comparability finding for Fishery ID 890 because it "[d]oes not prioritize or implement reporting, monitoring, and mitigation of mortality and serious injury of endangered marine mammal stocks/species, Taiwanese white dolphin, that likely co-occurs with this export fishery that is using fishing gear with a high risk of interaction/entanglement." Paradoxically, NMFS granted a comparability finding for Fishery ID 892, which also overlaps

with the endangered Taiwanese humpback dolphin (according to documented sightings and NMFS's own website) and which has less than 1% observer coverage.

202. Taiwan's CF states that "Taiwan is conducting research into the use of pingers and LED for some of its coastal domestic fisheries, but has not provided a timeline on the length of the research and when mitigation measures could be implemented." NMFS did not assess whether or establish that these measures are sufficient to reduce marine mammal bycatch below the relevant bycatch limit.

203. The Taiwan CF contains no assessment or indication of whether Taiwan's export fisheries meet a negligible impact standard for mortality or serious injury for species that are listed or would qualify for listing under the ESA, including but not limited to the Taiwanese humpback dolphin and the Indo-Pacific finless porpoise. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2). Taiwan's fisheries do not achieve a comparable standard.

204. The Taiwan CF contains no assessment or indication of whether Taiwan's regulatory program includes a requirement to reduce bycatch from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2). Taiwan's regulatory program does not have or achieve a comparable standard.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – The Comparability Finding for Argentina's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.

205. The allegations made in paragraphs 1–204 are realleged and incorporated by this reference.

206. The MMPA requires Federal Defendants to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Secretary

of Commerce must "insist on reasonable proof from the government of [the harvesting nation] of the effects on ocean mammals" from the fishery to determine if the import standard is met. *Id.* § 1371(a)(2)(A).

207.    The Import Regulations prohibit importation of seafood from a fishery "that does not have a valid comparability finding in effect." 50 C.F.R. § 216.24(h)(1)(ii)(A). To issue a valid comparability finding, NMFS must reasonably find "that the harvesting nation for an export . . . fishery has met the applicable conditions specified in § 216.24(h)(6)(iii) subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)." *Id.* § 216.3.

208.    The Comparability Finding for Argentina is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

209.    The Argentina CF is arbitrary and capricious and contrary to law in multiple respects.

210.    First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Argentina's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The bycatch rate of the franciscana dolphin in gillnet Fishery ID 48 exceeds the applicable bycatch limit. The Argentina CF does not provide bycatch estimates based on reasonable proof for other marine mammals in Argentina's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Argentina's export fisheries do not exceed the applicable bycatch limit.

211.    Second, NMFS was required to evaluate whether and establish that Argentina implements monitoring procedures comparable to U.S. standards for monitoring bycatch. *Id.* §§

60

1371(a)(2), 1387(f)(2), (f)(5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the Argentina CF. Argentina's regulatory program lacks a comparable standard for monitoring bycatch.

212.    Third, NMFS was required to evaluate whether and establish that Argentina's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the Argentina CF. And Argentina's regulatory program lacks a comparable standard.

213.    Fourth, NMFS was required to evaluate whether and establish that Argentina's regulatory program implements measures comparable in effectiveness to U.S. standards to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*). NMFS did not do so in the Argentina CF. And Argentina's regulatory program lacks a comparable standard.

214.    Fifth, NMFS was required to evaluate whether and find that Argentina has a standard comparable to the U.S. standard that incidental mortality and serious injury of threatened or endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. 16 U.S.C. § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Argentina CF. And Argentina's regulatory program lacks a comparable standard.

215.    Sixth, NMFS was required to evaluate whether and establish that Argentina has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. §

216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Argentina CF. And Argentina's regulatory program lacks a comparable standard.

216. Seventh, NMFS was required to consider eight factors enumerated in 50 C.F.R. § 216.24(h)(7). NMFS failed to adequately assess the factors and arbitrarily asserted most of the factors were not applicable in the Argentina CF.

217. Accordingly, the Argentina CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**SECOND CAUSE OF ACTION – The Comparability Finding for Ecuador's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

218. The allegations made in paragraphs 1–217 are realleged and incorporated by this reference.

219. The Comparability Finding for Ecuador is a final agency action as defined by the APA, for which there is no other adequate remedy in a court

220. The Ecuador CF is arbitrary and capricious and contrary to law in multiple respects.

221. First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Ecuador's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The Ecuador CF does not provide bycatch estimates based on reasonable proof for marine mammals in Ecuador's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Ecuador's export fisheries do not exceed the applicable bycatch limit.

222. Second, NMFS was required to evaluate whether and establish that Ecuador implements monitoring procedures comparable to U.S. standards for monitoring. *Id.* §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the Ecuador CF. And Ecuador's regulatory program lacks a comparable standard.

223. Third, NMFS was required to evaluate whether and establish that Ecuador's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the Ecuador CF. And Ecuador's regulatory program lacks a comparable standard.

224. Fourth, NMFS was required to evaluate whether and find that Ecuador has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. *Id.* § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(7)(i). NMFS did not do so in the Ecuador CF. And Ecuador's regulatory program lacks a comparable standard.

225. Fifth, NMFS was required to evaluate whether and establish that Ecuador has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Ecuador CF. And Ecuador's regulatory program lacks a comparable standard.

226. Sixth, NMFS was required to consider eight factors enumerated in 50 C.F.R. § 216.24(h)(7). NMFS arbitrarily asserted most of the factors were not applicable in the Ecuador CF.

63

227.    Accordingly, the Ecuador CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**THIRD CAUSE OF ACTION – The Comparability Finding for India's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

228.    The allegations made in paragraphs 1–227 are realleged and incorporated by this reference.

229.    The Comparability Finding for India is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

230.    The India CF is arbitrary and capricious and contrary to law in multiple respects.

231.    First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in India's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The India CF does not provide bycatch estimates based on reasonable proof for marine mammals in India's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in India's export fisheries do not exceed the applicable bycatch limit.

232.    Second, NMFS was required to evaluate whether and establish that India implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. *Id.* §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the India CF. And India's regulatory program lacks a comparable standard.

233.    Third, NMFS was required to evaluate whether and establish that India's regulatory program provides for marine mammal assessments that are comparable to the

MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the India CF. And India's regulatory program lacks a comparable standard.

234.    Fourth, NMFS was required to evaluate whether and find that India has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. *Id.* § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(7)(i). NMFS did not do so in the India CF. And India's regulatory program lacks a comparable standard.

235.    Fifth, NMFS was required to evaluate whether and establish that India has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the India CF. And India's regulatory program lacks a comparable standard.

236.    Sixth, NMFS was required to consider eight factors enumerated in 50 C.F.R. § 216.24(h)(7). NMFS arbitrarily asserted most of the factors were not applicable in the India CF.

237.    Accordingly, the India CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**FOURTH CAUSE OF ACTION – The Comparability Finding for Norway's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

238.    The allegations made in paragraphs 1–237 are realleged and incorporated by this reference.

239. The Comparability Finding for Norway is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

240. The Norway CF is arbitrary and capricious and contrary to law in multiple respects.

241. First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Norway's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The bycatch rate of harbor porpoises in Norway's export fisheries is exceeding the applicable bycatch limit. The bycatch rate of gray seals in Norway's export fisheries is also exceeding the applicable bycatch limit. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Norway's export fisheries do not exceed the applicable bycatch limit.

242. Second, NMFS was required to evaluate whether and establish that Norway implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. *Id.* §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the Norway CF. And Norway's monitoring program lacks a comparable standard.

243. Third, NMFS was required to evaluate whether and establish that Norway's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the Norway CF. And Norway's regulatory program lacks a comparable standard.

244. Fourth, NMFS was required to evaluate whether and establish that Norway's regulatory program implements measures comparable in effectiveness to U.S. standards to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*). NMFS did not do so in the Norway CF. And Norway's regulatory program lacks a comparable standard.

245. Fifth, NMFS was required to evaluate whether and find that Norway has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. 16 U.S.C. § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(7)(i). NMFS did not do so in the Norway CF. And Norway's regulatory program lacks a comparable standard.

246. Sixth, NMFS was required to evaluate whether and establish that Norway has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Norway CF. And Norway's regulatory program lacks a comparable standard.

247. Seventh, NMFS was required to consider eight factors enumerated in 50 C.F.R. § 216.24(h)(7). NMFS arbitrarily asserted most of the factors were not applicable in the Norway CF.

248. Accordingly, the Norway CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**FIFTH CAUSE OF ACTION – The Comparability Finding for Tunisia's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

249.    The allegations made in paragraphs 1–248 are realleged and incorporated by this reference.

250.    The Comparability Finding for Tunisia is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

251.    The Tunisia CF is arbitrary and capricious and contrary to law in multiple respects.

252.    First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Tunisia's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The Tunisia CF does not provide bycatch estimates based on reasonable proof for marine mammals in Tunisia's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Tunisia's export fisheries do not exceed the applicable bycatch limit.

253.    Second, NMFS was required to evaluate whether and establish that Tunisia implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. 16 U.S.C. §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the Tunisia CF. And Tunisia's regulatory program lacks a comparable monitoring standard.

254.    Third, NMFS was required to evaluate whether and establish that Tunisia's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. §

68

216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the Tunisia CF. And Tunisia's regulatory program lacks a comparable standard.

255.   Fourth, NMFS was required to evaluate whether and find that Tunisia has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. 16 U.S.C. § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Tunisia CF. And Tunisia's regulatory program lacks a comparable standard.

256.   Fifth, NMFS was required to evaluate whether and establish that Tunisia has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Tunisia CF. And Tunisia's regulatory program lacks a comparable standard.

257.   Sixth, NMFS was required to consider eight factors enumerated in 50 C.F.R. § 216.24(h)(7). NMFS arbitrarily asserted most of the factors were not applicable in the Tunisia CF.

258.   Accordingly, the Tunisia CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**SIXTH CAUSE OF ACTION – The Comparability Finding for the United Kingdom's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

259.    The allegations made in paragraphs 1–258 are realleged and incorporated by this reference.

260.    The Comparability Finding for the United Kingdom is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

261.    The United Kingdom CF is arbitrary and capricious and contrary to law in multiple respects.

262.    First, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in the United Kingdom's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The United Kingdom CF does not provide sufficient evidence of bycatch rates for marine mammals in the United Kingdom's export fisheries. The bycatch rate of harbor porpoises and common dolphins in Fishery ID 2679 exceeds the applicable bycatch limit. The bycatch rate of minke whales in Fishery ID 2653 exceeds the applicable bycatch limit. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in the United Kingdom's export fisheries do not exceed the applicable bycatch limit.

263.    Second, NMFS was required to evaluate whether and establish that the United Kingdom implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. 16 U.S.C. §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the United Kingdom CF. And the United Kingdom's regulatory program lacks a comparable monitoring standard.

70

264.    Third, NMFS was required to evaluate whether and establish that the United Kingdom's regulatory program provides for marine mammal assessments that are comparable to the MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the United Kingdom CF. And the United Kingdom's regulatory program lacks a comparable standard.

265.    Fourth, NMFS was required to evaluate whether and establish that the United Kingdom's regulatory program implements measures comparable in effectiveness to U.S. standards to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*). NMFS did not do so in the United Kingdom CF. And the United Kingdom's regulatory program lacks a comparable standard.

266.    Fifth, NMFS was required to evaluate whether and establish that the United Kingdom has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the United Kingdom CF. And the United Kingdom's regulatory program lacks a comparable standard.

267.    Accordingly, the United Kingdom CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. 1371(a)(2); 50 C.F.R. § 216.24(h).

**SEVENTH CAUSE OF ACTION – The Comparability Finding for Vanuatu's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

268.    The allegations made in paragraphs 1–267 are realleged and incorporated by this reference.

269.    The Comparability Finding for Vanuatu is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

270.    The Vanuatu CF is arbitrary and capricious and contrary to law in multiple respects.

271.    First, NMFS arbitrarily concluded that Vanuatu and the United States do not share any transboundary stocks. The Hawai'i pelagic stock of false killer whales is a transboundary stock shared by Vanuatu and the United States.

272.    Second, NMFS was required to evaluate whether and establish that Vanuatu's export fisheries operating on the high seas implement "measures to reduce the incidental mortality and serious injury of [a transboundary] stock that the United States requires its domestic fisheries to take with respect that transboundary stock," as well as "measures to reduce incidental mortality and serious injury that the United States requires its domestic fisheries to take with respect to that marine mammal stock when they are operating on the high seas." 50 C.F.R. § 216.24(h)(6)(iii)(E)(*2*)(*ii*); *see also* 16 U.S.C. § 1371(a)(2). Vanuatu's export fisheries operating on the high seas pose a bycatch risk to the transboundary Hawai'i pelagic stock of false killer whales, as well as other marine mammals. NMFS failed to rationally evaluate whether or establish that Vanuatu's pelagic longline fisheries operating on the high seas implement measures that the United States requires of the Hawai'i-based deep-set and shallow-set pelagic longline fisheries. Vanuatu's pelagic longline fisheries do not implement many of the measures the United States requires these Hawai'i-based longline fisheries to take to protect false killer whales. Vanuatu does not require the gear modifications in its pelagic longline fisheries that the United States requires of the Hawai'i deep-set longline fishery under the FKWTRP to protect the Hawai'i pelagic stock of false killer whales. Vanuatu does not implement any static or dynamic

closures in its pelagic longline fisheries to protect false killer whales. NMFS failed to rationally evaluate whether or establish that Vanuatu's pelagic longline fisheries implement measures comparable to those that the United States requires of the Hawai'i-based deep-set and shallow-set pelagic longline fisheries. Vanuatu's pelagic longline fisheries do not implement such comparable measures.

273.    Third, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Vanuatu's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The Vanuatu CF does not provide bycatch estimates based on reasonable proof for marine mammals in Vanuatu's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Vanuatu's export fisheries do not exceed the applicable bycatch limit.

274.    Fourth, NMFS was required to evaluate whether and establish that Vanuatu has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Vanuatu CF. And Vanuatu's regulatory program lacks a comparable standard.

275.    Accordingly, the Vanuatu CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**EIGHTH CAUSE OF ACTION – The Comparability Finding for Taiwan's Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

276.    The allegations made in paragraphs 1–275 are realleged and incorporated by this reference.

277.    The Comparability Finding for Taiwan is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

278.    The Taiwan CF is arbitrary and capricious and contrary to law in multiple respects.

279.    First, NMFS arbitrarily concluded that Taiwan and the United States do not share any transboundary stocks. Taiwan and the United States share the Hawai'i pelagic stock of false killer whales, which is a transboundary stock.

280.    Second, NMFS was required to evaluate whether and establish that Taiwan's export fisheries operating on the high seas implement "measures to reduce the incidental mortality and serious injury of [a transboundary] stock that the United States requires its domestic fisheries to take with respect that transboundary stock," as well as "measures to reduce incidental mortality and serious injury that the United States requires its domestic fisheries to take with respect to that marine mammal stock when they are operating on the high seas." 50 C.F.R. § 216.24(h)(6)(iii)(E)(*2*)(*ii*); *see also* 16 U.S.C. § 1371(a)(2). Some of Taiwan's export fisheries operating on the high seas pose a bycatch risk to the transboundary Hawai'i pelagic stock of false killer whales, as well as other marine mammals. NMFS failed to rationally evaluate whether or establish that Taiwan's pelagic longline fisheries operating on the high seas implement measures that the United States requires of the Hawai'i-based deep-set and shallow-set pelagic longline fisheries. Taiwan's pelagic longline fisheries do not implement many of the measures the United States requires these Hawai'i-based longline fisheries to take to protect false

74

killer whales. Taiwan does not require the gear modifications in its pelagic longline fisheries that the United States requires of the Hawai'i deep-set longline fishery under the FKWTRP to protect the Hawai'i pelagic stock of false killer whales. Taiwan does not implement any static or dynamic closures in its pelagic longline fisheries to protect false killer whales. NMFS failed to rationally evaluate whether or establish that Taiwan's pelagic longline fisheries implement measures comparable to those that the United States requires of the Hawai'i-based deep-set and shallow-set pelagic longline fisheries. Taiwan's pelagic longline fisheries do not implement such comparable measures.

281.    Third, NMFS was required to evaluate whether and establish that the rate of mortality or serious injury of any marine mammal stock in Taiwan's export fisheries is not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*) (requiring that fisheries "[d]o not exceed the bycatch limit"). The Taiwan CF does not provide bycatch estimates based on reasonable proof for marine mammals in Taiwan's export fisheries. NMFS failed to rationally evaluate and establish that the rates of marine mammal mortality or serious injury in Taiwan's export fisheries do not exceed the applicable bycatch limit.

282.    Fourth, NMFS was required to evaluate whether and establish that Taiwan implements monitoring procedures comparable to U.S. standards for monitoring in similar circumstances. 16 U.S.C. §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*). NMFS did not do so in the Taiwan CF. And Taiwan's regulatory program lacks a comparable standard.

283.    Fifth, NMFS was required to evaluate whether and establish that Taiwan's regulatory program provides for marine mammal assessments that are comparable to the

MMPA's stock assessment requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*). NMFS did not do so in the Taiwan CF. And Taiwan's regulatory program lacks a comparable standard.

284.    Sixth, NMFS was required to evaluate whether and establish that Taiwan's regulatory program implements measures comparable in effectiveness to U.S. standards to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*). NMFS did not do so in the Taiwan CF. And Taiwan's regulatory program lacks a comparable standard.

285.    Seventh, NMFS was required to evaluate whether and find that Taiwan has a standard comparable to the U.S. standard that incidental mortality and serious injury of endangered marine mammals in commercial fisheries has no more than a "negligible impact" on the species. 16 U.S.C. § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Taiwan CF. And Taiwan's regulatory program lacks a comparable standard.

286.    Eighth, NMFS was required to evaluate whether and establish that Taiwan has a standard comparable to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(*ii*), (*5*), (*6*). NMFS did not do so in the Taiwan CF. And Taiwan's regulatory program lacks a comparable standard.

287.    Accordingly, the Taiwan CF is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

**NINTH CAUSE OF ACTION – Federal Defendants Failed to Ban the Importation of Fish from Export Fisheries in Eight Nations as Required by the MMPA.**

288.    The allegations made in paragraphs 1–287 are realleged and incorporated by this reference.

289.    The MMPA requires the Secretary of the Treasury to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1).

290.    An export fishery without a "valid comparability finding" in effect is deemed to "result[] in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards." 50 C.F.R. § 216.24(h)(1)(i), (h)(2); *see also id.* § 216.24(h)(1)(ii)(A) (making it unlawful to import fish from "a fishery that does not have a valid comparability finding in effect at the time of import").

291.    To issue a valid comparability finding, NMFS must reasonably establish "that the harvesting nation for an export . . . fishery has met the applicable conditions specified in § 216.24(h)(6)(iii) subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)." 50 C.F.R. § 216.3. Further, a comparability finding is only valid if NMFS establishes that the fishery does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards" within the meaning of the MMPA. 16 U.S.C. § 1371(a)(2).

292.    NMFS did not reasonably and lawfully establish that certain export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, or Vanuatu meet the applicable conditions specified in 50 C.F.R. § 216.24(h)(6) and (7) or in 16 U.S.C. § 1371(a)(2),

specifically Fishery IDs: 45 and 48 from Argentina; 1171, 1180, 1182, and 1183 from Ecuador; 1505, 1507, 1509, 1511, 1512, 1513, 1515, 1516, 7084, and 7085 from India; 2018, 2019, and 10219 from Norway; 809, 885, 886, 889, 891, 892, 893, 10431, and 11108 from Taiwan; 2454, 2457, 2458, 2459, 2461, 2462, 2463, 12737, 12752, and 12754 from Tunisia; 2653 and 2679 from the United Kingdom; and 2796, 2850, 2851, and 2852 from Vanuatu.

293.    Accordingly, those export fisheries do not have a valid comparability finding in effect.

294.    In addition, NMFS found that Fishery ID 48 from Argentina and Fishery IDs 2018, 2019, and 10219 from Norway incidentally kill or seriously injure marine mammals (including francsicana dolphins, harbor porpoises and gray seals) at rates that exceed U.S. standards.

295.    The MMPA accordingly requires Federal Defendants to ban the importation of seafood caught by Fishery IDs 45, 48, 809, 885, 886, 889, 891, 892, 893, 1171, 1180, 1182, 1183, 1505, 1507, 1509, 1511, 1512, 1513, 1515, 1516, 2018, 2019, 2454, 2457, 2458, 2459, 2461, 2462, 2463, 2653, 2679, 2796, 2850, 2851, 2852, 7084, 7085, 10219, 10431, 11108, 12737, 12752, and 12754 . Federal Defendants have not banned the importation of seafood caught by those fisheries.

296.    An import ban is a discrete, legally required final agency action that can be compelled under the APA. 5 U.S.C. § 706(1).

297.    Federal Defendants' failures to implement the import bans that are legally required for the Fishery IDs listed in paragraph 295 constitute "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. *Id.*

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.      Declare that the Comparability Findings for the export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu violate the MMPA, its implementing regulations, and the APA;

2.      Vacate each of the Comparability Findings, in full or in part;

3.      Remand each of the Comparability Findings in full or in part to NMFS;

4.      Declare that Federal Defendants failed to ban imports from the export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu as required by the MMPA, its implementing regulations, and the APA;

5.      Order Federal Defendants to ban imports from export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu;

6.      Grant any injunctive relief necessary to bar imports from export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu;

7.      Maintain jurisdiction over this action until Federal Defendants are in compliance with the MMPA, APA, and every order of this Court in this matter;

8.      Award Plaintiffs their costs and reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

9.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 21st day of May, 2026.

/s/ Natalie Barefoot
Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000

79

Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
ceaton@earthjustice.org

*Attorneys for Center for Biological Diversity,
Natural Resources Defense Council, and Animal
Welfare Institute*

Sarah Uhlemann
Center for Biological Diversity
120 State Avenue NE #268
Olympia, WA 98501
T (206) 327-2344
suhlemann@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

Stephen Zak Smith
Natural Resources Defense Council
544 E Main St., Unit B
Bozeman, MT 59715
T (406) 556-9305
zsmith@nrdc.org

*Attorney for Natural Resources Defense Council*

80