IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL, INC.; AND ANIMAL WELFARE INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; EUGENIO PINEIRO SOLER, in his official capacity as the ASSISTANT ADMINISTRATOR FOR NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES; HOWARD LUTNICK, in his official capacity as the SECRETARY OF COMMERCE; SCOTT BESSENT, in his official capacity as the SECRETARY OF THE TREASURY; AND MARKWAYNE MULLIN, in his official capacity as the SECRETARY OF HOMELAND SECURITY,<br><br>Defendants. | Court No. 26-2998 |

**ORDER**

On consideration of defendants' motion to dismiss for lack of jurisdiction, it is hereby

ORDERED that defendants' motion to dismiss is GRANTED; and it is further

ORDERED that the action is DISMISSED.

**SO ORDERED.**

Dated: ____________________, 2026
New York, NY

________________________________
Judge

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL, INC.; AND ANIMAL WELFARE INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, *ET, AL.*,<br><br>Defendants. | Court No. 26-2998 |

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)**


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 353-2494
Blake.W.Cowman@usdoj.gov


September 18, 2026

*Attorneys for Defendants*

# TABLE OF CONTENTS

BACKGROUND .......... 1

I. The Marine Mammal Protection Act .......... 1

II. Factual and Procedural Background .......... 4

SUMMARY OF THE ARGUMENT .......... 5

ARGUMENT .......... 7

I. Standard of Review .......... 7

II. The Plaintiffs Lack Standing to Pursue Injunctive Relief .......... 9

A. Plaintiffs Must Demonstrate Standing on a Fishery-by-Fishery Basis .......... 10

B. Plaintiffs Do Not Allege an Injury-In-Fact .......... 12

C. Plaintiffs Do Not Allege any Redressable Injury .......... 15

D. Assuming Plaintiffs Have Established the Possibility of Standing Generally, They Fail to Establish Standing for Certain Specific Fisheries .......... 23

CONCLUSION .......... 32

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allen v. Wright*,
468 U.S. 737 (1984) ........ 6

*Animal Legal Def. Fund v. Quigg*,
932 F.2d 920 (Fed. Cir. 1991) ........ 17

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) ........ 8

*Ashley Furniture Industries, LLC v. United States*,
750 F. Supp. 3d 1329 (Ct. Int'l Trade 2024) ........ 11

*Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ........ 9

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ........ 8

*Conservation L. Found. v. Ross*,
422 F. Supp. 3d 12 (D.D.C. 2019) ........ 12

*Ctr. for Biological Diversity v. United States Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ........ 11

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) ........ 13

Doe 1 v. Apple Inc.,
96 F.4th 403, 410 (D.C. Cir. 2024) ........ 19

*Engage Learning, Inc. v. Salazar*,
660 F.3d 1346 (Fed. Cir. 2011) ........ 7

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ........ 16

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 8, 12, 16

*Friends of Animals v. Bernhardt*,
961 F.3d 1197 (D.C. Cir. 2020) ........ 11

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........ 20

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ........ 8

*Kwan v. United States*,
272 F.3d 1360 (Fed. Cir. 2001) ........ 20

*Lujan v. Defenders of Wildlife*,
504 U.S. 562 ........ passim

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 10

*Nat. Res. Def. Council, Inc. v. Ross*,
331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ........ passim

*Māui & Hector's Dolphin Defs. NZ Inc. v. Nat'l Marine Fisheries Serv.*,
2026 WL 2018678 (Ct. Int'l Trade July 13, 2026) ........ 21, 22

*NEXTEEL Co. v. United States*,
28 F.4th 1226 (Fed. Cir. 2022) ........ 16

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
345 F.3d 1379 (Fed. Cir. 2003) ........ 16

*Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55 (2004) ........ 11

*NRDC v. Lutnick*,
774 F. Supp. 3d 1348 (Ct. Int'l Trade 2024) ........ 4

*Oregon v. United States*, No.,
26-1472, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026) ........ 10

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) ........ 8

*Sea Shepherd New Zealand v. United States*,
606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ........ 14, 21

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ........ 8, 12

*Simon v. E. Kentucky Welfare Rts. Org.*,
426 U.S. 26 (1976) ........ 17

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.*,
672 F.3d 1041 (Fed. Cir. 2012) ........ 11

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 7

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 11

*Unemployment Comp. Comm'n of Alaska v. Aragon*,
329 U.S. 143 (1946) .......... 16

*United Transp. Union v. Interstate Commerce Comm'n*,
891 F.2d 908 (D.C. Cir. 1989) .......... 19

*Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*,
454 U.S. 464 (1982) .......... 8

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 7

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 15

**<u>Statutes</u>**

5 U.S.C. § 702 .......... 9

5 U.S.C. § 706 .......... 9

5 U.S.C. § 706(2)(A) .......... 16

16 U.S.C. § 1371(a)(2) .......... 2, 3

16 U.S.C. § 1378 .......... 19

28 U.S.C. § 1581 .......... 17

28 U.S.C. §§ 1601-08 .......... 17

16 U.S.C. § 1387(f)(3) .......... 27

**<u>Regulations</u>**

50 C.F.R. § 216.24(h) .......... 2

50 C.F.R. § 216.24(h)(11) .......... 20

50 C.F.R. §§ 216.24(h)(1)(i) .......... 10

50 C.F.R. § 216.24(h)(6) .......... 3

50 C.F.R. § 216.24(h)(8) .......... 3

50 C.F.R. § 216.24(h)(9) .......... 3

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL, INC.; AND ANIMAL WELFARE INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, *ET, AL.*,<br><br>Defendants. | Court No. 26-2998 |

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)**

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security, respectfully file this motion to dismiss the complaint filed by plaintiffs, Center for Biological Diversity, Natural Resources Defense Council, Inc. (NRDC), and Animal Welfare Institute. *See* ECF No. 6. For the reasons below, the complaint should be dismissed because the plaintiffs have not established that they have standing to pursue their claims.

## BACKGROUND

### I. The Marine Mammal Protection Act

The MMPA, 16 U.S.C. §§ 1361–1423h, among other things, directs the Government to ban imports of commercial fish or products from fish following a determination that harvesting of such fish or fish products resulted in the incidental killing or serious injury of marine mammals "in excess of United States standards." *See id.* § 1371(a)(2). By statute, "the

Secretary [of Commerce] . . . shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

The authority to implement the MMPA has been delegated to NMFS. In 2016, NMFS promulgated regulations (the MMPA Imports Rule) to implement the import provisions of the MMPA. *See Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390 (August 15, 2016) (codified at 50 C.F.R. Part 216). The MMPA Imports Rule established a process for NMFS to determine whether a foreign country maintains a regulatory program that provides for, or effectively achieves comparable results as, the United States' regulatory program. *See* 50 C.F.R. § 216.24(h). Absent a finding of comparability, fish or fish products may not be imported into the United States because those commercial fisheries have been deemed to result in the incidental mortality or incidental serious injury of marine mammals in excess of United States standards. 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(1)(ii).

To this end, the MMPA Imports Rule establishes a multi-step regulatory process setting forth conditions that nations must meet in order to export fish and fish products to the United States. First, NMFS must identify and publish a list of foreign fisheries that export fish and fish products to the United States and classify these fisheries based on the frequency of marine mammal interactions. *See* 50 C.F.R. § 216.24(h)(3)-(4).

Second, each foreign nation with fisheries on the list of foreign fisheries must submit an application for a comparability finding for each of its fisheries, with documentary evidence showing that the foreign nation has met certain conditions, including "reasonable proof as to the

effects on marine mammals of the commercial fishing technology in use in the fishery for fish or fish products exported from such nation to the United States." *Id.* § 216.24(h)(6). To obtain a comparability finding, the harvesting nation must establish that it "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B). The regulations require NMFS to determine, among other things, whether the harvesting nation has implemented a regulatory program that "provides for, or effectively achieves comparable results as," among other things, marine mammal stock assessments, mandatory reporting of takes of marine mammals, and calculation of bycatch limits. *Id.* § 216.24(h)(6)(iii)(C).

Third, NMFS will determine, based on the submissions by the harvesting nations, whether to issue a comparability finding for each fishery in the foreign nation on a fishery-by-fishery basis. *See id.* § 216.24(h)(8). If it declines to do so, NMFS must first notify the harvesting nation that it is preliminarily denying a comparability finding and provide the nation an opportunity to refute the preliminary denial. *Id.* § 216.24(h)(8)(iii). Before reaching a final determination granting or denying a comparability finding, NMFS must consider the information it receives from the harvesting nation in response to a preliminary denial. *Id.* § 216.24(h)(8)(iii)(B).

Fourth, if NMFS denies a comparability finding, it will specify the fishery, fish, and fish products that will be subject to import prohibitions and, in cooperation with the Secretaries of the Treasury and Homeland Security, identify and prohibit the importation of fish and fish products into the United States, 30 days after the publication of a Federal Register notice. *Id.* § 216.24(h)(9).

## II. Factual and Procedural Background

Following a 2008 rulemaking petition submitted by environmental organizations, NMFS undertook a rulemaking process to implement the import provisions of the MMPA. Compl. ¶ 122; 81 Fed. Reg. at 54,390 (noting that the petition sought "to ban the imports of swordfish and swordfish products from nations that have failed to provide reasonable proof of the effects on ocean mammals of the commercial fishing technology in use to catch swordfish"). NMFS issued the resulting MMPA Imports Rule in 2016 and, after multiple extensions, extended the effective date of the rule to January 1, 2026. Compl. ¶ 122. Before the rule went into effect, plaintiffs filed suit seeking to compel NMFS to ban the importation of fish and fish products under the rule in *NRDC v. Lutnick*, 774 F. Supp. 3d 1348 (Ct. Int'l Trade 2024). The parties subsequently entered into a stipulated settlement in which NMFS would issue comparability findings for all exporting nations under the MMPA Imports Rule by September 1, 2025, with any import bans going into effect on January 1, 2026. Compl. ¶ 123.

As plaintiffs acknowledge, "[p]ursuant to the *Lutnick* settlement, NMFS published comparability finding determinations for roughly 2,500 fisheries across 135 nations on September 2, 2025, in the Federal Register" and "NMFS granted comparability findings to approximately 2,286 of these fisheries, concluding that the fisheries do not kill or seriously injure marine mammals in excess of U.S. standards and therefore should be allowed to export seafood to the United States. Import bans for nearly all of the remaining fisheries went into effect on January 1, 2026. 90 Fed. Reg. at 42396." Compl ¶ 124.

Plaintiffs now bring this lawsuit challenging NMFS's comparability findings for fisheries in Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu.

Compl. ¶ 125. NMFS granted comparability findings to all exporting fisheries[1] in Argentina, India, Norway, Tunisia, the United Kingdom, and Vanuatu; NMFS granted comparability findings for some, but not all of the exporting fisheries in Ecuador and Taiwan. *See* NMFS, *Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations*, https://www.fisheries.noaa.gov/international-affairs/marine-mammal-protection-act-comparability-finding-determinations-harvesting (last accessed Sep. 16, 2026) (NMFS Comparability Findings Page).

## SUMMARY OF THE ARGUMENT

Plaintiffs ask the Court to order the Government to enact a country-wide embargo of seafood imports from eight countries. Plaintiffs have not alleged standing for such far-reaching relief.

First, plaintiffs must allege standing for each specific fishery and each specific comparability finding that they seek to challenge; they lack standing to seek a universal embargo of any country's seafood imports. The MMPA and its implementing regulations provide that comparability findings are to be made on a fishery-by-fishery basis, with each country challenged here having multiple Fishery IDs created by NMFS. This scheme produces a discrete regulatory action for each fishery: the issuance or denial of a comparability finding. Plaintiffs therefore must establish standing to challenge each comparability finding, meaning their allegations of injury-in-fact, causation, and redressability must relate to each specific fishery. Plaintiffs' complaint challenges several specific fisheries. Those standing allegations are defective for reasons discussed below, but, even assuming plaintiffs have established standing,

---

[1] The term "exporting fisheries" is used herein to describe generally the harvesting nations' "Export" and "Exempt" fisheries, as such terms are defined in the MMPA Imports Rule.

that standing (and any subsequent relief from the Court) would be limited to the individual fisheries challenged in the complaint.

Second, plaintiffs fail to allege an injury-in-fact. To maintain the aesthetic injury to their members' aesthetic interests in viewing and studying marine mammals, plaintiffs must allege that bycatch from a specific fishery is causing harm to a specific species of marine mammal, and therefore injury to their aesthetic interest in viewing them. Plaintiffs' generalized allegations of injury, untethered to any specific fishery or any specific marine mammal species, are speculative in nature and insufficient to establish an injury-in-fact for standing in this matter. Moreover, the injury plaintiffs allege here is much more speculative than the injuries this Court has previously recognized in MMPA litigation. Whereas past MMPA litigation concerning the vaquita and Māui and Hector's dolphins recognized both specific allegations of bycatch of the species in the challenged fisheries and specific allegations that bycatch was putting the species at risk of extinction, plaintiffs allege nothing of the sort here. For many of the challenged countries, plaintiffs fail to allege or establish that fishing practices in a specific fishery are causing harm to a marine mammal species in which they have an aesthetic interest, and therefore plaintiffs fail to allege an injury-in-fact.

Third, plaintiffs fail to establish that any injury was caused by the United States or is redressable by this Court. Plaintiffs allege that an embargo of the challenged countries would likely induce those countries to take actions to protect marine mammals. But such allegations cannot demonstrate that "relief from the injury [is] 'likely' to follow from a favorable decision." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Where, as here, plaintiffs' alleged injury stems from the Government's regulation of someone else, it is substantially more difficult to

establish the requisite chain of causation and resulting redressability. And the theory of causation plaintiffs allege here is simply too attenuated to establish standing, where neither this Court nor the United States have authority to direct the actions of a sovereign foreign government. Moreover, plaintiffs fail to allege any specific evidence that the foreign countries at issue here would react in the ways they predict. Unlike the vaquita and Māui Dolphin litigation, in which the record contained specific evidence about Mexico and New Zealand, nothing of the sort exists here for the challenged countries, making the chain of causation even more tenuous than in the prior cases. Plaintiffs' complaint therefore fails to allege that any of the third-party sovereign countries will act in a predictable way to establish standing here.

Finally, even assuming that plaintiffs sufficiently allege standing as a general matter, their allegations related to several specific fisheries in multiple countries still would be separately deficient, as discussed below.

Therefore, plaintiffs have failed to establish standing to bring this lawsuit, and the Court should dismiss their complaint for lack of jurisdiction.

## ARGUMENT

### I. Standard of Review

In deciding a motion to dismiss for lack of jurisdiction pursuant to USCIT R. 12(b)(1), the Court accepts as true all uncontroverted factual allegations in the complaint. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011) (analyzing identical Federal Rule of Civil Procedure). Although, "[w]here, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)), because "the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the

movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). Defendants therefore may introduce and rely on extrinsic evidence in challenging plaintiff's standing allegations, which we have attached as an exhibit (Ex.). The plaintiffs bear the burden of establishing subject-matter jurisdiction by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988), and "must support [their] allegations by competent proof," *Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp*., 546 U.S. 500, 514 (2006); s*ee also* USCIT R. 12(h)(3).

Pursuant to Article III of the United States Constitution, a party bringing suit must present a live case or controversy—that is, "a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Alliance for Hippocratic Med.*, 602 U.S. at 394 (quoting *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982)). Although "an organization whose members are injured may represent those members," the Court must dismiss the case for lack of standing an organization that fails to allege that any of its members suffered an injury in fact. *Sierra Club v. Morton*, 405 U.S. 727, 734-39 (1972) (concluding the Sierra Club lacked standing where "[n]owhere in the pleadings or affidavits did the Club state that its

members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.").

This Court has exclusive jurisdiction over any civil action "aris[ing] out of any law of the United States providing for . . . embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C.§ 1581(i). This Court reviews actions brought pursuant to section 1581(i) as provided in the Administrative Procedure Act (APA). *Id.* § 2640(e); 5 U.S.C. § 706. The APA establishes a private cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A person identified in section 702 may ask the Court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), or to "hold unlawful and set aside" agency actions that are, among other things, "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A). The Court's role in determining whether an agency action is arbitrary or capricious is "narrow." *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). It is ultimately limited to determining whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted). "The court is not empowered to substitute its judgment for that of the agency." *Id.*

## II. The Plaintiffs Lack Standing to Pursue Injunctive Relief

The plaintiffs cannot establish standing to pursue their claims because they have failed to sufficiently allege that they (A) have standing to challenge the comparability finding for each individual fishery for which they request injunctive relief; (B) have suffered a concrete, particularized, injury-in-fact related to each of the comparability findings that they challenge;

(C) that any alleged injury is fairly traceable to the actions of the defendants or can be redressed by a favorable decision; and (D) meet the elements of standing individually for several of the individual countries challenged. Therefore, the action must be dismissed. USCIT R. 12(b)(1), (h)(3).

**A. Plaintiffs Must Demonstrate Standing on a Fishery-by-Fishery Basis**

Plaintiffs request that this Court "[o]rder Federal Defendants to ban imports from export fisheries from Argentina, Ecuador, India, Norway, Taiwan, Tunisia, the United Kingdom, and Vanuatu," and other related relief. Compl. at 79. Plaintiffs, however, lack standing for such relief. *See Oregon v. United States*, No. 26-1472, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026) (noting it is necessary to examine "standing to inform the scope of any relief the court may find appropriate"). Because the discrete regulatory action at issue here—comparability findings—are made on a fishery-by-fishery basis and not a country-wide basis, plaintiffs must allege standing for each individual comparability finding that they are seeking to enjoin. Here, because plaintiffs identify only a limited number of fisheries for each country, and they have not pled with sufficient particularity how the individual fisheries and NMFS's findings for such fisheries affect their interests, they lack standing to obtain the broad, country-wide relief that they seek.

Determinations of comparability findings are made on a fishery-by-fishery basis. 50 C.F.R. §§ 216.24(h)(1)(i), (6).[2] As the Supreme Court recently reaffirmed, "standing is not dispensed in gross," and "plaintiffs must demonstrate standing for each claim that they press against each defendant, and of each form of relief that they seek." *Murthy v. Missouri*, 603 U.S.

[2] Even though NMFS may have provided a single analysis for multiple fisheries in some instances, each comparability finding remains a discrete agency action. As NMFS explained in its decision memorandum, "[c]omparability determinations are made on a fishery-by-fishery basis, not on a nation-basis." Ex. 1.

43, 61 (2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Where, as here, plaintiffs challenge a regulatory action, plaintiffs must demonstrate standing for each "discrete regulatory action[]" individually. *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020); *Ashley Furniture Industries, LLC v. United States*, 750 F. Supp. 3d 1329, 1354 n. 8 (Ct. Int'l Trade 2024) ("The fact that plaintiffs have standing to challenge other aspects of the IDM and the Remand Results does not mean that plaintiffs also have standing to challenge Commerce's use of the Cohen's *d* test."); *cf. Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1061 (Fed. Cir. 2012) ("A plaintiff attempting to challenge an agency's failure to act under the Administrative Procedure Act can only do so in federal court if that failure to act involves 'a *discrete* agency action that [the agency] is *required to take.*'" (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)). Therefore, because each comparability finding "is a distinct agency action, plaintiffs must establish standing as to each." *Ctr. for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 309 (D.C. Cir. 2025).

Consequently, because applicable law requires, and NMFS in fact made, fishery-by-fishery determinations, the plaintiffs must also at least allege some facts to support a conclusion, on a fishery-by-fishery basis, that the particular fisheries here have caused the alleged aesthetic and other injuries to plaintiffs' members and that the purportedly injurious actions are fairly traceable to the challenged agency action. *See id.* This requirement is not only consistent with how NMFS addresses comparability findings, but it also makes logical sense. Across the eight countries for which plaintiffs seek country-wide embargos, many of the countries' individual fisheries do not interact with marine mammals at all, and plaintiffs do not raise any allegations about those fisheries in their complaint. Those fisheries thus cannot be causing plaintiffs' alleged aesthetic injuries in their viewing of marine mammals, and an embargo would not redress

those injuries. As a result, at the outset, the Court must dismiss any requests for relief relating to individual fisheries (including requests for country-wide embargos) for which plaintiffs have not alleged standing.

**B. Plaintiffs Do Not Allege an Injury-In-Fact**

To allege an injury in fact, a plaintiff must allege an injury that is (1) "'concrete,' meaning that it must be real and not abstract;" (2) particularized, meaning that "the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance;" and (3) actual or imminent, not speculative, "meaning that the injury must already have occurred or be likely to occur soon." *Alliance for Hippocratic Medicine*, 602 U.S. at 381. These requirements "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.*

Of course, "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992). Nevertheless, to establish standing for such an aesthetic injury, the plaintiffs must demonstrate, "through specific facts, not only that [the species they seek to view are] in fact being threatened by [the Government's failure to embargo fish from the challenged country], but also that one or more of [their] members would thereby be 'directly' affected apart from their 'special interest in the subject.'" *Lujan*, 504 U.S. at 563 (quoting *Morton*, 405 U.S. at 735, 739); *see also Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 20 (D.D.C. 2019) ("CLF must show both that opening these closure areas to gillnet fishing would threaten North Atlantic right whales and that at least one CLF member will suffer a concrete and particularized — that is, *individualized* — harm if the future of the species was even more threatened than it already is.").

*First*, plaintiffs fail the first part of the *Lujan* test for each of the countries, fisheries, and species discussed below: they do not allege that bycatch in the fisheries they challenge is causing a threat to any of the specific species in which they claim to have an aesthetic interest in viewing. *See infra* sec. II(D). In general, the plaintiff organizations attempt to allege specific injuries on the part of their members in each of the challenged countries, and that "[b]ycatch by [the named countries] harms the marine wildlife species that [the organizations'] members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild." Compl. ¶¶ 22, 30; Compl. ¶ 36 (similar).[3] But a general, conclusory statement that bycatch harms marine mammals, untethered to a specific mammal species or fishery, is wholly insufficient to establish standing. Even where the plaintiff organizations (in some instances) identify specific mammal species that they hope to observe in specific countries, they still must allege "specific facts" demonstrating that a specific species is "in fact being threatened" by that fishery. *Lujan*, 504 U.S. at 643. For the countries discussed below, *infra* sec. II(D), plaintiffs do not allege any specific fishing practices in the challenged fisheries *cause* bycatch of the specific mammals that perceptively decreases plaintiffs' likelihood of viewing those species in the wild during their members' purported planned trips to do so.

*Second*, this failure is particularly relevant in this matter because plaintiffs do not allege any change in the status quo that would cause them injury. Where a plaintiff alleges an injury to an aesthetic interest in viewing a species, the Government action at issue typically directly affects the level of protection afforded to the species. *See, e.g.*, *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025) ("the [Endangered

[3] Plaintiffs also allege "procedural harms," but do not explain what those harms are, which also falls short of establishing an injury-in-fact. Compl. ¶ 37.

Species Act] downlisting decision reduced the level of protection and conservation measures for the Beetle”). Here, in contrast, the agency action at issue—the issuance of a comparability finding—does not reduce the level of protection afforded to any marine mammals. It merely allows the continued export of seafood from the fishery. Therefore, because the status quo remains in place, any decrease in the likelihood of viewing any specific species is speculative absent specific facts to the contrary.

In previous MMPA cases, this Court concluded that the plaintiffs there had established standing because they had set forth specific facts showing species in which they alleged to have had an aesthetic interest in viewing was near-extinction *because of* commercial fishing practices. For example, in the vaquita litigation, this Court concluded that the “[p]laintiffs have demonstrated that their members have a recreational and aesthetic interest in viewing the vaquita that is harmed by the continual decrease in its population and its potential extinction,” and “experts and advisory organizations agree that the ongoing gillnet fishing threatens the vaquita’s existence.” *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1357 (Ct. Int’l Trade 2018). Similarly, in the Māui and Hector’s dolphin litigation, the Court concluded that the plaintiffs’ “members have a recreational and aesthetic interest in viewing Māui dolphins that would be harmed by the species’ potential extinction.” *Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286, 1307 (Ct. Int’l Trade 2022); *see also* NMFS, *MMPA Import Provisions Comparability Finding Application Final Report – New Zealand* at 16, *available at https://www.fisheries.noaa.gov/s3/2025-08/New-Zealand-final-2025-508.pdf* (last accessed Sep. 18, 2026) (finding that certain fisheries “have more than a remote likelihood of incidental mortality or serious injury of Māui dolphin within their range on the west coast of the North Island.”). Thus, in the prior cases before this Court, the Court held that the alleged connection

between bycatch and threat to the specific species was not impermissibly speculative: bycatch in specific fisheries harmed the species, any increase in bycatch carried a likelihood of causing extinction, and therefore injury to the plaintiffs.

Here, in contrast, plaintiffs do not allege that any marine mammal species face extinction because of bycatch in the fisheries referenced in the complaint. Nor, in most instances do plaintiffs allege specific facts showing that bycatch in the challenged fisheries is harming any specific species they allege they have an aesthetic interest in viewing. Plaintiffs have therefore failed to allege that the marine mammal species they seek to view are "in fact being threatened" by the fisheries referenced in the complaint. *See Lujan*, 504 U.S. at 563.

*Third*, plaintiffs have also not alleged that the lack of an import ban will cause imminent, particularized, and concrete injury to their members in certain instances, as discussed below. *Cf. Lujan*, 504 U.S. at 564; *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of [Article III]. A threatened injury must be certainly impending to constitute injury in fact.") (internal quotation marks omitted).

### C. Plaintiffs Do Not Allege any Redressable Injury

In addition to alleging an injury in fact, plaintiffs must also allege that any injury that will be redressed by a favorable decision must be "likely, as opposed to merely speculative." *Lujan*, 504 U.S. at 561 (quotation marks omitted). When "a plaintiff's asserted injury arises from the [G]overnment's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" than when the plaintiff is the intended object of the Government's action. *Id.* at 562. Specifically, plaintiffs must "adduce facts showing that" the choices of the third parties who are the object of the Government's action "have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* Demonstrating only attenuated links between the Government and the parties directly causing injury, "that is, where the government

action is so far removed from its distant (even if predictable) ripple effects" is insufficient to establish standing. *Alliance for Hippocratic Med.*, 602 U.S. at 383.

Plaintiffs do not allege that an embargo will directly redress their alleged injuries. Rather, they allege that an embargo "is likely to induce exporting nations to take actions that reduce marine mammal bycatch risk to maintain access to U.S. markets." Compl. ¶ 37. However, this entirely speculative allegation of redressability is insufficient because (1) neither this Court nor the Government has authority to direct regulation of foreign commercial fisheries, meaning there are no predictable effects from any embargo that would redress plaintiff's injuries; and (2) even assuming redressability were possible in this circumstance, plaintiffs still have failed to allege any facts showing how the countries at issue here would react to an embargo.

**1. Neither This Court Nor the Government Has Authority to Direct Regulation of Foreign Commercial Fisheries**

The legal authorities of both the Court and the Government could not bind any party to take any action that would redress the plaintiffs' alleged harm. This Court could conclude—as plaintiffs erroneously allege—that NMFS issued its comparability findings in a manner not in accordance with law, and so "hold unlawful and set aside" those final agency actions. 5 U.S.C. § 706(2)(A). But it may not step into the shoes of an agency and direct it to reach a foregone conclusion that United States standards have been exceeded. *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946); *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1279 (Fed. Cir. 2012); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381-82 (Fed. Cir. 2003).

NMFS *may* conclude—as plaintiffs allege—that a foreign commercial fisheries management regime results in marine mammal take in excess of U.S. standards, thereby triggering an import prohibition. But none of the Government agencies named in this action, or

any other, can direct a foreign sovereign nation to undertake specific policy actions or to regulate the actions of commercial fishers operating in that sovereign's waters. *See, e.g.*, Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note (Am. Law Inst. 2018). This Court likewise has no authority to direct a foreign sovereign to take any particular action. *Cf.* 28 U.S.C. § 1581. And any Court's exercise of jurisdiction over a foreign nation is cabined by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601-08, and customary international law, which do not permit a trial court to direct an independent, sovereign nation to undertake a discretionary regulatory or policy action in a predetermined manner.

**2. Plaintiffs Fail to Allege Any Evidence of How Any Specific Country May React to an Embargo**

In the absence of any legal authority to order redress, plaintiffs instead contend that an embargo is "likely to induce" unspecified "actions that reduce marine mammal bycatch risk to maintain access to U.S. markets." Compl. ¶ 37. But without authority over foreign governments, any "inducement" by the United States would amount to, at most, encouragement of policies aimed at bycatch reduction, which cannot alone establish standing. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 43-45 (1976) (plaintiffs could not establish standing when challenged tax rule merely encouraged hospitals to withhold certain services that were the direct cause of the alleged injuries); *Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 934 (Fed. Cir. 1991) (alleged monetary injuries to farmers could not be fairly traced to the mere encouragement of certain research and development activities due to change in patent policy).

Indeed, the chain of causation here is far more attenuated than that rejected in *Simon* and *Animal Legal Defense Fund*. In those cases, the alleged encouragement of U.S. Government agencies targeted persons over whom those agencies had direct legal authority and who were, in turn, the alleged proximate cause of the plaintiffs' injuries. In this action, plaintiffs have alleged

that the direct cause of their injuries is commercial fishing in the various countries challenged. The United States does not regulate commercial fishing in any foreign country. Any management of those fisheries is overseen by independent sovereign states over which neither this Court nor the Government may exercise any control.

Further, it is far from clear that an embargo on seafood imports will "likely" induce or encourage foreign countries to take action to reduce bycatch. How a foreign government would react to an embargo is anyone's guess. Fishers may find adequate domestic or export markets outside of the United States, thus alleviating pressure to enact bycatch reforms. Fishers may seek to harvest significantly *more* fish in the challenged fisheries to compensate for falling prices in the face of artificially decreased demand caused by an import embargo. The costs of investing in new fishery gear may significantly outweigh the costs of renegotiating purchase contracts. The foreign government may offer subsidies to help fishers to divert to other markets.

Plaintiffs point to three examples of countries that were denied comparability findings in September 2025, implemented corrective measures, and reapplied for comparability findings that were subsequently granted: Grenada, New Caledonia, and Ireland. Compl. ¶ 38. But these examples do not establish a sufficient likelihood of redressability for several reasons. First, in the same September 2025 findings, ten countries were denied comparability findings in whole, and 32 others were denied comparability findings for at least one fishery. NMFS Comparability Findings Page. To date, the vast majority of the harvesting nations that were denied comparability findings in whole or in part have not implemented corrective measures following the denials and most have not re-applied for new comparability findings. *Id.*[4] Plaintiffs' focus

[4] On June 22, 2026, Suriname was also granted new comparability findings after addressing shortcomings in its initial application. 91 Fed. Reg. 37,086.

on a small handful of jurisdictions that promptly reacted to the threat of an import embargo masks the reality that 38 additional countries have not taken such steps and that roughly 250 additional fisheries remain subject to an import embargo under section 1371(a)(2). Put differently, plaintiffs' best evidence is that approximately eight out of nine foreign jurisdictions have *not* taken concrete steps to avoid an import ban in the year since NMFS issued denials. No common understanding of "likely" or "predictable" encompasses a one-in-nine chance.

The mere fact that Congress established embargoes as one component of the MMPA's statutory scheme does not establish that an embargo is likely to have the effect plaintiffs contend. Rather, "courts should bear in mind that when Congress predicts that an injury is caused by a certain behavior or phenomenon and when it predicts the likely impact of legislation, it performs a task that is quite different from both the 'fairly traceable' and 'redressability' portions of the Article III standing inquiry." *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 916 (D.C. Cir. 1989). "A court's causation inquiry is much more rigorous . . . it must determine that the causal nexus is firm." *Id.*; *see also Doe 1 v. Apple Inc.*, 96 F.4th 403, 410 (D.C. Cir. 2024) ("Article III provides a constitutional minimum that cannot be lowered by Congress.").

Moreover, the MMPA does not set out embargoes alone as a tool to enact the policy objectives of the MMPA; rather, the MMPA sets out a complex scheme encouraging international negotiation, of which embargos are merely one component. The statutory tools afforded to the Executive Branch by the MMPA include sticks, such as the section 1371(a)(2) import prohibition, and carrots, including mandates to enter into negotiations for international agreements and to seek to revise treaties to be consistent with the underlying purpose of the MMPA. *See generally* 16 U.S.C. § 1378. Through its regulations, NMFS has elaborated on the

foreign policy role Congress envisioned, contemplating particular actions to promote international cooperation and coordination, such as technical assistance, research cooperation, and technology transfers. 50 C.F.R. § 216.24(h)(11); 81 Fed. Reg. 54390, 54395 (August 15, 2016) (discussing NMFS's approach to engaging foreign harvesting nations to address compliance with the MMPA Imports Rule and means to address marine mammal bycatch from commercial fisheries); 81 Fed. Reg. 54390, 54407 (Response to Comment 63). Balancing the use of these carrots—like technical assistance—against the threat of the stick—an import prohibition—to promote foreign policy objectives and aid in international negotiations is a task for which the Executive Branch is fundamentally equipped to handle and with which the Judicial Branch should be especially cautious to avoid interference. *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) ("[P]olicies in regard to the conduct of foreign relations . . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) ("[Government-to-government] negotiations are consigned to the executive branch in its conduct of foreign relations").

Indeed, the history of embargos ordered by this Court demonstrates that embargos do not have the straightforward effect that plaintiffs allege. For example, in litigation concerning the vaquita, this Court issued a preliminary injunction banning imports of fish and fish products from Mexico caught with gillnets in the range of the vaquita, a critically endangered porpoise endemic to the Upper Gulf of California. *Nat. Resources Def. Council v. Ross*, 331 F. Supp. 3d 1371-72 (Ct. Int'l Trade 2018). Rejecting the Government's standing arguments, the Court concluded that "the third parties in question" (specifically, Mexico and commercial fishers and illegal poachers operating in Mexico) "are likely to respond to a United States import ban in a

way that reduces danger to the vaquita and consequently harm to plaintiffs' recreational and esthetic interests." *Id.* at 1359. Despite import bans that have continued to this day, gillnet fishing by Mexican commercial fishers continue to endanger the survival of the vaquita. *See, e.g.*, NMFS, *MMPA Import Provisions Comparability Finding Application Final Report - Mexico* at 2 (Aug. 29, 2025) (2025 Mexico Final Report), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf ("Mexico still fails to implement a regulatory program to reduce or eliminate vaquita bycatch that is comparable in effectiveness to the United States.").

Likewise, in litigation concerning Māui and Hector's dolphins in New Zealand, this Court enjoined the agency's comparability finding and ordered an immediate ban of nine species of fish caught in certain set net and trawl fisheries operating off New Zealand's North Island. *Sea Shepherd*, 606 F. Supp. 3d at 1286. Despite that, litigation concerning the species continues to this day. *Māui & Hector's Dolphin Defs. NZ Inc. v. Nat'l Marine Fisheries Serv.*, No. 26-02462, 2026 WL 2018678, at *4 (Ct. Int'l Trade July 13, 2026).

Although this Court recently concluded that the causation and redressability elements of standing were met in the Māui and Hector's dolphin litigation, that decision was premised on data and information that were specific to New Zealand, and similar information is not present here. There, the Court concluded that causation was met because plaintiffs sufficiently alleged that the United States was a significant importer of seafood such that inferences could be drawn to support standing, specifically, that "[t]he Government of New Zealand's economic reporting demonstrates that the import ban ordered by the Court in *Sea Shepherd New Zealand v. United States* ("*Sea Shepherd I*"), 46 CIT ——, 606 F. Supp. 3d 1286 (2022), contributed to a decrease in export demands from inshore fisheries, indicating that the United States market is not an

insignificant driver of New Zealand's seafood export economy." *Māui & Hector's Dolphin Defs.*, 2026 WL 2018678, at *4. The Court also noted that "the Government of New Zealand's presence in this action" and related prior litigation "is indicative of its level of interest in the effect of an import ban and supports Plaintiff's redressability arguments." *Id.* Therefore, the Court's prior decision was based on specific information related to the possibility of redress by New Zealand. *Id.*

Similarly, in the vaquita litigation, the Court relied on evidence "that the United States is a significant export market for the gillnet fisheries in question," including evidence that "about 80% of Mexico's fish exports end up in the US." *Ross*, 331 F. Supp. 3d at 1359. The Court also relied on evidence that "Mexico has responded to past import bans imposed under similar circumstances by enacting and enforcing new environmental regulations." *Id.* at 1360.

Plaintiffs allege nothing of the sort in their present complaint. Although they contend generally that "the United States is a significant market for these fisheries," they allege no further support for this conclusory statement. Compl. ¶ 37. Plaintiffs fail to bring forth or allege any of the specific evidence related to the economic importance of any specific fishery. As explained, any import embargo would apply only to specific fisheries—not the whole country—meaning any economic pressure is at the fishery, rather than the country, level. Likewise, plaintiffs do not allege that any of the challenged countries have responded to import bans with enhanced environmental regulations in the past, or that the countries are particularly concerned about the imposition of an import ban with the exception of some limited actions taken by the United Kingdom to bolster its application. Compl. ¶ 39. In short, none of the specific evidence of redressability present in the Māui and Hector's dolphin or vaquita litigation is present here.

Therefore, to the extent those cases are persuasive, they do not support plaintiff's allegations of standing here, which fall far short.

### D. Assuming Plaintiffs Have Established the Possibility of Standing Generally, They Fail to Establish Standing for Certain Specific Fisheries

Even assuming that plaintiffs' theory could establish injury, causation, and redressability as a general matter, plaintiffs nevertheless fail to establish one or more of the elements of standing for several specific fisheries. [5]

#### 1. India

The sole allegation in the complaint of an injury related to Indian fisheries comes from NRDC member Roshan Balasubramanian, who lives in Chennai, India. Compl. ¶ 27. The complaint, however, does not identify *any* specific mammal species that he seeks to observe and that interact with any Indian fishery or *any* specific plan to observe a species in the future. Rather, it merely alleges that Mr. Balasubramanian "loves seeing marine mammals in their natural environment," and that "he intends to look for the marine mammal species that make Indian waters their home." *Id.* These allegations fall far short of establishing any injury, let alone a justiciable injury-in-fact stemming from a comparability finding. The complaint fails to allege any specific species, how Mr. Balasubramanian is harmed, or how his alleged harm would be traceable to any fishery's comparability finding. A mere general intent to look for marine mammals generally, without alleging when or what mammals, is not an injury, let alone a justiciable one. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do

[5] Although we do not raise any specific challenges to plaintiffs' allegations of standing in their challenge to the Taiwan and Norway fisheries comparability findings, plaintiffs nevertheless lack standing because any injuries are not redressable as discussed in the preceding section. Moreover, the Court should also limit standing to the specific species plaintiffs have an interest in and Fishery IDs challenged, as discussed in section II(A).

not support a finding of the 'actual or imminent' injury that our cases require."). To that end, because the complaint does not identify an interest in any specific species, it cannot link any harm to Government action, failing the causation and redressability elements as well. Indeed, the complaint fails to establish that the challenged comparability findings will prohibit Mr. Balasubramanian from seeing marine mammals, or even that the comparability findings will impact his activities in any way whatsoever.

Because the activities of Mr. Balasubramanian are the only alleged injury related to Indian fisheries, and because they fail to establish any injury-in-fact, the plaintiffs lack standing to challenge the Indian fisheries comparability findings.

**2. Ecuador**

The sole allegation in the complaint of an injury related to Ecuador fisheries comes from Dr. Alex Hearn. Compl. ¶ 20. The complaint alleges that Dr. Hearn "regularly visits coastal Ecuador," where he "looks for and often sees dolphins and whales," and also visits the Galapagos Islands "for 12 to 16 weeks each year" where he observes marine mammals, "including bottlenose dolphins, pilot whales, Byrde's whales, and other species at risk of entanglement in Ecuador's fisheries." *Id.* However, the complaint fails to allege that these activities will be negatively affected by bycatch in any of the challenged fisheries.

First, the plaintiffs contend that, in Ecuador, certain mammals "may be" at risk from fishing operations, but that "it is impossible to determine that bycatch rates are within applicable U.S. limits because the nations do not effectively monitor their fisheries to obtain reliable bycatch estimates." *Id.* ¶¶ 8, 94. But if there are no reliable estimates of bycatch, as plaintiffs allege, there is no basis on which to assume that bycatch is making it less likely to observe bottlenose dolphins, pilot whales, or Byrde's whales, let alone bycatch in the four fisheries challenged by the plaintiffs (Fishery IDs 1171, 1180, 1182, and 1183).

Second, although the complaint alleges that "[b]ycatch is a particular concern for a resident population of bottlenose dolphins" that "is genetically distinct from other coastal populations of bottlenose dolphins and is at risk of extirpation, in part due to fisheries bycatch," Compl. ¶ 95, this allegation falls short of alleging that any *particular fishery* has impermissible levels of bycatch, or that the bycatch is causing harm to plaintiffs' aesthetic interest. Moreover, NMFS did enact an embargo on imports from one Ecuador fishery, Fishery ID 1179, in part due to prior studies that recorded instances of bycatch of bottlenose dolphins and the fact that "surface gillnets have a high entanglement risk for cetaceans." Ex. 22. The complaint does not allege why this embargo fails to address any alleged injury relating to bycatch and Dr. Hearn's ability to observe the listed species.

The complaint therefore fails to allege any injury relating to impermissible levels of bycatch for any specific species.

**3. United Kingdom**

The complaint alleges injuries to two members of the plaintiff organizations related to United Kingdom fisheries. First is Nicola Hodgins, who "lives on the coast of a Scottish island where she sees wildlife, including marine mammals, on a daily basis" and "goes to Tiumpan Head on the Isle of Lewis in Scotland every day to look for marine mammals and also crews for a whale watching company operating out of Stornoway harbor, where it is possible to see any of the United Kingdom's marine mammal species." Compl. ¶ 25. The complaint does not allege that Ms. Hodgins seeks to view any specific species—only marine mammals generally—and therefore fails to meet the concrete or particularized requirements of the injury-in-fact element. *See Lujan*, 504 U.S. at 564. Second is Rebecca Allen, who "lives in the United Kingdom and regularly sees marine mammals, including common dolphins and harbor porpoises." Compl. ¶ 26. Although plaintiffs allege that "[t]he primary threat to these species is fisheries bycatch,"

Compl. ¶ 110, plaintiffs fail to allege any particular threat stemming from the two fisheries they identify—Fishery ID 2653 and Fishery ID 2679.

With respect to Fishery ID 2653, plaintiffs contend that the fishery is "a pot and trap fishery operating in humpback whale and minke whale habitat." Compl. ¶ 176. But neither plaintiff alleges that they have concrete plans to view humpback whales or minke whales. Simply alleging a general desire to view marine mammals or whales generally is insufficient to allege an injury-in-fact to specific species related to Fishery ID 2653 and therefore, plaintiffs have not met their burden as to NMFS's comparability finding for Fishery ID 2653. *See Lujan*, 504 U.S. at 564.

With respect to Fishery ID 2679, plaintiffs fail to allege a connection between the fishery and the harm they allege. As plaintiffs acknowledge, NMFS determined that, although there is documented bycatch in the fishery, it is below the bycatch limit and is "contributing 25% of the bycatch limit for harbor porpoise." Compl. ¶ 177; Ex. 36. Plaintiffs allege in response that "an OSPAR Convention report found that bycatch of harbor porpoises and common dolphins is exceeding sustainable thresholds in certain areas of the Northeast Atlantic, including in the Celtic seas, an area which overlaps with the area for Fishery ID 2679." Compl. ¶ 177. But evidence that there are unsustainable levels of bycatch in a larger area, a portion of which includes Fishery ID 2679, does not establish that bycatch within Fishery ID 2679 itself is at unsustainable levels (and therefore harming plaintiffs). At the very least, plaintiffs' allegations show that the harm is not traceable to Fishery ID 2679's comparability finding because they allege that the harm stems also from other areas and different fisheries. Therefore, plaintiffs have not alleged any injury in fact from Fishery ID 2679.

Taken together, plaintiffs have not shown an injury-in-fact related to the two United Kingdom comparability findings that they challenge.

**4. Vanuatu**

The only member of the plaintiff organizations who alleges an injury related to a Vanuatu fishery is Doug Perrine, who "is regularly on the water both around Hawai'i and in other parts of the globe," and "intends to continue regularly looking for and photographing false killer whales in the future, as he has in the past." Compl. ¶ 29. Though this allegation references "other parts of the globe," such generalized allegations are too general to establish standing. Plaintiffs, apparently recognizing this limitation, describe the source of the injury as efforts to view Hawaii's pelagic false killer whale stock. *See* Compl ¶ 114. Thus, plaintiffs' allegations of standing are limited to the Hawaii pelagic false killer whale stock. However, the complaint fails to demonstrate that the Hawaii pelagic false killer whale stock is impacted by Fishery IDs 2796, 2850, 2851, and 2852, the challenged Vanuatu fisheries.

The complaint puts forth the conclusory statement that "Vanuatu's longline fisheries are known to incidentally kill or seriously injure false killer whales (*Pseudorca crassidens*) from the Hawai'i pelagic stock." Compl. ¶ 114. But the conclusion is insufficient to tie any alleged harm to false killer whales to the challenged fisheries. Vanuatu "indicated it had no interactions with marine mammals in any of its export fisheries" and, of the five alleged marine mammal takes in 2019, Compl. ¶ 189, none were identified as false killer whales, considered by NMFS to be a "16 U.S.C. § 1387(f)(3) species." Ex. 43, 45-46; *see also* Ex. 66-75 (fisheries data showing no injury to false killer whales).

Moreover, even assuming plaintiffs have alleged bycatch of false killer whales, the current data would not support plaintiffs' argument that the challenged fisheries interact with false killer whales from the Hawaiian pelagic stock. The complaint references "an IATTC report

from 2022 for Vanuatu showing it had five marine mammal takes in 2019." Compl. ¶ 189. The Vanuatu comparability finding report acknowledges this IATTC report, Ex. 43, and in any event, the take of five marine mammals in 2019 does not demonstrate that any of those mammals were false killer whales (let alone false killer whales from the Hawai'i pelagic stock). Likewise, the complaint refers to the Vanuatu comparability findings report's statement that "Vanuatu lists false killer whales as being in the same area as its fisheries but listed the stock as unknown. This stock could be the Hawai'i Pelagic Population, which includes false killer whales inhabiting waters from around the main Hawaiian Islands and Northwestern Hawaiian Islands out to the adjacent high seas waters." Ex. 43; Compl. ¶ 185. But NMFS's speculation that the false killer whales that Vanuatu references could be the Hawai'i pelagic stock does not indicate that it is in fact the Hawai'i pelagic stock, particularly where NMFS concluded otherwise in the same document. Ex. 46 ("Vanuatu and the United States do not share any transboundary stocks.").

Therefore, because plaintiffs allege only an interest in Hawai'i pelagic stock false killer whales and have not sufficiently alleged that Vanuatu fisheries harm those false killer whales, they have failed to establish an injury-in-fact related to Vanuatu's fisheries.

**5. Argentina**

The complaint challenges the comparability findings for only two Argentinian fisheries, Fishery ID 45 and 48. *See, e.g.*, Compl. ¶ 126. Plaintiffs allege that they have plans to view only one specific marine mammal in Argentina, the franciscana dolphin. *See* Compl. ¶ 17 ("Mr. Hartl also has concrete plans to visit Buenos Aires and the Rio de la Plata area in Argentina in 2027. He visited the same region in 2023 and unsuccessfully attempted to view an imperiled franciscana dolphin. He plans to hire a guide boat on his next trip to increase his chances of viewing the species, as well as other marine mammals."); Compl ¶ 18 ("Ms. Scout Coborg . . . has concrete plans to return to Buenos Aires in December 2026 for a two-week trip.

Ms. Coberg will visit the coast as she usually does on these trips and will attempt to view marine mammals, including the imperiled franciscana dolphin.”). However, although plaintiffs allege that the franciscana dolphin is threatened by bycatch, they fail to allege that injury is traceable to the actions of the United States or redressable by an embargo.

With respect to Fishery ID 48, although NMFS concluded that fishery exceeds the bycatch limit for the franciscana dolphin, as the complaint correctly acknowledges, NMFS concluded that Fishery ID 48 “is not currently being exported to the United States.” Compl ¶¶ 128-29; *see* Ex. 50. For that reason, any injury to plaintiff’s aesthetic interests in viewing a franciscana dolphin cannot be traced to NMFS’s action because fish or fish products from Fishery ID 48 are not currently being exported to the United States. Therefore, assuming plaintiffs have been injured, that injury was not caused by the actions of the United States, and would not be redressed by an embargo on that fishery, because that fishery does not export to the United States.

Plaintiffs raise several arguments in response. They first contend that NMFS’s 2020 List of Foreign Fisheries lists the fishery as exporting to the United States. Compl. ¶ 129. But the fact that a fishery exported to the United States *six years* ago cannot establish that it is currently importing, or that an embargo would have the effect plaintiffs intend. NMFS’s more recent comparability finding is the relevant determination concerning the fishery, not a subset of data that was produced to support the 2020 List of Foreign Fisheries. Argentina subsequently provided information attesting to the fact that Fishery ID 48 does not “export to the United States.” Ex. 77. Plaintiffs also contend that “U.S. seafood import records show imports of fish targeted by Fishery ID 48.” Compl. ¶ 129. But this argument is contradicted by NMFS’s own data, which indicate that fish or fish products from Fishery ID 48 were not being exported to the

United States at the time of the comparability finding. Ex. 77. While it is true that similar fish or fish products may have been imported into the United States from Argentina, they likely resulted from Fishery ID 45, which plaintiffs allege targets the *exact same species*. Compl. ¶ 126; *see* Ex. 81. Finally, plaintiffs contend that, "because NMFS issued a comparability finding for this fishery, the Import Regulations allow the fishery to export fish to the United States at any time over the Argentina CF's four-year period." Compl. ¶ 129. Whether Argentina opts to change its export strategy in the future as it relates to Fishery ID 48 is speculative and plaintiffs cannot show an imminent, redressable injury such that plaintiffs have standing to challenge the comparability findings.

With respect to Fishery ID 45—unlike Fishery ID 48—plaintiffs do not allege that fishing gear or practices used in the fishery cause bycatch of franciscana dolphins. Plaintiffs instead rely on NMFS's statement that the fishery "does not currently have a monitoring program in place." Compl. ¶ 130. However, the fact that the fishery does not have a monitoring program in place does not establish that there are impermissible levels of bycatch. Simply because Argentina currently lacks a monitoring program for the fishery does not mean it lacks a process for gathering marine mammal bycatch data and that its regulatory program is not comparable in effectiveness. *See* Ex. 49-50. Indeed, as NMFS concluded, Argentina employs a different type of scheme for Fishery ID 45, using electronic logbooks with dedicated sections for reporting marine mammal bycatch. *Id.* And those electronic logbooks show no records of bycatch of franciscana dolphins in Fishery ID 45. Ex. 85. This makes sense given the gear used in the two fisheries. Fishery ID 48 is a gillnet fishery, whereas Fishery ID 45 is a bottom trawl fishery, *see* Compl. ¶ 126, so there is no reason to assume that Fishery ID 45 has impermissible bycatch

based off Fishery ID 48's levels of bycatch. Thus, plaintiffs' allegations are not only too speculative on their own terms to establish injury, but are also contradicted by the data available.

Therefore, because Fishery 48 is not being exported to the United States and plaintiffs do not allege that Fishery ID 45 has impermissible levels of bycatch for the franciscana dolphin, they have not established a redressable injury related to those fisheries, and as a result lack standing to challenge the comparability findings.

**6. Tunisia**

Plaintiffs identify only one individual with an alleged interest in Tunisian fisheries, Anna Sophia, who "has booked a trip in the summer of 2027 during the eclipse to visit Tunisia [where she] plans to dive, swim snorkel, and look for whales and dolphins, including common bottlenose dolphins, that may become entangled in Tunisian fisheries." Compl. ¶ 19.

Plaintiffs allege that bycatch is threatening "the Mediterranean population of common bottlenose dolphin." Compl. ¶ 107. However, as plaintiffs acknowledge, with respect to Fishery IDs 2459, 2461, 2462, and 2463 the bycatch estimates indicated that these fisheries had no "documented interactions with common bottlenose dolphins." Compl. ¶ 170; Ex. 96, 99, 102, 105. Plaintiffs do not allege that this conclusion is incorrect. Therefore, with respect to Fishery IDs 2459, 2461, 2462, and 2463, plaintiffs have not alleged (1) an injury, as the complaint and comparability findings indicate that these fisheries are not harming common bottlenose dolphins, or (2) causation or redressability, since any embargo on these fisheries would have no effect on the population of the animals.

With respect to the remaining fisheries, Fishery IDs 2454, 2457, 2458, 12737, and 12754, plaintiffs allege that "many of" these fisheries "use gear that poses a documented bycatch threat to marine mammals." Compl. ¶ 168. But this allegation merely speculates that these fisheries are harming common bottlenose dolphins, indicating that only "many of," rather than any

specific listed fisheries uses gear that threatens "marine mammals," not common bottlenose dolphins. Moreover, the complaint contends that there are no "statistically reliable estimates of bycatch," meaning any allegation that impermissible amounts of bycatch are harming populations of common bottlenose dolphins is inherently speculative. To that end, NMFS's data shows there is no bycatch of common bottlenose dolphins (or any other mammals) in any of these fishery IDs. Ex. 88, 91, 94, 108, 110 (showing no "marine mammals present in the area where this fishery occurs").

Therefore, because plaintiffs have failed to allege that any of the listed fisheries are causing harm to common bottlenose dolphins, they fail to allege any aesthetic injury sufficient to establish an injury-in-fact. Similarly, because none of the challenged fisheries have impermissible levels of bycatch of bottlenosed dolphins, any decrease in their injury is not traceable to the Government's action or redressable by an embargo.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss plaintiffs' complaint for lack of jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Blake W. Cowman
BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 353-2494
Blake.W.Cowman@usdoj.gov

*Attorneys for Defendants*

OF COUNSEL:

MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric
Administration

September 18, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1) contains 9,821 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Blake W. Cowman