# UNITED STATES COURT OF INTERNATIONAL TRADE

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

*Plaintiffs*,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendants*.

Case No. 1:26-cv-02998-GSK

Before: Judge Gary S. Katzmann

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

STANDARD OF REVIEW ........ 2

ARGUMENT ........ 2

I. Plaintiffs Request Relief Only for Challenged Fisheries. ........ 4

II. Plaintiffs Have Established Injury in Fact for Each of the Challenged Fisheries. ........ 5

A. A Risk of Bycatch in a Fishery Is an Injury in Fact. ........ 5

B. NMFS Found that Nearly All the Challenged Fisheries Pose a Bycatch Risk to Marine Mammals in which Plaintiffs' Members Have Interests. ........ 7

C. Plaintiffs Further Establish that Each Challenged Fishery Poses a Bycatch Risk to Marine Mammals in which Plaintiffs' Members Have Interests. ........ 9

D. Defendants' Arguments Rely on Incorrect Legal Standards. ........ 21

III. Plaintiffs' Injuries Are Redressable. ........ 23

A. Congress and Defendants Have Determined that MMPA Import Bans Are Likely to Redress Plaintiffs' Injuries. ........ 24

1. Congress Determined that Import Bans Are an Effective Remedy to Protect Marine Mammal Populations. ........ 24

2. Defendants' Claim that Import Bans Are Ineffective Conflicts with Their Own Determinations about the Import Provisions. ........ 27

3. Defendants Are Wrong that the CIT Should Not Adjudicate Challenges to Embargo Decisions. ........ 31

B. Plaintiffs Have also Shown that Import Bans Are Likely to Redress Their Injuries as a Matter of Fact. ........ 33

1. Governments Will Likely Respond to an Import Ban. ........ 34

2. Fishermen Are Likely to Respond to an Import Ban Due to Market Forces. ........ 41

3. Defendants' Attempt to Raise the Burden for Demonstrating Redressability Is Unsupported by the Law. ..........42

CONCLUSION..........45

CERTIFICATE OF COMPLIANCE..........47

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Animal Legal Def. Fund, Inc. v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) ....................21

*Animal Prot. Inst. of Am. v. Mosbacher*,
799 F. Supp. 173 (D.D.C. 1992) ....................42

*Animal Welfare Inst. v. Kreps*,
561 F.2d 1002 (D.C. Cir. 1977) ....................21, 25, 26

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003)....................6, 7, 10

*Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....................45

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)....................30

*Brower v. Daley*,
93 F. Supp. 2d 1071 (N.D. Cal. 2000) ....................6

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993)....................2, 4

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ....................6

*Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*,
970 F.3d 372 (D.C. Cir. 2020) ....................33, 34

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.* (*CEI*),
901 F.2d 107 (D.C. Cir. 1990) ....................24, 33

*Conservation L. Found. v. Ross*,
422 F. Supp. 3d 12 (D.D.C. 2019) ....................6

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
793 F.2d 1322 (D.C. Cir. 1986) ....................25

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) ....................22

*Ctr. for Biological Diversity v. Little*,
724 F. Supp. 3d 1113 (D. Idaho 2024) ....................22

*Def. of Animals v. U.S. Dep't of Interior*,
808 F. Supp. 2d 1254 (E.D. Cal. 2011)....................5

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025).................... *passim*

*Doe 1 v. Apple Inc.*,
96 F.4th 403 (D.C. Cir. 2024)....................26

*Earth Island Inst. v. Christopher*,
913 F. Supp. 559 (Ct. Int'l Trade 1995) ....................43

*Entergy Ark., LLC v. FERC*,
134 F.4th 576 (D.C. Cir. 2025)....................34

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................3

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................3, 5, 24, 25, 26

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391 (9th Cir. 1992) ....................5

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021)....................41

*Humane Soc'y v. Brown*,
920 F. Supp. 178 (Ct. Int'l Trade 1996) ....................25, 32

*Kōloa Rum Co. v. Noem*,
822 F. Supp. 3d 8 (D.D.C. 2026)....................26

*LaFleur v. Whitman*,
300 F.3d 256 (2d Cir. 2002)....................21, 22

*Larson v. Valente*,
456 U.S. 228 (1982)....................40

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................5

*Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS* (*MHDD*),
No. 26-02462, 2026 WL 2018678 (Ct. Int'l Trade July 13, 2026).................... *passim*

*Mayo v. Jarvis*,
177 F. Supp. 3d 91 (D.D.C. 2016)....................6, 7, 22

*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*),
331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ............2, 6, 27, 32

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
397 F. Supp. 3d 430 (S.D.N.Y. 2019)............29

*Nat. Res. Def. Council v. EPA*,
542 F.3d 1235 (9th Cir. 2008) ............25

*Nat'l Env't Dev. Ass'ns' Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014)............23

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) ............4

*Nat'l Fisheries Inst. v. United States*,
No. 25-cv-00223 (Ct. Int'l Trade Oct. 29, 2025)............29, 32

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974)............31

*Native Vill. of Chickaloon v. NMFS*,
947 F. Supp. 2d 1031 (D. Alaska 2013) ............23

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ............6

*Oceana, Inc. v. Pritzker*,
75 F. Supp. 3d 469 (D.D.C. 2014)............7

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
547 U.S. 47 (2006)............3

*Safari Club Int'l v. Jewell*,
No. CV 14-0670 (ABJ), 2015 WL 13651265 (D.D.C. Mar. 12, 2015)............42

*Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*,
550 F.3d 1121 (Fed. Cir. 2008)............3

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018)............26

*Sea Shepherd N.Z. v. United States*,
606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ............27, 32

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............26

*Stewart v. Azar*,
313 F. Supp. 3d 237 (D.D.C. 2018) ....................4

*United Transp. v. Interstate Com. Comm'n*,
891 F.2d 908 (D.C. Cir. 1989) ....................26

*URS Fed. Servs., Inc. v. United States*,
102 Fed. Cl. 664 (2011) ....................26

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ....................33

*Warth v. Seldin*,
422 U.S. 490 (1975) ....................22

**Statutes**

5 U.S.C. § 706 ....................31

16 U.S.C. § 1362 ....................21

16 U.S.C. § 1371 .................... *passim*

16 U.S.C. § 1826a ....................39

28 U.S.C. § 1581 ....................31, 32

Pub. L. No. 100-711, 102 Stat. 4755 (1988) ....................35

Pub. L. No. 101-162, 103 Stat. 988 (1989) ....................39

**Other Authorities**

50 C.F.R. § 216.3 ....................8, 44

50 C.F.R. § 216.24 ....................1, 8, 22, 44

**Federal Register**

56 Fed. Reg. 21096 (May 7, 1991) ....................35

80 Fed. Reg. 48172 (Aug. 11, 2015) ....................28

81 Fed. Reg. 54390 (Aug. 15, 2016) ....................28, 30

84 Fed. Reg. 39047 (Aug. 8, 2019) ....................39

85 Fed. Reg. 63527 (Oct. 8, 2020) ....................8, 9

88 Fed. Reg. 80193 (Nov. 17, 2023) ........ 30

90 Fed. Reg. 42395 (Sept. 2, 2025) ........ 8

91 Fed. Reg. 12510 (Apr. 16, 2026) ........ 30

91 Fed. Reg. 25867 (May 12, 2026) ........ 30

**Other Authorities**

H.R. Rep. No. 100-970 (1998) ........ 25

U.S. Const. art. I, § 8, cl. 3 ........ 32

## INTRODUCTION

When Congress enacted the Marine Mammal Protection Act (MMPA) in 1972, it included a short but mighty provision requiring the government (with a mandatory "shall") to ban the import of fish and fish products from foreign fisheries that result "in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2) [hereinafter the Import Provisions]. Congress designed the Import Provisions to address the global and pervasive issue of marine mammal bycatch. However, that Congressional command lay dormant for decades until Plaintiffs and other organizations began to press Defendants for its implementation.

In September 2025, the National Marine Fisheries Service (NMFS) finally operationalized the Import Provisions and their implementing regulations, 50 C.F.R. § 216.24(h) [hereinafter the Import Regulations], by determining whether approximately 2,500 fisheries from 135 nations satisfy the Import Provisions' requirements. NMFS found that 240 fisheries do not and, accordingly, Defendants banned imports from those fisheries. In response to those bans, several countries took immediate action to reduce marine mammal bycatch risk to get the bans lifted, just as Congress intended. Although the September 2025 findings were a step forward, several of Defendants' findings are arbitrary and capricious and contrary to law. Plaintiffs challenge those findings for 44 fisheries that have been permitted to continue exporting to the United States despite Defendants' failure to determine based on reasonable proof that these fisheries are not killing and injuring marine mammals in excess of U.S. standards.

Defendants now attempt to dismiss Plaintiffs' case on a theory that MMPA import bans do not and will not work. In doing so, they regurgitate arguments the Court of International Trade (CIT) rejected just months ago in another case, once again discounting Congressional determinations and Defendants' own findings. Defendants also try to claim Plaintiffs have not

established an injury in fact by misconstruing Plaintiffs' complaint and applying incorrect legal standards. Plaintiffs have demonstrated the fisheries at issue in this case pose a credible threat of harm to marine mammals that Plaintiffs' members have an interest in observing in the wild. And Congress and Defendants, as well as Plaintiffs, have established that MMPA import bans are likely to redress those injuries. This Court should reject Defendants' attempt to avoid judicial review of their unlawful comparability findings and deny their motion to dismiss.

## STANDARD OF REVIEW

If a Rule 12(b)(1) motion "challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). "If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Id.* In a factual challenge, the "court may consider relevant evidence in order to resolve the factual dispute." *Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*), 331 F. Supp. 3d 1338, 1352 (Ct. Int'l Trade 2018) (citation omitted). A plaintiff in that situation must establish standing by a "preponderance of the evidence," which means they have "demonstrate[d] that their allegations are '*more likely* than not' to be true." *Id.* (citation omitted). However, "even when a motion to dismiss challenges some jurisdictional facts alleged in the complaint, the Court still must accept as true any uncontroverted factual allegations." *Id.* at 1352–53 (cleaned up).

## ARGUMENT

Plaintiffs have standing to challenge the comparability findings and seek import bans on the fisheries identified in their complaint that harm marine mammals in which Plaintiffs' members have an interest. "To establish standing … a plaintiff must show that (1) it suffered an

injury-in-fact that is (2) fairly traceable to the challenged conduct of the defendant and (3) likely redressable by a favorable judicial decision." *Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1130 (Fed. Cir. 2008) (citation omitted). To satisfy the first prong, Plaintiffs must show that one or more of their members "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.' If a defendant's action causes an injury, enjoining the action … will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (citation omitted).

Plaintiffs challenge comparability findings and seek relief for the 44 fisheries identified in their complaint. *See, e.g.*, Compl. ¶¶ 11, 292, 295, ECF 6. For each of these fisheries, Plaintiffs have demonstrated, through their allegations and declarations attached hereto, that one or more of their members has a legally cognizable recreational interest in observing marine mammals that are at meaningful risk of bycatch in the fishery. *See Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) (noting "the presence of one party with standing is sufficient" regardless of "whether the other plaintiffs have standing"). Congress, the CIT, and Defendants themselves have determined that import bans are likely to redress bycatch risk from foreign fisheries. Those determinations alone are sufficient to establish standing. Plaintiffs go further, presenting evidence that fishers and governments are likely to react to an import ban in predictable ways likely to redress Plaintiffs' injuries.

While Defendants object that the allegations in Plaintiffs' complaint are insufficient to establish standing, Defendants do not actually deny or otherwise controvert any allegations in the

complaint; so "those allegations are taken as true and construed in a light most favorable to" Plaintiffs. *Cedars-Sinai*, 11 F.3d at 1583. Defendants' arguments rest on their misunderstanding of Plaintiffs' claims, their incomplete identification of Plaintiffs' members' interests, and an inappropriate attempt to raise the bar for standing that conflicts with well-established caselaw.

## I. Plaintiffs Request Relief Only for Challenged Fisheries.

As an initial matter, Defendants' argument that Plaintiffs "lack standing to obtain … broad, country-wide relief" misinterprets Plaintiffs' complaint. Defs' Mot. Dismiss, ECF 18, at 10. Plaintiffs do not seek country-wide relief but rather relief only for the fisheries specified in the complaint. Compl. ¶ 292. The complaint identifies, by Fishery ID, 44 individual fisheries. *Id.* ¶¶ 126, 138, 146, 155, 166, 174, 183, 194, 197. The first eight causes of action challenge the comparability findings for these fisheries. *See id.* ¶¶ 205–87. The ninth cause of action challenges Defendants' failure to ban imports from these fisheries. *Id.* ¶¶ 292, 295. Accordingly, Plaintiffs ask the Court to "vacate and remand the Comparability Findings *with respect to those fisheries*[,] and order Federal Defendants to promptly implement a ban on imports *from those fisheries*." *Id.* ¶ 11 (emphasis added); *see also id.* at 79 (Prayer for Relief seeking vacatur and remand "in full *or in part*" (emphasis added)). Plaintiffs do not ask the Court to rule on or order relief with respect to Fishery IDs not challenged in the complaint, so Plaintiffs do not have to establish standing for those fisheries. *Cf.* ECF 18, at 10–11 (arguing plaintiffs must demonstrate standing for each claim and form of relief).[1]

[1] While the Court need not reach the issue, Defendants' argument that Plaintiffs must show standing on a fishery-by-fishery basis is also wrong as a matter of law. "[S]tanding is assessed based on the claims asserted and the type of injury alleged not argument-by-argument." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 910 (9th Cir. 2020) (citations omitted)). Because "relief is tethered to the claim," a court "need ask only whether Plaintiffs 'have an interest in some portion' of the [thing] affected by" a challenged agency action, even if that action includes many other components that may not injure the plaintiffs (such as a single comparability finding approving all fisheries from a nation). *Stewart v. Azar*, 313 F. Supp. 3d 237, 253–54 (D.D.C.

## II. <u>Plaintiffs Have Established Injury in Fact for Each of the Challenged Fisheries.</u>

A plaintiff establishes injury in fact if it has a concrete interest in observing a population of animals that face an increased risk of harm from the challenged activity. Plaintiffs' members have cognizable interests in observing marine mammal populations that overlap with each of the challenged fisheries. *See infra* Table 1 (citing declarations). NMFS made findings connecting nearly every challenged fishery to a risk of bycatch to the particular marine mammals identified by Plaintiffs' members. Plaintiffs also provide further uncontroverted allegations and evidence that each fishery is likely to harm marine mammals in which their members have interests. That is sufficient to establish injury in fact for each of the fisheries. Defendants' arguments to the contrary rely on incorrect legal standards and alleged omissions from Plaintiffs' complaint that are inconsequential, yet are nonetheless addressed in the attached declarations.

### A. A Risk of Bycatch in a Fishery Is an Injury in Fact.

In environmental cases, "plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 181 (citation omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."). A decreased chance of seeing a population of animals in the wild—and the corresponding diminishment of plaintiffs' ability to pursue their recreational interest in observing that population—constitutes an injury. *See, e.g.*, *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992); *see also In Def. of Animals v. U.S. Dep't of Interior*, 808 F. Supp. 2d 1254, 1262 (E.D. Cal. 2011) ("[I]njury-in-fact stems from [plaintiffs'] diminished

---

2018) (citation omitted).

ability to interact with, view and enjoy wild horses and burros on Twin Peaks."). Accordingly, this Court found plaintiffs had standing to challenge the absence of an import ban where their members "have a recreational and aesthetic interest in viewing the vaquita that is harmed by the continual decrease in its population" and where fishing in the vaquita's habitat caused mortality. *NRDC*, 331 F. Supp. 3d at 1357.

While evidence that animals are killed by the fishery is undoubtedly sufficient to establish injury, it is not necessary. Instead, "a credible threat of harm is sufficient to constitute actual injury for standing purposes." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002); *see also Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) ("To require actual evidence of environmental harm, rather than an increased risk based on a violation of a statute, misunderstands the nature of environmental harm and would unduly limit the enforcement of statutory environmental protections." (cleaned up)); *Baur v. Veneman*, 352 F.3d 625, 640–41 (2d Cir. 2003) ("[E]xposure to a credible threat of harm constitutes the relevant injury in fact for Article III purposes."); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 129–30 (D.D.C. 2016) (rejecting argument that plaintiffs must show "that another grizzly bear will actually be taken" to establish injury). Therefore, if fishing gear poses a credible risk of harm to marine mammals in which Plaintiffs have an interest, that is sufficient to establish injury in fact to Plaintiffs' recreational or professional pursuits. *Cent. Delta*, 306 F.3d at 950; *see also Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 22–23 (D.D.C. 2019) (finding injury to a declarant because increased use of gillnet gear "decreas[ed] her chances of seeing" North Atlantic right whales); *Brower v. Daley*, 93 F. Supp. 2d 1071, 1081 (N.D. Cal. 2000) (finding standing established by evidence that fisheries use harmful gear (purse seines) in dolphin habitat). Further, it is sufficient if the alleged injury is "to a population segment of animals the

plaintiffs have directly visited, observed, or studied," even if Plaintiffs' members do not observe the marine mammals in the specific area where fishing puts them at risk. *Mayo*, 177 F. Supp. 3d at 131; *see also Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 480–81 (D.D.C. 2014) (finding standing where operation of scallop fishery 100 miles to the north "leads to the deaths of loggerhead sea turtles within the [Northwest Atlantic population], and that those loggerheads nesting on Bald Head Island [where plaintiffs sought to view turtles] are members of this specific population of turtles").

Accordingly, under established caselaw, Plaintiffs establish injury in fact if 1) one or more members has a cognizable interest in observing a marine mammal, 2) that population of marine mammals overlaps with a fishery, and 3) the fishery poses a credible threat of harming the marine mammal—and thus Plaintiffs' ability to observe the species—through bycatch. Plaintiffs make all three showings for each of the challenged fisheries. *See* Table 1.

### B. NMFS Found that Nearly All the Challenged Fisheries Pose a Bycatch Risk to Marine Mammals in which Plaintiffs' Members Have Interests.

To begin, NMFS itself has determined in its List of Foreign Fisheries that each of the challenged fisheries poses a credible bycatch risk to marine mammals. [2] For nearly all those fisheries, the LOFF also identifies which specific marine mammals are at risk. NMFS's findings thus establish injury in fact for the vast majority of challenged fisheries. *See Baur*, 352 F.3d at 637 (finding credible threat of harm because "government studies and statements confirm" plaintiff's allegations of threat).

The LOFF is a fishery-by-fishery assessment produced by NMFS to determine which foreign fisheries pose a bycatch risk to particular marine mammals and thus require a

---

[2] *See* NMFS, *2020 Final List of Foreign Fisheries* (2020), attached as Exhibit A [hereinafter LOFF].

comparability finding under the MMPA Import Regulations before they export to the United States. NMFS classifies each fishery that exports to the United States "as either 'exempt' or 'export' fisheries" based "on their frequency of marine mammal interactions." 85 Fed. Reg. 63527, 63527 (Oct. 8, 2020). In making this determination, NMFS considers "information provided by nations, industry, the public, and other readily available sources." *Id.*

> As bycatch estimates are lacking for most fisheries, NMFS relied on three considerations to assess the likelihood of bycatch or interaction with marine mammals [to determine whether fisheries qualify as exempt or export], including: (1) Co-occurrence, the spatial and seasonal distribution and overlap of marine mammals and fishing operations as a measure of risk; (2) analogous gear … ; and (3) overarching classifications, evaluation of gears and fishing operations and their risk of marine mammal bycatch.

*Id.* at 63530. NMFS explained that "[c]o-occurrence data is useful to develop risk assessment models in the absence of bycatch estimates." *Id*. at 63533.

NMFS characterized each of the challenged fisheries as "Export Fisheries," meaning NMFS determined they "have more than a remote likelihood of incidental mortality and serious injury of marine mammals." 50 C.F.R. § 216.3; *see also* 90 Fed. Reg. 42395, 42396 (Sept. 2, 2025). It is precisely because of this risk that NMFS requires these fisheries to demonstrate that they have a "regulatory program … comparable in effectiveness" to U.S. standards as a condition to import. 50 C.F.R. § 216.24(h)(6).

Each of the challenged fisheries uses a gear type (gillnets or set nets, trawls, longlines, purse seines, or pots and traps) that NMFS determined poses a bycatch risk to marine mammals. 85 Fed. Reg. at 63530–31. In most cases, the LOFF also identifies which marine mammals are at risk of bycatch from the challenged fisheries: it includes a column that identifies marine mammals "whose distribution overlaps the area of operation of the fishery" and "that have a regular and significant co-occurrence with this fishery, depredate on bait or catch, are captured

and released alive, or are killed or injured in the fishery." *Id.* at 63533. For nearly all the challenged fisheries, the LOFF lists one or more marine mammal species in which Plaintiffs' members have a demonstrated interest as facing a bycatch risk. *See* Table 1.[3] Accordingly, the LOFF demonstrates an injury in fact for those challenged fisheries. It provides the "'specific facts' demonstrating that a specific species is 'in fact being threatened' by that fishery," that Defendants claim are lacking. ECF 18, at 13 (quoting *Lujan*, 504 U.S. at 563).

### C. Plaintiffs Further Establish that Each Challenged Fishery Poses a Bycatch Risk to Marine Mammals in which Plaintiffs' Members Have Interests.

In addition to the LOFF's findings, Plaintiffs' complaint allegations and attached declarations establish injury for each challenged fishery, as detailed in Table 1. Plaintiffs' member declarants demonstrate cognizable interests in marine mammals that co-occur with each fishery. And there is evidence that each fishery is either known to catch or is likely to catch marine mammals based on its gear and location.

While Defendants do not deny any of Plaintiffs' allegations, they nitpick Plaintiffs' complaint, claiming its allegations fall short of what is required to establish injury for certain fisheries. *See* ECF 18, at 23–32. Defendants do not challenge the sufficiency of Plaintiffs' allegations to establish injury for Taiwan or Norway fisheries. ECF 18, at 23 n.5. They claim

[3] For 11 of the challenged fisheries (Fishery ID 1180 from Ecuador, Fishery IDs 7085 and 1509 from India, Fishery IDs 2851 and 2852 from Vanuatu, and Fishery IDs 2545, 2457, 2458, 2463, 12737, 12752, and 12754 from Tunisia), the LOFF left the field on marine mammal co-occurrence blank. For these fisheries, Table 1 cites other evidence of co-occurrence and threat. Tunisia's Comparability Finding provides a list of marine mammals that overlap with the challenged Tunisian fisheries. The Vanuatu Comparability finding and a study by NMFS scientists demonstrate a bycatch risk for the Hawai'i Pelagic Population of False Killer Whales from Vanuatu's Fishery IDs 2851 and 2852. Ecuador Fishery ID 1180 places the same marine mammals at risk as those listed in the LOFF's entry for Fishery ID 1178 because the two fisheries operate in the exact same geographic location. For Fisheries IDs 1509 and 7085 from India, scientific studies showing bycatch risk and/or the relevant species' range demonstrate the fisheries pose a bycatch risk to specific marine mammals.

only that the complaint does not explain in which specific marine mammals declarants have an interest for Vanuatu, Tunisia, United Kingdom, Ecuador, India, and Argentina fisheries. However, "at the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur*, 352 F.3d at 631. Plaintiffs' complaint allegations are sufficient to demonstrate injury in fact for each of the challenged fisheries.

Even if Plaintiffs must establish standing by a preponderance of the evidence, they have done so. Plaintiffs submit declarations that provide the details Defendants claim are lacking and fully establish injury in fact for each challenged fishery. For each fishery, Table 1 identifies 1) the Fishery ID, 2) the marine mammal(s) in which Plaintiffs' members have interests,[4] 3) the evidence that the marine mammal population overlaps with the fishery, and 4) the evidence that the fishery poses a credible risk of harm to the marine mammal.

**Table 1 – Fishery- and Species-Specific Evidence of Injury**

| **Fishery ID** | **Plaintiffs' Interest** | **Spatial Overlap**[5] | **Bycatch Risk** |
|---|---|---|---|
| 45 Bottom pair trawls, bottom trawls (Argentina) | Franciscana dolphin, (Coberg Decl. ¶ 7, Hartl Decl. ¶ 8). | NOAA Fisheries, *Comparability Finding Approvals for Harvesting Nations' Fisheries* 2 (2026), attached as Exhibit B; LOFF 4 (Column 5, Line 19); Compl. ¶ 90. | NMFS, *Fishing Gear: Bottom Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-bottom-trawls (last updated Jan. 8, 2026);<br><br>Paul R. Wade et al., *Best Practices for Assessing and Managing Bycatch of Marine Mammals*, 8 |

[4] While this column identifies only one to three marine mammals for brevity, many declarations establish interests in additional marine mammals affected by the fishery.

[5] The citation to NMFS's 2025 Final Comparability Finding Approval identifies the Fishery ID, the gear used by that fishery, and where the fishery operates. The LOFF citation shows the fishery using that gear in that location has spatial overlap with one or more of the marine mammals in which Plaintiffs have an interest. For citations to line numbers in Column 5 of the LOFF, Plaintiffs counted only the lines containing text in Column 5, excluding lines containing headings and blanks.

| | | | |
|---|---|---|---|
| | | | Front. Mar. Sci. 1, 5 (2021), attached as Exhibit C. |
| 48 Gillnets and entangling nets (Argentina) | Franciscana dolphin (Coberg Decl. ¶ 7, Hartl Decl. ¶ 8). | Ex. B, at 1; LOFF 4 (Column 5, Line 28); Compl. ¶ 90. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-gillnets (last updated Jan. 8, 2026); Ex. C, at 5. |
| 1171 Longlines (Ecuador) | Bottlenose dolphins, sperm whales, (Hearn Decl. ¶¶ 5, 6). | Ex. B, at 52; LOFF 122 (Column 5, Line 15–16, 21, 35); Compl. ¶ 94. | NMFS, *Fishing Gear: Longlines*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-pelagic-longlines (last updated Nov. 14, 2025); Ex. C, at 5. |
| 1180 Longlines (Ecuador) | Common dolphins, sperm whales (Hearn Decl. ¶¶ 5, 6). | Ex. B, at 21; LOFF 122 (Column 5, Line 31, 34) (showing fishery operating in the same geographic location spatially overlaps with multiple marine mammals, including common dolphins and sperm whales); Compl. ¶ 94. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 1182 Gillnets and entangling nets (Ecuador) | Bottlenose dolphins, humpback whales (Hearn Decl. ¶ 6). | Ex. B, at 51; LOFF 122 (Column 5, Line 5–6); Compl. ¶ 94. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 1183 Set gillnets/set nets (Ecuador) | Bottlenose dolphins, humpback whales (Hearn Decl. ¶ 6). | Ex B, at 51; LOFF 122 (Column 5, Line 1–2); Compl. ¶ 94. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 1505 Purse seines (India) | Indo-Pacific bottlenose dolphin, Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 61; LOFF 134 (Column 5, Line 27–28); Compl. ¶ 97. | NMFS, *Fishing Gear: Purse Seines*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-purse-seines (last updated Feb. 12, 2010); Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 1507 Stationary bag nets and dol nets (India) | Indo-Pacific bottlenose dolphin, Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 62; LOFF 134 (Column 5, Line 24–25); Compl. ¶ 97. | "A dol net is a type of set bag net." Suraj Pradhan et al., *Design and Operational Parameters of Dol Nets Operated in Bhayander Estuaray Maharashtra*, 22 J. Exp. Zool. India 145 (2019), attached as Exhibit D;<br><br>NMFS has identified set bag nets as "gear with high-risk of entanglement with marine mammals." *See* NMFS, *Bangladesh Comparability Finding* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Bangladesh-Final-2025-508.pdf. |
| 1509 Trawls (India) | Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 62; NMFS, *MMPA Import Provisions Comparability Finding Application Final Report India* 3 (2025), https://www.fisheries.noaa.gov/s3/2025-08/India-final-2025-508.pdf (noting humpback dolphin interacts with India's export fisheries); Aaron Savio Lobo, *The Bycatch Problem: Effects of Commercial Fisheries on Non-Target Species in India* 62–63, Resonance (2007), attached as Exhibit E (showing documented dolphin bycatch in Indian trawl fisheries); Compl. ¶ 97. | NMFS, *Fishing Gear: Bottom Trawls*, *supra*; NMFS, *Fishing Gear, Midwater Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-midwater-trawls (last updated Jan. 15, 2026); Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 1511 Gillnets and entangling nets (India) | Indo-Pacific bottlenose dolphin, Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 62; LOFF 134 (Column 5, Line 33–34); Compl. ¶ 97. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 1512 Longlines (India) | Indo-Pacific bottlenose dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 61; LOFF 134 (Column 5, Line 3031); Compl. ¶ 97. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 1513 Gillnets and entangling nets (India) | Indo-Pacific bottlenose dolphin, Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 61; LOFF 134 (Column 5, Line 10–11); Compl. ¶ 97. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 1515 Hook and lines (pelagic) (India) | Indo-Pacific Humpback dolphin, Indo-Pacific bottlenose dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 61; LOFF 134 (Column 5, Line 8–9, 30–31); Compl. ¶ 97. | N. Gopinatha Menon et al., *Hooks and Line Fishery Resources of India* 30–38 (1993), https://eprints.cmfri.org.in/8682/1/Gopinatha_Menon.pdf, attached as Exhibit F (stating hook and longline fisheries in India include the use of longline gear);<br><br>NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 1516 Purse seines (India) | Indo-Pacific bottlenose dolphin, Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 61; LOFF 134 (Column 5, Line 27–28); Compl. ¶ 97. | NMFS, *Fishing Gear: Purse Seines*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 7084 Pots/traps (India) | Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 60; LOFF 134 (Column 5, Line 39); Compl. ¶ 97. | NMFS, *Fishing Gear: Traps and Pots*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-traps-and-pots (last updated May 12, 2025); Ex. C, at 5. |
| 7085 Lobster traps (India) | Indo-Pacific humpback dolphin (Balasubramanian Decl. ¶ 6). | Ex. B, at 59 (noting fishery operates in southern parts of the Bay of Bengal); Dipani Sutaria & Thomas A. Jefferson, *Records of Indo-Pacific Humpback Dolphins (*Sousa Chinensis*, Osbeck, 1765) Along the Coasts of India and Sri Lanka: An Overview*, 30 Aquatic Mammals 125, 126 (2004), attached as Exhibit G (showing habitat range of humpback dolphin, including in the southern Bay of Bengal); Compl. ¶ 97. | NMFS, *Fishing Gear: Traps and Pots*, *supra*; Ex. C, at 5. |
| 2019 Set gillnets/set nets (Norway) | Harbor seals, gray seals (Lien Decl. ¶ 9, Røising Decl. ¶ 6). | Ex. B, at 98; LOFF 170 (Column 5, Line 9); Compl. ¶ 101. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 10291 Set gillnets/set nets (Norway) | Harbor porpoises, gray seals (Lien Decl. ¶ 9, Røising Decl. ¶ 6). | Ex. B, at 98; LOFF 170 (Column 5, Line 7); Compl. ¶ 101. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 2018 Set gillnets/set nets (Norway) | Harbour seals, harbor porpoises (Lien Decl. ¶¶ 7, 9). | Ex. B, at 98; LOFF 170 (Column 5, Line 5); Compl. ¶ 101. | ECF 18-1, at 16, 50; NMFS, Fishing Gear: Gillnets, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-gillnets; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 809 Longlines (Taiwan) | False killer whales from the Hawai‘i pelagic population (Perrine Decl. ¶¶ 6, 8) | Ex. B, at 115; LOFF 202 (Column 5, Line 13–14); Compl. ¶ 116;<br><br>NMFS, *False Killer Whale (*Pseudorca crassidens*): Hawaiian Islands Stock Complex – Main Hawaiian Islands Insular, Northwestern Hawaiian Islands, and Hawai‘i Pelagic Stocks* 298 (Rev. July 11, 2024), attached as Exhibit H (showing Hawai‘i pelagic population habitat zone);<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, https://www.fisheries.noaa.gov/resource/map/iattc-and-wcpfc-convention-area-map (last updated May 21, 2019) (showing where IATTC and WCPFC fisheries operate). | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 885 Longlines (Taiwan) | False killer whales from the Hawai‘i pelagic population (Perrine Decl. ¶ 6, 8). | Ex. B, at 114; LOFF 201 (Column 5, Line 27 noting overlap with unspecified toothed whales); Compl. ¶ 116;<br><br>Ex. H, at 298 (showing Hawai‘i pelagic population habitat zone);<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, *supra* (showing where IATTC and WCPFC fisheries operate). | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 886 Longlines (Taiwan) | Indo-Pacific bottlenose dolphins (Balasubramanian Decl. ¶ 6). | Ex. B, at 114; LOFF 201 (Column 5, Line 23); Compl. ¶ 116. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C at 5. |

| | | | |
|---|---|---|---|
| 889 Longlines (Taiwan) | Common bottlenose dolphins, beaked whales (Hodgins Decl. ¶ 9). | Ex. B, at 114; LOFF 201 (Column 5, Line 14, 20–21); Compl. ¶ 116. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 891 Set gillnets/set nets (Taiwan) | Risso's dolphin (Kuo ¶ 12) | Ex. B, at 114; LOFF 201 (Column 5, Line 10 noting overlap with unspecified dolphin species); Hsin-Yi Yu et al., *Distribution of Risso's Dolphin (Grampus griseus) in the east-central coastal waters of Taiwan based on whale-watching records*, 64 Tiawania 417, 418–19 (2019), attached as Exhibit I (showing Risso's dolphin inhabits nearshore waters of Taiwan, which is where this fishery operates); Compl. ¶ 116. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 892 Stow nets (Taiwan) | Taiwanese white dolphin (Kuo ¶ 10; Winkler Decl. ¶ 12 (describing interest in Taiwanese humpback dolphin, which is another name for the Taiwanese white dolphin)). | Ex. B, at 114; LOFF 201 (Column 5, Line 7, noting overlap with unspecified dolphin species); Barbara L. Taylor et al., *Recovery Plan for the Taiwanese White Dolphin (*Sousa chinensis tiawanensis*)* 23 (August 2019), attached as Exhibit J (showing habitat range of the Taiwanese white dolphin in northwest coastal waters of Taiwan, which is where this fishery operates); Compl. ¶ 116. | Similar to gillnets, stow nets have "high potential for marine mammal bycatch." Jung-Mo Jung et al., *A Study on the Catch Losses and Mesh Selectivity Related to the Attachment of Marine Mammal Bycatch Reduction Devices on Midwater Trawl Gear*, 9 Fishes (2024), attached as Exhibit K. |
| 893 Bottom trawls (Taiwan) | Common bottlenose dolphins (Kuo Decl. ¶ 10). | Ex. B, at 114; LOFF 201 (Column 5, Line 8); Compl. ¶ 116. | NMFS, *Fishing Gear: Bottom Trawls*, *supra*; Ex. C, at 5. |
| 10431 Longlines (Taiwan) | Risso's dolphins (Kuo Decl. ¶ 12). | Ex. B, at 115; LOFF 202 (Column 5, Line 20–21); Compl. ¶ 116. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 11108 Pots/traps (Taiwan) | Taiwanese white dolphins, Risso's dolphins (Kuo Decl. ¶¶ 10, 12; Winkler Decl. ¶ 12). | Ex. B, at 115; LOFF 202 (Column 5, Line 17, noting overlap with unspecified dolphin species); Ex. I, at 418–419 (habitat range for Risso's dolphin); Ex. J, at 23 (habitat range for Taiwanese white dolphin); Compl. ¶ 116. | NMFS, *Fishing Gear: Traps and Pots*, *supra* Ex. C, at 5. |
| 2454 Drifting longlines (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 2457 Trammel nets (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5 (explaining trammel nets are a type of gillnet). |
| 2458 Pots/traps (Tunisa) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | NMFS, *Fishing Gear: Traps and Pots*, *supra*; Ex. C, at 5. |
| 2459 Purse seines (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; LOFF 209 (Column 5, Line 9); Compl. ¶ 106. | NMFS, *Fishing Gear: Purse Seines*, *supra*; Ex. C, at 5. |
| 2461 Purse seines (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; LOFF 209 (Column 5, Line 7); Compl. ¶ 106. | NMFS, *Fishing Gear: Purse Seines*, *supra*; Ex. C, at 5. |
| 2463 Otter trawls (a type of bottom trawl) (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | NMFS, *Fishing Gear: Bottom Trawls*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 2462 Gillnets and entangling nets (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; LOFF 209 (Column 5, Line 8); Compl. ¶ 106. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 12737 Pots/traps (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | NMFS, *Fishing Gear: Traps and Pots*, *supra*; Ex. C, at 5. |
| 12752 Combined gillnets-trammel nets, single boat bottom otter trawls, trammel nets, trolling lines (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |
| 12754 Barriers, fences, weirs, fyke (Tunisia) | Bottlenose dolphins (Sofia Decl. ¶ 18). | Ex. B, at 120; ECF 18-1, at 58–59 (showing Tunisia's fisheries overlap with common bottlenose dolphins, among other marine mammals); Compl. ¶ 106. | Ex. C, at 5 (explaining fykes, a type of trap net, have medium risk of entanglement for marine mammals). |
| 2653 Pots/traps (United Kingdom) | Minke whales, humpback whales (Hodgins Decl. ¶ 9). | Ex. B, at 123; LOFF 214 (Column 5, Line 7, 9); Compl. ¶ 109. | NMFS, *Fishing Gear: Traps and Pots*, *supra*; Ex. C, at 5. |
| 2679 Gillnets and entangling nets (United Kingdom) | Harbor porpoises, common dolphins (Allen Decl. ¶¶ 7, 12). | Ex. B, at 123; LOFF 213 (Column 5, Line 1–2, 35, 37); Compl. ¶ 109. | ECF 18-1, at 16, 50; NMFS, *Fishing Gear: Gillnets*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| 2796 Longlines (Vanuatu) | False killer whales from the Hawai‘i pelagic population (Perrine Decl. ¶¶ 6, 8). | Ex. B, at 125; LOFF 216 (Column 5, Line 1) (noting overlap with unspecified dolphin species); Compl. ¶ 114; ECF 18-1, at 43 (stating "Vanuatu lists false killer whales as being in the same area as its fisheries ... this ... could be the Hawai‘i Pelagic Population.");<br><br>Ex. H, at 298, 302 (identifying Hawai‘i pelagic population of FWKs habitat zone and noting significant risk of bycatch to false killer whales from foreign longline fleets fishing operating under WCPFC and IATTC jurisdiction);<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, *supra* (showing where IATTC and WCPFC fisheries operate). | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 2850 Longlines (Vanuatu) | False killer whales from the Hawai‘i pelagic population (Perrine Decl. ¶¶ 6, 8). | Ex. B, at 125; LOFF 215 (Column 5, Line 32); Compl. ¶ 114; ECF 18-1, at 43 (stating "Vanuatu lists false killer whales as being in the same area as its fisheries ... this ... could be the Hawai‘i Pelagic Population.");<br><br>Ex. H, at 298, 302 (identifying Hawai‘i pelagic population of FWKs habitat zone and noting significant risk of bycatch to false killer whales from foreign longline fleets fishing operating under WCPFC and IATTC jurisdiction);<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, *supra* | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| | | (showing where IATTC and WCPFC fisheries operate). | |
| 2851 Longlines (Vanuatu) | False killer whales from the Hawaiʻi pelagic population (Perrine Decl. ¶¶ 6, 8). | Ex. B, at 125; Compl. ¶ 114; ECF 18-1, at 43 (stating "Vanuatu lists false killer whales as being in the same area as its fisheries ... this ... could be the Hawaiʻi Pelagic Population.");<br><br>Ex. H, at 298, 302 (identifying Hawaiʻi pelagic population of FWKs habitat zone and noting significant risk of bycatch to false killer whales from foreign longline fleets fishing operating under WCPFC jurisdiction); *id.* at 305 (noting that the Hawaiʻi pelagic FKW habitat zone "may not account for all animals in this stock");<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, *supra* (showing where IATTC and WCPFC fisheries operate). | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |
| 2852 Longlines (Vanuatu) | False killer whales from the Hawaiʻi pelagic population (Perrine Decl. ¶¶ 6, 8). | Ex. B, at 125; Compl. ¶ 114; ECF 18-1, at 43 (stating "Vanuatu lists false killer whales as being in the same area as its fisheries ... this ... could be the Hawaiʻi Pelagic Population.");<br><br>Ex. H, at 298 (identifying Hawaiʻi pelagic population of FWKs habitat zone and noting significant risk of bycatch to false killer whales from foreign longline fleets fishing operating under WCPFC and IATTC jurisdiction);<br><br>NMFS, *IATTC and WCPFC Convention Area Map*, *supra* | NMFS, *Fishing Gear: Longlines*, *supra*; Ex. C, at 5. |

| | | | |
|---|---|---|---|
| | | (showing where IATTC and WCPFC fisheries operate). | |

In sum, Plaintiffs have shown that for each of the fisheries challenged in this case, they have at least one member with a cognizable interest in marine mammals that face a credible risk of harm from the fishery. That is sufficient to establish injury in fact for each claim and form of relief.

### D. Defendants' Arguments Rely on Incorrect Legal Standards.

Defendants improperly attempt to raise the bar for establishing injury in fact. They overstate the legal burden in four ways.

**First**, Defendants are wrong that Plaintiffs must show the relevant marine mammals in which they have an interest are facing extinction. *See* ECF 18, at 14–15. "[I]t has never been the law, and is not so today, that injury in fact requires the elimination (or threatened elimination) of either the animal species or environmental feature in question." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 437 (D.C. Cir. 1998). Defendants cite to cases concerning the highly endangered vaquita and Māui dolphin to support their argument. ECF 18, at 14–15 (citing *NRDC*, 331 F. Supp. 3d 1338, and *Sea Shepherd N.Z. v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022)). Neither case held plaintiffs must establish an extinction-level threat. The MMPA applies to all marine mammals, not just endangered ones. 16 U.S.C. §§ 1362(6), 1371(a)(2)(A). And courts have found standing under the MMPA based on injuries to non-endangered animals. *See, e.g.*, *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1007 (D.C. Cir. 1977).

**Second**, Defendants are wrong that Plaintiffs must establish bycatch limits are being exceeded to demonstrate injury in fact. *See, e.g.*, ECF 18, at 25, 26, 30, 32. A plaintiff does not need to show harm will exceed a regulatory limit to establish injury. *LaFleur v. Whitman*, 300

F.3d 256, 269–71 (2d Cir. 2002) (also observing, "The injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice'" (citation omitted)). A plaintiff does not even need to show an animal will be killed to establish injury, much less that the bycatch reaches a certain level. *See Mayo*, 177 F. Supp. 3d at 129–30 (evidence of actual take not required); *see also, e.g.*, *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (finding standing to challenge authorization of non-lethal activities). Moreover, Defendants improperly conflate standing with the merits. While one way—but not the only way—a fishery operates in excess of U.S. standards is if bycatch is exceeding a bycatch limit, *see* 50 C.F.R. § 216.24(h)(6)(iii)(C)*(3)(ii)*, Plaintiffs do not have to prove that substantive violation to demonstrate standing, *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ... ."); *Ctr. for Biological Diversity v. Little*, 724 F. Supp. 3d 1113, 1133 (D. Idaho 2024) (finding injury based on credible threat of harm and holding that "[r]equiring Plaintiffs to prove that a grizzly bear has actually been trapped or snared by a recreational trapper … confuses the jurisdictional standing inquiry with the merits question.").

**Third**, Defendants claim Plaintiffs cannot establish harm from bycatch in fisheries that lack bycatch data. ECF 18, at 24, 30, 32. Hard data on mortality are not the only way to show a "credible threat of harm," particularly given that a plaintiff is not required to prove animals are caught and killed to establish standing. *See supra* p. 6–7 (citing cases). A "hear no evil, see no evil" approach does not mean there is no threat. It just means those nations' bycatch monitoring is inadequate and/or that NMFS failed to insist on "reasonable proof" that these fisheries do not pose a credible threat of bycatch in excess of U.S. standards. 16 U.S.C. § 1371(a)(2)(A). Providing bycatch data is especially unnecessary here, where Plaintiffs are challenging the

adequacy of monitoring to detect whether bycatch is occurring in the first place. Compl. ¶¶ 211, 222, 232, 242, 253, 263, 282; *see Native Vill. of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031, 1048 (D. Alaska 2013) (finding injury in fact despite the fact that monitoring had revealed no evidence of harm because "the presence of these animals in the [action] area indicates the harm that Plaintiffs are concerned with could have occurred or is likely to occur, particularly given Plaintiffs' challenge to certain aspects of [industry's] monitoring techniques").

**Fourth**, Defendants are incorrect that Plaintiffs must allege a "change in the status quo that would cause them injury." ECF 18, at 13. In assessing standing, consequences must "be assessed not by reference to the status quo ante but instead to other actions [the agency] could have taken." *Nat'l Env't Dev. Ass'ns' Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (finding standing because "had the EPA taken the course of action that [plaintiffs] claim the law required, they would have been better off"). Had Defendants banned imports from the identified fisheries, bycatch risks to the marine mammals in which Plaintiffs have an interest would likely be reduced. *See infra* Section III.

Plaintiffs allege, and further show through their declarations, a credible threat of harm to marine mammals in which their members have an interest. The Court should reject Defendants' attempts to heighten the well-established legal standard.

## III. <u>Plaintiffs' Injuries Are Redressable.</u>

"When the plaintiff is not the object of a government regulation," a court asks whether "third parties will likely react to the government regulation (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiff's injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (cleaned up). The Court need look no further than Congress' policy determinations and Defendants' own statements that foreign nations are likely to react to MMPA import bans in ways that reduce risk to marine mammals. That is sufficient to establish

redressability. Defendants may not evade that conclusion with their litigation argument that they have unilateral authority, to the exclusion of Congress and this Court, to decide if trade policy will be effective for standing purposes. While not necessary given the policy determinations, Plaintiffs also provide evidence that fishers and governments will likely react to import bans in predictable ways, based on common sense and simple laws of economics, that would redress Plaintiffs' injuries.

### A. Congress and Defendants Have Determined that MMPA Import Bans Are Likely to Redress Plaintiffs' Injuries.

Defendants' redressability argument is premised on the remarkable assertion that MMPA import bans are and will be completely ineffective at protecting marine mammals from bycatch in foreign fisheries. Their position in this Court contradicts Congress' policy determinations and Defendants' own statements outside of litigation that such bans *will* be effective. It also disregards the CIT's findings that such bans are likely to redress Plaintiffs' injuries. In fact, the CIT recently rejected identical arguments from Defendants in a challenge to comparability findings for New Zealand fisheries. *Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS* (*MHDD*), No. 26-02462, 2026 WL 2018678, *4–6 (Ct. Int'l Trade July 13, 2026). This Court should do the same.

#### 1. Congress Determined that Import Bans Are an Effective Remedy to Protect Marine Mammal Populations.

The Supreme Court has recognized that, because it is Congress' role to make policy choices on how to ameliorate specific harms, a "congressional determination [on appropriate remedy] warrants judicial attention and respect" in assessing redressability. *Laidlaw*, 528 U.S. at 185. Accordingly, "a match between the statutory objective behind the … regulation and the alleged injury," while "not essential," can establish redressability. *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.* (*CEI*), 901 F.2d 107, 114 (D.C. Cir. 1990); *see Laidlaw*,

528 U.S. at 185 (finding judicial imposition of civil penalties would redress environmental plaintiffs' interests because "Congress has found that civil penalties in Clean Water Act cases … promote immediate compliance" and "deter future violations"); *Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1248 (9th Cir. 2008) ("Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects."); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1334–35 (D.C. Cir. 1986) (finding redressability because the "object of the agency's regulation and the injury are … directly linked"). In *Animal Welfare Institute v. Kreps*, for example, the court concluded that "Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices." 561 F.2d at 1010.

Here, Congress decided that an import ban under the MMPA is an effective remedy for addressing unsustainable marine mammal bycatch in foreign fisheries. *See MHDD*, 2026 WL 2018678, at *5–6; *Kreps*, 561 F.2d at 1010 ("The MMPA … reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world."); *see also Humane Soc'y v. Brown*, 920 F. Supp. 178, 205 (Ct. Int'l Trade 1996) (relying in part on record developed before Congress in finding that trade restrictions on foreign fisheries "can be and are effective in furtherance of underlying conservation policies"). This is corroborated by the MMPA's legislative history, where Congress made explicit reference to the effectiveness of denying nations' access to U.S. markets as a means of forcing changes in destructive fishing practices abroad. H.R. Rep. No. 100-970, at 15 (1998), *as reprinted in* 1988 U.S.C.C.A.N. 6154, 6156. "In the face of this congressional determination, it is impossible to

conclude," as Defendants urge, "that the causal relationship is 'purely speculative.'" *Kreps*, 561 F.2d at 1010; *see also Kōloa Rum Co. v. Noem*, 822 F. Supp. 3d 8, 27 (D.D.C. 2026) ("The relationship between the government restriction, third-party behavior, and a favorable judicial decision is not speculative [where] [t]he Jones Act's very purpose is to bar conduct that Congress believed would otherwise occur.").

Defendants ask this Court to completely disregard Congress' determination and substitute their litigation position. *But see infra* Section III.A.2 (describing Defendants' consistent position outside of court that import bans are effective); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 (2018) ("It is Congress's job to enact policy and it is this Court's job to follow the policy Congress has prescribed."); *URS Fed. Servs., Inc. v. United States*, 102 Fed. Cl. 664, 670 (2011) (rejecting standing argument that "would be contrary to Congress' decision to impose an automatic stay as a temporary remedy"). Defendants cite only two cases for their position that it is inappropriate to rely on a Congressional determination, and they misinterpret both. ECF 18, at 19. The court in *Doe 1 v. Apple Inc.* explicitly *did* rely on Congress' judgment, quoting the Supreme Court's pronouncement that "Congress has the power to … articulate chains of causation that will give rise to a case or controversy where none existed before." 96 F.4th 403, 409 (D.C. Cir. 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)). The language quoted by Defendants refers only to whether the chain of causation "has a close common law or historical analogue." *Id.* at 410. In *United Transportation v. Interstate Commerce Commission* (which predates *Spokeo*, *Laidlaw*, and other Supreme Court cases on respecting Congressional determinations), the court held only that it "cannot be *bound* by Congress' predictions or intentions"; but it also agreed that courts should still pay "attention to Congress' predictions of the effect of legislation." 891 F.2d 908, 916 (D.C. Cir. 1989). The court only discarded Congress' assessment because "it

would be irrational to defer to Congress' 1914 pronouncements" about a "a transportation industry in which railroads held a far more dominant market share than" they did in 1989. *Id.* at 918. In contrast, marine mammal bycatch in foreign fisheries remains nearly as much of a problem today as it was when the MMPA was enacted, in part because Defendants neglected their duty to implement the Import Provisions until recently.

Next, Defendants argue the Court should not defer to Congress' determination on remedy because there are multiple remedies contained in the MMPA, and it is Defendants' job to "[b]alanc[e] the use of these carrots—like technical assistance—against the threat of the stick—an import prohibition." ECF 18, at 20. But this argument disregards the plain text of the statute. The MMPA does not give Defendants discretion to choose which tools to use. The Import Provisions state Defendants "*shall* ban" imports if they are caught in a way that "results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2) (emphasis added). Accordingly, this Court held that the statutory duty to ban imports when fisheries do not meet U.S. standards is mandatory because "Congress left the Government with no discretion whether to act." *NRDC*, 331 F. Supp. 3d at 1353–54; *see also Sea Shepherd*, 606 F. Supp. 3d at 1312. Defendants' suggestion that they may choose to use "carrots" *instead of* an import ban is contrary to the MMPA and established caselaw. While Defendants may use their array of diplomatic tools under the law *alongside* an import ban, they still must comply with their statutory obligation to implement an import ban when they are unable to reasonably conclude that marine mammal bycatch is not in excess of U.S. standards.

2. <u>Defendants' Claim that Import Bans Are Ineffective Conflicts with Their Own Determinations about the Import Provisions.</u>

In contrast to their counsel's assertions in this litigation, NMFS has also repeatedly

determined that MMPA import bans are effective at improving marine mammal protections in foreign fisheries. The Court should look to NMFS's public positions on the efficacy of import bans rather than their contradictory position taken solely for the purpose of challenging standing.

Throughout its efforts to implement the Import Provisions, NMFS has repeatedly asserted that bans are effective. For example, when proposing regulations to implement the Import Provisions, it stated the regulations "would advance the U.S. conservation objective to reduce marine mammal incidental mortality and serious injury in commercial fisheries" abroad. 80 Fed. Reg. 48172, 48187 (Aug. 11, 2015). NMFS repeatedly indicated nations would "develop" protections to comply with the Import Provisions. *Id.* at 48174, 48175, 48180, 48185, 48187. NMFS found its proposed regulations "necessary … to enhance the conservation and recovery of marine mammals."[6] And it explicitly rejected the option of relying solely on diplomatic negotiations due to the "leverage" inherent in the ability to impose import bans.[7] In a press statement, NMFS called the Import Regulations "a significant step forward in the global conservation of marine mammals."[8] NMFS also gave nations an initial exemption period from the regulations because it "expected [harvesting nations] to develop regulatory programs to comply with the requirements to obtain a comparability finding during this time period." 81 Fed. Reg. 54390, 54391 (Aug. 15, 2016). When it made its comparability finding determinations last

---

[6] NMFS, *Final Environmental Assessment, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for a Proposed Rule to Implement Provisions of Section 101(a)(2)(A) of the Marine Mammal Protection Act For Imports of Fish and Fish Products* 63 (August 2016), https://www.fisheries.noaa.gov/s3/2023-01/FINAL_EA_%20RIR_FRFA%20%20MMPA%20Import%20Rule%20Version%208_1_16%20with%20appendices%20-%20Kris%20Gamble%20-%20NOAA%20Federal%20-508.pdf.
[7] *Id.* at 58–59; *see also* 80 Fed. Reg. at 48187 (stating "bilateral and multilateral fora alone are not sufficient to achieve the MMPA goals" and noting the MMPA requires import bans).
[8] NOAA, *NOAA establishes international marine mammal bycatch criteria for U.S. imports* (Aug. 11, 2016), https://www.noaa.gov/media-release/noaa-establishes-international-marine-mammal-bycatch-criteria-for-us-imports.

year, it identified the Import Provisions as the means to raise standards to protect marine mammals by extending U.S. bycatch protections worldwide.[9] And the agency's webpage for the Import Provisions states that it "aim[s] to reduce marine mammal bycatch associated with [international] commercial fishing operations."[10] Defendants have also acknowledged in other briefing that "an import ban creates economic, political, or other pressure on a foreign sovereign to take action to reduce marine mammal bycatch" and that "such bans have successfully obtained increased protections for marine mammal species." Defs.' Opp. Mot. Intervene 4–5, *Nat'l Fisheries Inst. v. United States*, No. 25-cv-00223 (Ct. Int'l Trade Oct. 29, 2025), ECF 32; *see also* Defs.' Resp. Opp'n Pls.' Mot. Prelim. Inj. 2, *MHDD*, No. 26-cv-02462-JCG (Ct. Int'l Trade May 1, 2026), ECF 26 (acknowledging the Import Provisions "harness[] the economic power of the American seafood market to prompt exporting countries to adopt measures to address marine mammal bycatch in their fisheries").

For over a decade, Defendants have stated that implementation of the Import Provisions would result in nations developing additional marine mammal protections that would reduce bycatch risk. Now they tell this Court that the Import Provisions will do nothing of the sort. The Court should reject Defendants' attempt to flip-flop solely for purposes of getting this case dismissed on standing grounds. *See Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 439–40 (S.D.N.Y. 2019) ("Now that the shoe is on the other foot, Defendants cannot credibly dismiss as speculative the logic underlying the States' theory of injury … ."); *cf.*

[9] *NOAA Fisheries Findings Pave the Way for Import Restrictions for Foreign Fisheries*, NOAA, https://www.fisheries.noaa.gov/feature-story/noaa-fisheries-findings-pave-way-import-restrictions-foreign-fisheries (last updated April 21, 2026).
[10] *Marine Mammal Protection Act Import Provisions*, NOAA, https://www.fisheries.noaa.gov/foreign/marine-mammal-protection/marine-mammal-protection-act-import-provisions (last updated Sept. 22, 2026).

*Diamond Energy*, 606 U.S. at 118 ("[I]f invalidating the regulations would change nothing in the market, why are EPA and California enforcing and defending the regulations?"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Further, several of the bans Defendants imposed on January 1, 2026, have already produced marine mammal protections, supporting Defendants' out-of-court position that bans are effective. Grenada, New Caledonia, Ireland, Sri Lanka, Indonesia, and Vietnam promptly implemented new measures to address inadequacies that were a basis for import bans on their fisheries, and Defendants subsequently lifted the bans. *See* 91 Fed. Reg. 12510 (Apr. 16, 2026); 91 Fed. Reg. 25867 (May 12, 2026). Defendants attempt to distract from this success by stating most nations that received bans have not yet reapplied for a new comparability finding. ECF 18, at 18–19. This proves nothing in terms of the bans' effectiveness. It has been barely a year since the bans were announced. It takes time for foreign governments to amend their laws and regulatory regimes. Some political systems can make changes quickly, like the six nations above. Others require more process, as Defendants themselves acknowledge. *See* Defs.' Resp. Opp'n Pls.' Mot. Prelim. Inj. 40, *MHDD*, No. 26-cv-02462-JCG, ECF 26 (arguing New Zealand would not be able to quickly implement protections in response to an import ban because changing fisheries laws "take[s] time"). That is precisely why NMFS delayed the implementation of the Import Regulations by a whole decade: to allow nations time to make necessary changes. *See* 88 Fed. Reg. 80193 (Nov. 17, 2023); 81 Fed. Reg. at 54391. In addition, just because nations have not reapplied for a new comparability finding yet does not mean that they have taken no action. For example, NMFS denied a comparability finding for Ecuador's Fishery ID 1179 because the fishery lacked a bycatch monitoring program. ECF 18-1, at 22. Within months, Ecuador had

adopted a new regulatory agreement requiring reporting, citing NMFS's comparability finding denial.[11] While Ecuador has apparently not yet reapplied for a comparability finding, it has certainly taken action in response to the ban. Defendants cannot assume that the absence of a reapplication for a comparability finding equates to complete inaction.

Defendants have consistently determined that MMPA import bans are an effective means to protect marine mammals abroad. Nations' responses to recent bans help prove they were right. Defendants cannot outrun their own findings and success in seeking to have this case dismissed.

3. Defendants Are Wrong that the CIT Should Not Adjudicate Challenges to Embargo Decisions.

Finally, Defendants' suggestion that the "Judicial Branch should … avoid interference" in this case because MMPA embargoes are "a task for … the Executive Branch" is a nonstarter. ECF 18, at 20. The Judicial Branch's constitutional role is to ensure that the Executive Branch complies with the laws enacted by the Legislative Branch. *E.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). And the Administrative Procedure Act (APA) directs the Judiciary to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," and to "set aside" or "compel" agency action when the Executive Branch has run afoul of the law. 5 U.S.C. § 706. Congress has given the CIT express and exclusive jurisdiction to hear "any civil action commenced against the United States, its agencies, or its officers"—i.e., the Executive Branch—"that arises out of any law of the United States providing for … embargoes." 28 U.S.C. § 1581(i)(1). The Import Provisions are such a law, requiring Defendants to impose import bans in certain circumstances. 16 U.S.C. § 1371(a)(2). The CIT has a clear, well-established

[11] Republica del Ecuador, ACUERDO Nro. MAGP-SRP-2025-0010-A (Dec. 11, 2025), at Art. 5, attached as Exhibit L.

constitutional and statutory role in ensuring Defendants have followed the law here. Exercising that power is not improper interference in foreign relations, but rather the proper functioning of judicial review. Indeed, this is why the CIT has issued orders requiring bans on imports from various fisheries and suspending import bans on others. *NRDC*, 331 F. Supp. 3d at 1372; *Sea Shepherd*, 606 F. Supp. 3d at 1331; Joint Stipulation Dismissal 4, *Nat'l Fisheries Ins.*, No. 25-cv-00223 (Ct. Int'l Trade Oct. 31, 2025), ECF 41.

Accepting Defendants' argument that import ban decisions should "be largely immune from judicial inquiry," ECF 18, at 20 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)), would require the CIT to cede its own jurisdiction to hear cases relating to "embargoes or other quantitative restrictions," 28 U.S.C. § 1581(i)(1). Indeed, the implication of Defendants' argument appears to be that the CIT lacks jurisdiction to hear *any* case that involves the Executive Branch's international trade decisions because they involve foreign policy. *See* ECF 18, at 20. It is no wonder that Defendants do not cite any support for their sweeping proposition. They cite only inapt cases cautioning against judicial interference into "government to government negotiations" and other direct "foreign relations," neither of which is applicable to judicial review of a decision not to implement a statutorily required import ban. *Id.* (quoting *Harisiades*, 342 U.S. at 589; *Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001)).

Embargoes are not the exclusive domain of the Executive Branch, immune from Congressional action or judicial review. Rather, the Constitution assigns the regulation of "commerce with foreign nations" to Congress. U.S. Const. art. I, § 8, cl. 3. And it charges the Judicial Branch with ensuring the Executive Branch complies with the law when implementing foreign trade statutes. *See Humane Soc'y*, 920 F. Supp. at 191 (explaining that when a foreign trade decision "emanates, as herein, from an act of Congress, it is appropriate to invoke the

judicial duty to say what the law is"). Defendants' position that the Executive Branch has a free pass to violate the law whenever foreign trade is involved flies in the face of the Constitution's most essential principles.

### B. Plaintiffs Have also Shown that Import Bans Are Likely to Redress Their Injuries as a Matter of Fact.

The Court need look no further than Congress' and Defendants' determinations that MMPA import bans are effective to find that Plaintiffs have more than adequately established standing. Nevertheless, Plaintiffs also demonstrate redressability with factual evidence that nations and fishers will likely respond to an import ban in ways that benefit marine mammals.

To begin, Defendants are wrong that Plaintiffs must establish that this Court or Defendants have authority to "bind" or "direct" foreign nations to take particular actions. ECF 18, at 16–17. Plaintiffs only need to show that third parties will "likely react to [an import ban] (or judicial relief) in predictable ways." *Diamond Energy*, 606 U.S. at 112 (cleaned up). Similarly, Plaintiffs "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of the third parties." *CEI*, 901 F.2d at 113. Accordingly, Plaintiffs only need to show that an import ban is likely to cause some third party to take action that will benefit marine mammals in some way, however small. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("True, a single dollar often cannot provide full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement." (citation omitted)). Courts find third-party standing based on "commonsense economic realities" and "commonsense inferences." *Diamond Energy*, 606 U.S. 116. This can include a broad range of information, such as the "economic principles of supply and demand," *MHDD*, 2026 WL 2018678, at *4, "basic laws of economics," *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 382

(D.C. Cir. 2020), or "market forces," *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 585 (D.C. Cir. 2025). Plaintiffs need not present the Court with a crystal-ball vision of precisely what actions will follow from an import ban; it is enough to show governments or fishers "will likely react" to an import ban "in predictable ways." *Diamond Energy*, 606 U.S. at 112 (citation omitted); *see, e.g.*, *MHDD*, 2026 WL 2018678, at *6 (observing government may take an array of actions in response to an import ban).

Governments managing the challenged fisheries are likely to improve fisheries management to better protect marine mammals to regain U.S. market access. And fishers in these fisheries are likely to respond to decreased demand for fish by fishing less. Either of these "predictable" responses would result in fewer marine mammals killed or injured by the challenged fisheries, thereby at least partially redressing Plaintiffs' injuries.

1. <u>Governments Will Likely Respond to an Import Ban.</u>

Governments are likely to respond to an import ban. First, history shows that nations—including many of those at issue in this case—have responded to past MMPA import bans by increasing protections for marine mammals, indicating they will likely respond similarly to any new import ban. Second, all eight nations involved here have already shown they are highly invested in maintaining U.S. market access for the relevant fisheries by engaging in the yearslong and resource-intensive process of applying for comparability findings for each fishery. Third, the United States is a significant seafood market for each of these nations. Embargoes could cost them large sums of money. It is commonsense economic reality that nations would work to avoid such significant monetary losses. Finally, some of the very nations at issue in this case have responded to the threat of fisheries embargoes under other statutes by strengthening conservation policies, indicating they are likely do so in the MMPA context as well.

**First,** Plaintiffs have already given multiple examples of nations responding to import bans or the threat of such bans under the MMPA with increased protections, including nations at issue in this case (Ecuador and the United Kingdom). *See supra* III.B.2; Compl. ¶ 39 (describing an additional license requirement the United Kingdom instituted in order "[t]o continue to export fisheries products to the United States" (citation omitted)). This pattern of responsiveness is consistent with decades of history showing that import bans are highly effective at changing the conservation policy of foreign governments. Bans associated with dolphin bycatch are a prime example. In the 1980s, foreign tuna fishing vessels in the eastern tropical Pacific were catching hundreds of thousands of dolphins each year, threatening populations. Congress amended the MMPA to create tuna-specific import rules. Pub. L. No. 100-711, § 4(a), 102 Stat. 4755, 4765–66 (1988) (codified at 16 U.S.C. § 1371(a)(2)). This led to a ban on imports of tuna from Mexico, Venezuela, and Vanuatu, while nations such as Panama and Ecuador, took "sufficient steps" to avoid an import ban. 56 Fed. Reg. 21096, 21096 (May 7, 1991). Mexico and Venezuela responded with increased protections only months after the ban. Richard W. Parker, *The Use and Abuse of Trade Leverage to Protect the Global Commons: What We Can Learn from the Tuna-Dolphin Conflict*, 12 Geo. Int'l Env't L. Rev., at 41–42 (1999). And all five nations adopted the La Jolla Agreement in 1992, a program focused on reducing dolphin deaths to "insignificant levels." Kristin L. Stewart, *Dolphin-Safe Tuna: The Tide is Changing*, 4 ANIMAL LAW 111, 121–22 (1998). These policy changes helped bring the number of observed dolphin killings down from over 133,000 in 1986 to fewer than 4,000 in 1993.[12]

---

[12] Marine Mammal Commission, *Annual Report to Congress 1995*, at 100 (1996), attached as Exhibit M.

**Second**, the fact that all eight governments applied for comparability findings for each fishery to maintain access to the lucrative U.S. market strongly suggests they would respond to an import ban to regain that access. The application process is complex and time-intensive, with NMFS requiring nations to collect and submit significant amounts of information about each fishery. *See* ECF 18-1, at 7–8. Nations then need to engage in the application and follow-up processes for years on end. *See* ECF 18-1, at 28, 40, 50, 55, 64 (describing meetings, consultations, calls, progress reports, and/or email engagements with each nation, some beginning as early as 2018).[13] If a nation has little interest in exporting to the United States—say, if markets are interchangeable or if a fishery has negligible exports to the United States—it would be far easier not to apply for a comparability finding for the fishery at all. It is illogical that after multiyear effort and expense to apply for and receive a comparability finding to avoid an import ban, these same nations would do nothing in response to a ban.

**Third**, as Plaintiffs have alleged, the United States is a significant market for each fishery. Compl. ¶ 37. Although import data are not readily available for each individual fishery, NMFS's economic analysis shows U.S. seafood imports from each nation are significant, ranging from 1.63 million dollars (Vanuatu) to 2.47 billion dollars (India) in 2024.[14]

---

[13] NMFS, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report India* 9 (Aug. 2025), https://www.fisheries.noaa.gov/s3/2025-08/India-final-2025-508.pdf; NMFS, *Marine Mammal Protect Act Import Provisions Comparability Finding Application Final Report Taiwan* 14 (Aug. 2025), https://www.fisheries.noaa.gov/s3/2025-08/Taiwan-final-2025-508.pdf; NMFS, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Norway* 6 (Aug. 2025), https://www.fisheries.noaa.gov/s3/2025-08/Norway-final-2025-508.pdf.

[14] NMFS, *MMPA Import Provisions – Economic Impact Summary Tables* 2–3 (Dec. 2025), https://www.fisheries.noaa.gov/s3/2025-12/MMPA-Import-Provisions-Economic-Impact-Summary-Tables-508compliant.pdf.

| Nation | U.S. Seafood Imports 2024 |
|---|---|
| Argentina | $393,662,420 |
| India | $2,465,445,610 |
| Norway | $1,304,796,212 |
| United Kingdom | $194,047,586 |
| Ecuador | $1,543,580,761 |
| Vanuatu | $1,627,438 |
| Taiwan | $161,887,801 |
| Tunisia | $8,085,805 |

NMFS data show that the value of seafood embargoed from a single fishery in Taiwan and Ecuador equaled 71.5 and 200 million dollars respectively, showing that even embargoes on single fisheries can have dramatic economic effect.[15] Indeed, the U.S. is the largest seafood importing nation worldwide by value.[16] And while statistics are not available for every nation, for many of these nations, the United States is a crucially important seafood market. For example, the United States imports a third of all India's seafood exports by value.[17] For Argentina, the United States is the third most important market for seafood, after only China and Spain.[18] Argentina has even celebrated its positive comparability findings from NMFS, noting they give Argentina "a competitive advantage over other exporters" that were banned.[19] Likewise, the Norwegian Seafood Export Council stated that the United States is "one of the

[15] *Id*. at 5, 9.
[16] Jessica A. Gephart et al., *Opinion: To create sustainable seafood industries, the United States needs a better accounting of imports and exports*, 116 PNAS 9142 (May 7, 2019), attached as Exhibit N.
[17] MPEDA, *Marine Products Exports*, https://mpeda.gov.in/?page_id=438 (last updated Nov. 11, 2026) (Market Wise Export Data 10 Years), attached as Exhibit O.
[18] *Exportaciones 2025* 32, 68, 70, Revista Redes & Seafood, No. 245 (2026), https://issuu.com/redes-seafood/docs/redes_seafood_245_fa681a85519e2d, attached as Exhibit P.
[19] Ministerio de Economia República Argentina, *Monitor of requirements and standards for access to international markets*, Rep. No. 5 (Dec. 2025), attached as Exhibit Q.

most valuable markets for Norwegian seafood exports."[20] For Taiwan, seafood is the nation's *top* export product to the United States.[21] All this indicates the U.S seafood market is valuable, and nations will work hard to maintain access to it.

On top of direct losses, an import ban will likely cause reputational damage that may impact exports to other nations concerned with sustainable seafood. And markets are not interchangeable; it costs time and money to shift to other markets to avoid the impacts of a ban and alternative markets may have price differentials. It is "commonsense economic realit[y]" that governments would respond to the risk of such significant economic losses by taking corrective action to get an import ban lifted. *Diamond*, 606 U.S. at 116.

**Fourth**, in addition to the examples above, many of the nations at issue have taken corrective action in response to past embargoes or the threat of embargoes under different statutes. In October 2015, the European Union (EU) issued a "yellow card" warning to Taiwan for "serious shortcomings in the fisheries legal framework," inadequate sanctions to deter illegal, unregulated, or unreported (IUU) fishing, and lack of effective monitoring.[22] If a nation does not correct the issues identified, the EU can issue a red card, resulting in an embargo. Taiwan responded by amending and strengthening its Act for Distant Water Fisheries, raising fines for IUU fishing, and improving monitoring and traceability mechanisms.[23] The EU lifted the yellow

---

[20] Norwegian Seafood Council, *Norwegian seafood exports to the USA*, https://en.seafood.no/countrypages/usa/ (last visited Nov. 11, 2026), attached as Exhibit R.
[21] USDA, *Taiwan: 2025 Taiwan Agricultural Exports Summary* (April 16, 2026), https://www.fas.usda.gov/data/gain/2026/04/taiwan-2025-taiwan-agricultural-exports-summary.
[22] European Comm'n, *Fighting illegal fishing: Commission warns Taiwan and Comoros with yellow cards and welcomes reforms in Ghana and Papua New Guinea* (Sept. 30, 2015), https://ec.europa.eu/commission/presscorner/detail/en/ip_15_5736, attached as Exhibit S.
[23] *Taiwan's yellow card lifted*, FiskerForum (July 1, 2019), https://fiskerforum.com/taiwans-yellow-card-lifted/, attached as Exhibit T.

card in 2019.[24] Similarly, in 2019, the United States embargoed wild-caught shrimp from India under the Endangered Species Act, which prohibits imports of wild-caught shrimp unless the nation has adopted a sea turtle conservation program comparable to the U.S. program with respect to shrimp fishing. 84 Fed. Reg. 39047 (Aug. 8, 2019) (omitting India from list of nations authorized to import wild-caught shrimp); Pub. L. No. 101-162, § 609, 103 Stat. 988 (1989). India took substantial action in response, conducting sea turtle bycatch awareness campaigns, onboard trials to implement sea turtle excluder devices, and other campaigns "[t]o meet U.S. shrimp export regulations."[25] And in 2023, NMFS "identified" Vanuatu under the High Seas Driftnet Moratorium Protection Act (HSDFMPA) for failing to comply with international fishery reporting obligations.[26] If a nation fails to correct its actions within a certain period, the HSDFMPA allows an embargo on seafood. 16 U.S.C. § 1826a(b)(3). NMFS subsequently found that sanctions were not necessary because "Vanuatu took action to address the issues for which it was identified."[27] These examples show that embargoes and threats of embargoes can be highly effective at changing conservation policies abroad.

---

[24] *See id.*; European Comm'n, *Illegal fishing: EU lifts Taiwan's yellow card following reforms* (June 26, 2019) https://ec.europa.eu/commission/presscorner/detail/en/ip_19_3397, attached as Exhibit U.

[25] Dep't of Com., *Annual Report 2025-26*, at 186, Ministry of Com., India, https://www.commerce.gov.in/files/2026-04/Annual_0.pdf, attached as Exhibit V; *see also* Ashis Senapati, *State pushes for turtle protection to revive seafood exports to USA*, The Times of India (Nov. 6, 2024), https://timesofindia.indiatimes.com/city/bhubaneswar/indias-seafood-exports-at-risk-turtle-protection-measures-implemented/articleshow/114994661.cms, attached as Exhibit W.

[26] NOAA Fisheries, *Improving International Fisheries Management, 2026 Report to Congress* 21 (2026), https://www.fisheries.noaa.gov/s3/2026-07/report-to-congress-intl-fish-mgmt-june2026-508.pdf.

[27] NOAA Fisheries, *Improving International Fisheries Management, 2026 Report to Congress* 21 (2026), https://www.fisheries.noaa.gov/s3/2026-07/report-to-congress-intl-fish-mgmt-june2026-508.pdf.

Despite past successes of import bans, Defendants attempt to undermine the effectiveness of such bans by mischaracterizing the Mexican and New Zealand governments' reactions to past bans. Defendants argue that bans are ineffective because gillnet fishing continues to endanger the vaquita in Mexico and litigation continues over imports from New Zealand that put the Māui dolphin at risk. ECF 18, at 21. But Defendants mistake insufficient protection for no redress at all. *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (stating a plaintiff "need not show that a favorable decision will relieve his every injury"). With regard to New Zealand, the CIT has vetted and rejected any redressability claims related to Māui and Hector's dolphins. *MHDD*, 2026 WL 2018678, at *4–6 (holding an embargo on New Zealand fisheries would redress Plaintiff's injury based in part on previous actions the New Zealand government had taken to avoid a ban such as "expediting the Threat Management Plan review process" for the dolphin species at issue). And Mexico has taken significant action in response to import bans related to the vaquita. For example, Mexico issued new regulations in 2020 banning all fishing and transit through the vaquita's highest-use habitat; the conservation groups involved in the vaquita litigation heralded the development as "important, new protections" that represented "a substantial improvement from previous regulations."[28] While Mexico has struggled to enforce these new regulations, and more action is needed to protect the vaquita from extinction, that does not negate the fact that significant progress has been made because of the ban. Nor did an import ban make Mexico less willing to negotiate with NMFS. Mexico continues to engage with NMFS

---

[28] Letter from Zak Smith, Senior Attorney & Dir., Int'l Wildlife Conservation, Natural Resources Defense Council et al., to Secretary General Higuero (Apr. 1, 2021), https://www.nrdc.org/sites/default/files/letter-cites-vaquita-20210401.pdf, attached as Exhibit X.

to improve the status of the vaquita, even after import bans for an additional 21 fisheries, beyond the 6 already in place due to the vaquita litigation, were implemented on January 1, 2026.[29]

History shows nations are very likely to respond to an import ban by improving protections to at least some degree. Even if such action falls short of addressing all problems from a given fishery, it is enough to establish redressability.

2. Fishermen Are Likely to Respond to an Import Ban Due to Market Forces.

In addition, even if governments do not respond, fishermen are likely to react to a ban based on simple market forces. If U.S. demand vanishes, fishers are likely to curtail their fishing effort in the affected fisheries because there will be a smaller export market to supply. Courts, including the CIT, have held that this simple causal chain is sufficient to establish redressability.

For example, in *Growth Energy v. EPA*, environmental groups challenged an agency action requiring fuel manufacturers to buy certain volumes of biofuel because the farming of soybean and corn used to produce the biofuel has negative effects on certain endangered species. 5 F.4th 1, 7, 28 (D.C. Cir. 2021). The court found the groups' environmental injury was redressable based on a predictable economic chain: blocking the agency action "would cause the demand for corn and soy to drop and at least some farmers would respond by reducing their production of corn and soybeans," and reduced production would lessen impacts to endangered species. *Id.* at 33.

---

[29] *See* NMFS, *MMPA Import Provisions Comparability Finding Application Final Report—Mexico* 18–19 (2025), https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf (stating NMFS "held technical consultations with Mexico in 2019, December 2020, May and November 2021," "had numerous consultations with Mexico specifically regarding the vaquita and associated fisheries," and "Mexico was very responsive to NMFS['s] follow up application questions in April 2025"); Conapesca Information Note, *Mexico's actions to combat illegal, unreported, and unregulated fishing, strengthening traceability, and fulfilling international commitments* (Apr. 24, 2026), attached as Exhibit Y.

So too here. An import ban would cause demand for fish to drop, and at least some fishers are likely to respond by fishing less or by changing to a fishery that is not subject to the ban (e.g., fisheries using less harmful gear or in areas with fewer marine mammals)—either of which would make it less likely for marine mammals to be injured or killed by fishing activities. Indeed, this is precisely the theory the CIT used in *MHDD* to find standing, holding "[a]n import ban would halt the demand from the United States for seafood from the contested fisheries in New Zealand, directly impacting the economic demand from these fisheries and thus the fishing practices alleged to harm Maui and Hector's dolphins." *MHDD*, 2026 WL 2018678, at *4 (finding redressability based on plaintiff's "predictable economic model of supply and demand" including that halting importation of seafood "can impact the Government of New Zealand and fishers' decision-making"); *see also Safari Club Int'l v. Jewell*, No. CV 14-0670 (ABJ), 2015 WL 13651265, at *4 (D.D.C. Mar. 12, 2015) (finding standing for animal welfare group to defend import ban on elephant trophies, because although elephant hunting would still be allowed in foreign nation, fewer U.S. hunters would hunt with ban in place); *Animal Prot. Inst. of Am. v. Mosbacher*, 799 F. Supp. 173, 177 n.7 (D.D.C. 1992) (finding redressability in challenge to agency permit allowing import of whales because although exporting nations "might theoretically export their whales elsewhere, the diminution in demand would correlate directly to the diminution in harm to plaintiffs"). Because a U.S. embargo on seafood from a challenged fishery would affect demand for fish products that harm marine mammals, Plaintiffs' injuries will be at least partially redressed.

3. Defendants' Attempt to Raise the Burden for Demonstrating Redressability Is Unsupported by the Law.

Defendants attempt to undermine Plaintiffs' showing of redressability by arguing Plaintiffs need to provide specific facts and by reciting speculative reasons why governments or

fishers may not respond in the most predictable way market forces and simple laws of economics dictate. Defendants raised these same arguments in *MHDD*, and the CIT properly rejected them because they are contrary to law. *MHDD*, 2026 WL 2018678, at *4–6.

**First**, Article III does not require Plaintiffs to provide specific economic data showing imports from each individual fishery. *Contra* ECF 18, at 22. The law only requires that Plaintiffs "recite[] a predictable economic model of supply and demand." *MHDD*, 2026 WL 2018678, at *4. Here, Plaintiffs have shown that each nation believes these fisheries to be economically significant, as demonstrated by their efforts to secure U.S. market access, and that each of these nations export a significant value of seafood to the United States. *See supra* III.B.1. The "predictable economic model of supply and demand" allows the Court to make the commonsense economic inferences sufficient to establish redressability. *MHDD*, 2026 WL 2018678, at *4. Specific economic data from each challenged fishery are not required. *See Earth Island Inst. v. Christopher*, 913 F. Supp. 559, 570 (Ct. Int'l Trade 1995) (finding redressability to enforce an embargo on shrimp based on the total size and importance of shrimp imports into the U.S. generally, not based on imports from specific fisheries or even by nation).

The only fishery for which Defendants purport to provide evidence that imports are insignificant is Argentina's Fishery ID 48. ECF 18, at 29 (citing Ex. 77). Defendants cite the Argentinian Government's answer to a question on the application form for a comparability finding, which asked whether the fishery exports to the United States. At the time of the application, Argentina replied, "No." ECF 18-1, at 53. But Argentina nonetheless applied for a comparability finding, evidencing that it would like to be able to export from that fishery to the United States imminently. And the comparability finding gives Argentina permission to begin

exports from Fishery ID 48 at any point during the four-year duration the comparability finding is valid.[30]

**Second**, Plaintiffs do not have to establish that governments will intervene in this case or demonstrate how each nation has responded to an import ban in the *past* to establish redressability. *Contra* ECF 18, at 22. As explained above, Plaintiffs can rely on a broad range of information to demonstrate that third-party conduct is likely, including basic laws of economics and simple market forces. *See supra* p. 39 (citing cases). Requiring Plaintiffs to show how *each* nation responded to past import bans would immunize nations from any legal challenge so long as they have not received an import ban previously—an illogical result made even more so because this is the first time NMFS is implementing the Import Provisions and imposing bans on most nations. Likewise, foreign governments need not intervene in this case as a prerequisite for redressability. Nations may decline to intervene in litigation for any number of reasons, including expense, lack of experience with the U.S. judicial system, and trust that Defendants will defend their own decisions. *Cf. supra* Section III.B.1 (showing responsive efforts of Mexican government which did not intervene in the vaquita litigation). While these facts can be helpful to establish redressability, they are not required.

**Finally**, Defendants' speculative theories about why nations or fishermen may not respond to an embargo in the most predictable way are unavailing. Defendants produce a laundry list of reasons for why fishers or governments may not respond to an embargo in the way

[30] Moreover, if Fishery ID 48 is not exporting anything to the United States, then it falls outside the definition of either an exempt or export fishery, both of which require the fishery to "be the source of exports of commercial fish and fish products to the United States." 50 C.F.R. § 216.3. In that case, Fishery ID 48 is not even eligible for a comparability finding. *Id.* § 216.24(h)(6)(i)–(ii) (limiting applications for and issuance of comparability findings to exempt and export fisheries). Yet NMFS granted it one anyway.

Congress determined and basic market forces dictate, speculating governments *may* find markets outside the United States or that governments *could* subsidize markets elsewhere. ECF 18, at 18. Defendants have provided no evidence these responses are likely, nor acknowledge the real supply chain costs of shifting markets. And the Supreme Court has rejected the notion that defendants can defeat a plaintiff's standing using a "claimed lack of redressability rooted in questionable economic speculation." *Diamond Energy*, 606 U.S. at 123 ("To deny standing based on a theory that invalidating an important regulation would actually have zero impact on a dynamic and heavily regulated market requires a degree of economic and political clairvoyance that is difficult for a court to maintain."). "[T]he Supreme Court has made clear that redressability does not require plaintiffs to demonstrate certainty or eliminate all hypothetical alternatives." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 306 (D.D.C. 2025) (citing *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). The Court should reject Defendants' attempt to fabricate yet another unfounded legal requirement for standing. Plaintiffs have described a chain of events based on "commonsense economic principles" that can be predicted to ensue from an import ban and that would at least partially redress the injury to Plaintiffs' members. *Diamond Energy*, 606 U.S. at 116. That is sufficient to meet Plaintiffs' burden under the established legal standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to deny Defendants' Motion to Dismiss.

Respectfully submitted this 12th day of November, 2026.

*/s/ Danika Desai*
Danika Desai
Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
ddesai@earthjustice.org
nbarefoot@earthjustice.org

Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
ceaton@earthjustice.org

*Attorneys for Center for Biological Diversity, Natural Resources Defense Council, and Animal Welfare Institute*

Sarah Uhlemann
Center for Biological Diversity
120 State Avenue NE #268
Olympia, WA 98501
T (206) 327-2344
suhlemann@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

Stephen Zak Smith
Natural Resources Defense Council
544 E Main St., Unit B
Bozeman, MT 59715
T (406) 556-9305
zsmith@nrdc.org

*Attorney for Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

This document complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 13,747 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).

*/s/ Danika Desai*
Danika Desai